# EXHIBIT A

FILED IN MY OFFICE
DISTRICT COURT CLERK
11/7/2017 10:19:26 AM
James A. Noel
Patricia Serna

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

ROSS HUNTINGFORD,

      Plaintiff,

v.                                               Case No.  **D-202-CV-2017-08042**

PHARMACY CORPORATION OF AMERICA
D/B/A PHARMERICA

      Defendant.

## COMPLAINT

    Plaintiff Ross Huntingford for his cause of action against Pharmacy Corporation of America ("PharMerica") states:

### Jurisdiction and Venue

1. Plaintiff Ross Huntingford is a resident of the State of New Mexico.

2. Upon information and belief, Defendant PharMerica is a California corporation registered to do business in the State of New Mexico.

3. The contract that is the subject of this action was entered into in Bernalillo County, New Mexico.

4. This Court has jurisdiction over these proceedings.  Venue is proper in this Court, pursuant to NMSA 1978, Section 38-3-1 (1988).

### General Factual Allegations

5. Prior to September of 2013, Ross Huntingford was the sole shareholder of Integrated Concepts, Inc. D/B/A/ PharmaCare Health Services ("PharmaCare"), a New Mexico corporation.

6. PharmaCare was in the business of: (1) providing pharmaceutical products and related services and supplies; (2) providing clinical and consultant pharmacist services; (3) providing nutritional products; and (4) preparing and distributing of medical records with respect to its pharmaceutical products to various healthcare facilities.

7. In September of 2013, Mr. Huntingford and PharmaCare entered into a contract with Defendant to sell various assets belonging to PharmaCare, including its inventory, its personal property, and its customer accounts receivable. A true and correct copy of the contract, titled "Asset Purchase Agreement," is attached hereto as **Exhibit A**. A true and correct copy of the signed signature pages of the contract is attached hereto as **Exhibit B**.

8. As consideration for the sale, Defendant agreed to pay Mr. Huntingford an amount comprised of three parts: (1) a $1,750,000 payment at closing; (2) a variable "deferred payment" two years after closing; and (3) an inventory payment at closing. **Exhibit A, §§ 1.3 - 1.4**.

9. The deferred payment due to Mr. Huntingford two years after closing was to be calculated as a function of the profit Defendant earned on the accounts purchased from Mr. Huntingford. **Exhibit A, § 1.4**.

10. If Defendant's profit on the purchased accounts was $2,200,000 or greater, Defendant would pay Mr. Huntingford the maximum deferred payment of $1,250,000. If Defendant's profit on the purchased accounts was $1,870,000 or lesser, Defendant would pay Mr. Huntingford the minimum deferred payment of $0. If Defendant's profit on the purchased accounts was between $2,200,000 and $1,870,000, then Defendant would make a deferred payment to Mr. Huntingford that was calculated by a formula specified in the Asset Purchase Agreement. **Exhibit A, § 1.4**.

2

11. Under the Asset Purchase Agreement, if Defendant terminated an account that it assumed from Mr. Huntingford before the two-year anniversary of closing, the threshold for a deferred payment (profits of $1,870,000) would be reduced by an amount equal to the profits earned on those accounts before they were terminated. **Exhibit A, § 1.4(g)**.

12. Within ninety (90) days after the two-year anniversary of closing, Defendant was required to provide Mr. Huntingford with a "Deferred Payment Statement," setting forth the calculation of the profits that Defendant earned on the purchased accounts, and the corresponding deferred payment owed to Mr. Huntingford. **Exhibit A, § 1.4(d)**.

13. Defendant was required to provide "reasonable supporting documentation" accompanying the Deferred Payment Statement, to allow Mr. Huntingford to assess whether he received the full amount to which he was entitled. **Exhibit A, § 1.4(d)**.

14. After receiving the Deferred Payment Statement and accompanying documentation, Mr. Huntingford had twenty (20) days to object to Defendant's calculations. If Mr. Huntingford objected, the parties were to engage a certified public accounting firm to resolve their dispute and provide an independent accounting of the deferred payment calculations. **Exhibit A, § 1.4(d)**.

15. After the two-year anniversary of closing, Defendant sent Mr. Huntingford a Deferred Payment Statement and a Microsoft Excel spreadsheet in support of the statement.

16. In the spreadsheet and Deferred Payment Statement, Defendant concluded that the profits from Mr. Huntingford's former accounts did not meet the threshold to trigger a deferred payment to Mr. Huntingford.

3

17. The spreadsheet sent by Defendant omitted many of the accounts that Defendant purchased from Mr. Huntingford, without an explanation about why the accounts were omitted.

18. The spreadsheet did not show a reduction in the threshold for Mr. Huntingford to receive a deferred payment equal to the profits of these omitted accounts, as would have been required under the Asset Purchase Agreement.

19. If the threshold would have been reduced by the amount of profits from the omitted accounts, or if those profits would have been included in Defendant's calculations, Mr. Huntingford would have been entitled to a deferred payment.

20. Mr. Huntingford, through counsel, has made multiple requests to Defendant for an explanation of why many accounts were omitted from the spreadsheet and Deferred Payment Statement.

21. Defendant has refused Mr. Huntingford's requests without providing the necessary information for Mr. Huntingford assess whether he received the full amount to which he was entitled.

22. Mr. Huntingford cannot seek redress through the Asset Purchase Agreement's independent accounting process, because Defendant failed to meet its obligation to provide Mr. Huntingford with information supporting its calculations.

23. Defendant's omission of many of the accounts purchased from Mr. Huntingford prevents Mr. Huntingford from assessing whether he received the full payment to which he was entitled. As a result, Mr. Huntingford has insufficient information to formally challenge Defendant's calculations or to arrive at his own calculations.

4

## COUNT I – Breach of Contract

24. Mr. Huntingford incorporates by reference all previous factual allegations.

25. The Asset Purchase Agreement entered into between Mr. Huntingford and Defendant, under which Mr. Huntingford sold various assets in exchange for a three-part payment, constitutes a valid and enforceable contract.

26. Mr. Huntingford has fulfilled all of his promises and obligations under the contract.

27. Defendant has failed to fulfill all of its promises and obligations under the contract by, including other things, failing to provide Mr. Huntingford with a detailed statement of the profits from all of its purchased accounts and failing to pay Mr. Huntingford the deferred payment to which he is entitled.

28. Defendant's breach of the contract has directly and proximately caused Mr. Huntingford to incur damages, including costs and attorneys' fees.

## COUNT II – Specific Enforcement of Contract

29. Mr. Huntingford incorporates by reference all previous factual allegations.

30. The Asset Purchase Agreement entered into between Mr. Huntingford and Defendant, under which Mr. Huntingford sold various assets in exchange for a three-part payment, constitutes a valid and enforceable contract.

31. Mr. Huntingford has fulfilled all of his promises and obligations under the contract.

32. Mr. Huntingford is entitled to a decree of specific performance under the Asset Purchase Agreement, compelling Defendant to honor the agreement and provide Mr. Huntingford with an accounting of profits for every account transferred by Mr. Huntingford. When every account is considered, Mr. Huntingford is entitled to a deferred payment from Defendant under the terms set forth in Section 1.4 of the agreement.

5

## COUNT III – Breach of the Duty of Good Faith and Fair Dealing

33. Mr. Huntingford incorporates by reference all previous factual allegations.

34. Defendant's actions have denied Mr. Huntingford the benefit of the bargain that Mr. Huntingford reached with Defendant.

35. Every contract, including the asset purchase agreement, imposes upon the parties an obligation of good faith and fair dealing.

36. Defendant's actions constitute a breach of the duty of good faith and fair dealing that accompanies every contract.

37. As a direct and proximate result of Defendant's breach of the duty of good faith and fair dealing, Mr. Huntingford has suffered damages in an amount to be determined at trial.

38. Defendant's conduct constitutes bad faith, malicious, willful, reckless, and wanton conduct warranting an award of punitive damages.

## COUNT IV – Quantum Meruit & Unjust Enrichment

39. Mr. Huntingford incorporates by reference all previous factual allegations.

40. Mr. Huntingford transferred various assets to Defendant under the Asset Purchase Agreement.

41. Defendant requested, accepted, and benefitted from the assets received from Mr. Huntingford.

42. Defendant knew—and the Asset Purchase Agreement specified—that Mr. Huntingford expected to be paid a three-part payment for the transferred assets.

43. Defendant knowingly benefitted at Mr. Huntingford's expense in a manner such that Defendant has been unjustly enriched by Mr. Huntingford's transfer of assets under the Asset Purchase Agreement.

44. Mr. Huntingford is entitled to be paid by Defendant a deferred payment that accounts for all of the profits that Defendant reaped from the Asset Purchase Agreement. Mr. Huntingford's deferred payment should be calculated as specified, and as agreed upon, in the Asset Purchase Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Ross Huntingford requests the judgment be entered in his favor and against the Defendant, Pharmacy Corporation of America d/b/a PharMerica, providing the following relief:

(1) Ordering Defendant to specifically perform its obligations under the Asset Purchase Agreement, including providing Mr. Huntingford with an accounting of profits for every account transferred by Mr. Huntingford and paying him a properly calculated deferred payment; or, alternatively

(2) Awarding Mr. Huntingford damages for Defendant's breach of contract; or, alternatively;

(3) Awarding Mr. Huntingford damages for Defendant's breach of the duty of good faith and fair dealing; or, alternatively;

(4) Awarding Mr. Huntingford damages for quantum meruit and unjust enrichment; and

(5) Attorneys' fees, costs, and other related expenses incurred by Mr. Huntingford in pursuing this action; and

(6) Pre-judgment and post-judgment interest; and

(7) Punitive damages against Defendant; and

(8) Such other and further relief that the Court may deem just and proper.

7

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.


By:     /s/ Michelle A. Hernandez
        Michelle A. Hernandez
        Dominic A. Martinez
        Attorneys for Plaintiff
        Post Office Box 2168
        Bank of America Centre
        500 Fourth Street NW, Suite 1000
        Albuquerque, New Mexico  87103-2168
        Telephone: 505.848.1800

W3077758.DOCX

8

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**PHARMACY CORPORATION OF AMERICA, AS BUYER,**

**INTEGRATED CONCEPTS, INC. D/B/A PHARMACARE HEALTH SERVICES, AS SELLER,**

**AND**

**ROSS K. HUNTINGFORD, AS SHAREHOLDER**

**DATED AS OF SEPTEMBER 30, 2013**



TPADOCS 19895592 6

# TABLE OF CONTENTS

**Article I** PURCHASE AND SALE OF ASSETS ............................................................. 6

   1.1.   Agreement to Purchase and Sell ........................................................ 6
   1.2.   Assumption of Liabilities ................................................................. 7
   1.3.   Purchase Price ................................................................................. 7
   1.4.   Deferred Payment ........................................................................... 8
   1.5.   Inventory Payment ........................................................................ 10
   1.6.   Tax Treatment; Allocation of Purchase Price ................................. 10
   1.7.   Allocation of Certain Items ........................................................... 11

**Article II** REPRESENTATIONS AND WARRANTIES OF SELLER & SHAREHOLDER 11

   2.1.   Organization; Good Standing ......................................................... 11
   2.2.   Authorization; Binding Effect ....................................................... 11
   2.3.   Non-Contravention ....................................................................... 12
   2.4.   Financial Statements ..................................................................... 12
   2.5.   Real Property ............................................................................... 13
   2.6.   Intellectual Property ..................................................................... 13
   2.7.   Title to Purchased Assets; Sufficiency and Condition of Purchased Assets .......... 14
   2.8.   Permits; Compliance with Law ..................................................... 14
   2.9.   Litigation ...................................................................................... 15
   2.10.  Employees .................................................................................... 16
   2.11.  Employee Benefits ........................................................................ 16
   2.12.  Insurance ...................................................................................... 19
   2.13.  Taxes ........................................................................................... 19
   2.14.  Pharmaceutical Services Agreements ............................................ 19
   2.15.  Environmental Compliance ........................................................... 20
   2.16.  Healthcare Law Compliance .......................................................... 21
   2.17.  Brokers ........................................................................................ 21
   2.18.  Operations Since Balance Sheet Date ............................................. 21
   2.19.  Customers and Suppliers ............................................................... 21
   2.20.  Product Liability ........................................................................... 22
   2.21.  Customer Accounts Receivable ..................................................... 22
   2.22.  Affiliate Transactions ................................................................... 22
   2.23.  Payment Programs ........................................................................ 22
   2.24.  Disclosure .................................................................................... 23
   2.25.  Disclaimer of Other Representations and Warranties ..................... 23

**Article III** REPRESENTATIONS AND WARRANTIES OF BUYER .................. 23

   3.1.   Organization; Good Standing ......................................................... 23
   3.2.   Authorization; Binding Effect ....................................................... 23
   3.3.   Non-Contravention ....................................................................... 23
   3.4.   Litigation ...................................................................................... 24
   3.5.   Brokers ........................................................................................ 24
   3.6.   Disclaimer of Other Representations and Warranties ..................... 24

2

TPADOCS 19895592 6

**Article IV** COVENANTS ...........................................................................................24

    4.1.    Employees.......................................................................................24
    4.2.    Performance of Agreement ..........................................................25
    4.3.    Interim Operations .......................................................................25
    4.4.    Access ...........................................................................................26
    4.5.    Governmental Approvals ..............................................................26
    4.6.    Confidentiality .............................................................................26
    4.7.    Exclusivity ...................................................................................26
    4.8.    Tail Insurance ..............................................................................27
    4.9.    Pharmaceutical Services Agreements ..........................................27
    4.10.  Tax Matters..................................................................................27
    4.11.  Consents.......................................................................................27
    4.12.  Transition Services Agreement ....................................................28
    4.13.  Excluded Accounts Receivable ....................................................28

**Article V** CONDITIONS TO CLOSING.................................................................28

    5.1.    Conditions to Buyer's Obligations ..............................................28
    5.2.    Conditions to Seller's Obligations...............................................29

**Article VI** INDEMNIFICATION ...........................................................................30

    6.1.    Survival of Representations and Warranties.................................30
    6.2.    Indemnification............................................................................30
    6.3.    Notice of Claims..........................................................................31
    6.4.    Limitations of Liability................................................................32
    6.5.    Manner of Payment......................................................................32

**Article VII** TERMINATION; CLOSING .................................................................33

    7.1.    Termination...................................................................................33
    7.2.    Effect of Termination ..................................................................33
    7.3.    Closing.........................................................................................34
    7.4.    Closing Deliveries .......................................................................34

**Article VIII** MISCELLANEOUS...............................................................................35

    8.1.    Entire Agreement; Amendments ..................................................35
    8.2.    Invalidity.....................................................................................35
    8.3.    Specific Performance...................................................................35
    8.4.    Amendment; Extension; Waiver...................................................35
    8.5.    Expenses ......................................................................................36
    8.6.    Public Announcements .................................................................36
    8.7.    Notices .........................................................................................36
    8.8.    Successors and Assigns; No Third-Party Beneficiaries................37
    8.9.    Seller Disclosure Schedules.........................................................37
    8.10.  Compliance with Bulk Sales Laws ..............................................37
    8.11.  Interpretation................................................................................38
    8.12.  Governing Law ............................................................................38
    8.13.  Jurisdiction; Waiver of Jury Trial................................................38
    8.14.  Execution in Counterparts; Facsimile..........................................38

3

DEFINITIONS ................................................................................................................40
    (a)     Certain Definitions...........................................................................................40
    (b)     Terms Defined Elsewhere.................................................................................47

TPADOCS 19895592 6

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Physical Inventory Valuation Report |
| Exhibit B | - | Form of Transition Services Agreement |
| Exhibit C | - | Form of Bill of Sale |
| Exhibit D | - | Form of Assignment and Assumption Agreement |
| Exhibit E | - | Form of Consulting Agreement |
| Exhibit F | - | Form of Restrictive Covenant Agreement |

## SCHEDULES

| | | |
|---|---|---|
| Schedule 1.3(a)(i) | - | Indebtedness Payoff |
| Schedule 1.6 | - | Allocation of Purchase Price |
| Schedules 2.3(a) and (b) | - | Non-Contravention |
| Schedules 2.4(a), (b) and (c) | - | Financial Statements |
| Schedules 2.5(a) and (c) | - | Real Property |
| Schedules 2.6(b) and (d) | - | Intellectual Property |
| Schedule 2.7(a) | - | Liens |
| Schedules 2.8(a), (b), (c) and (d) | - | Permits; Compliance With Law |
| Schedule 2.9 | - | Litigation |
| Schedule 2.10(a), (b) and (c) | - | Employees |
| Schedule 2.11(g) and (h) | - | Employee Benefits |
| Schedule 2.12 | - | Insurance |
| Schedule 2.14(a) and (b) | - | Pharmaceutical Services Agreements |
| Schedule 2.16(a) and (b) | - | Healthcare Law Compliance |
| Schedule 2.17 | - | Brokers |
| Schedule 2.19 | - | Customers and Suppliers |
| Schedule 2.21 | - | Customer Accounts Receivable |
| Schedule 2.22 | - | Affiliate Transactions; Affiliated Customer Accounts |
| Schedule 2.23(a) and (b) | - | Payment Programs |
| Schedule 4.9 | - | Services Agreement Amendments |
| Schedule A-1 | - | Assumed Contracts |
| Schedule A-2 | - | Current Non-Affiliated Customer Accounts |
| Schedule A-3 | - | Additional Excluded Assets |
| Schedule A-4 | - | Marketed Customer Accounts |

TPADOCS 19895592 6

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT,** dated as of September 30, 2013, is made and entered into by and among PHARMACY CORPORATION OF AMERICA, a California corporation ("Buyer"), INTEGRATED CONCEPTS, INC., d/b/a PharmaCare Health Services, a New Mexico corporation ("Seller") and ROSS K. HUNTINGFORD, the sole shareholder of Seller ("Shareholder"). Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in Annex A.

## BACKGROUND

**WHEREAS,** Seller is engaged a number of enterprises including, the business of (i) providing pharmaceutical products (including oral, topical, injectable and infusion products) and related services and supplies, (ii) providing clinical and consultant pharmacist services, (iii) providing nutritional products (including enteral nutritional products), and (iv) the generation, preparation and distribution of medical records with respect to the foregoing products and services, in each case to nursing homes, assisted living facilities, group homes and other long-term care or institutional care facilities, and to residents of such homes or facilities (the provision of such services and products to such homes or facilities, collectively, the "Pharmacy Business");

**WHEREAS,** Seller conducts the principal operations of the Pharmacy Business at 3805-3807 Academy Parkway South, NE, Albequeuerque, NM 87109 (the "Operations Location") and at various customer facilities; and

**WHEREAS,** subject to the terms and conditions set forth herein, Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, certain assets used by Seller in the conduct of the Pharmacy Business, and Buyer will assume certain of the liabilities and obligations of Seller with respect to the Pharmacy Business, in each case as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, each Party hereby agrees as follows:

## ARTICLE I.
## PURCHASE AND SALE OF ASSETS

1.1.     Agreement to Purchase and Sell.

(a)     Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to all of the following assets, properties and rights wherever located and whether now existing or hereafter acquired, to the extent used, held for use or related to the conduct of the Pharmacy Business (such assets, properties and rights, being referred to as the "Purchased Assets"), in each case free and clear of all Liens:

(i)     all Inventory;

6

(ii)     all Included Personal Property;

(iii)    subject to <u>Section 4.11</u>, the Assumed Contracts;

(iv)    all Customer Accounts Receivable of Seller, the proceeds thereof, and any security therefor;

(v)     all causes of action, lawsuits, judgments, claims and demands relating to any of the Assumed Liabilities or the Purchased Assets, whether arising by way of counterclaim or otherwise; and

(vi)    all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Assumed Liabilities or the Purchased Assets, including third party warranties and guarantees and all related claims, credits, rights of recovery and set-off as to third parties which are held by or in favor of Seller and relate to the Assumed Liabilities or the Purchased Assets.

(b)     Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include any of the Excluded Assets.

1.2.    <u>Assumption of Liabilities</u>.

(a)     Subject to the terms and conditions hereof, effective as of the Closing, Buyer shall assume and agree to be responsible for, pay, perform and discharge when due only the following Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(i)     subject to <u>Section 4.11</u>, the Liabilities of Seller with respect to the Assumed Contracts to the extent relating to performance thereunder following the Closing Date; <u>provided, however</u>, that Buyer is not assuming any Liabilities of Seller in respect of a breach of or default under, or any non-compliance with respect to, any Assumed Contract that occurred on or before, or that relates to any period prior to, the Closing Date.

(b)     Except for the Assumed Liabilities, Buyer shall not assume any Liabilities of Seller, including the Excluded Liabilities.

1.3.    <u>Purchase Price</u>. In addition to the assumption of the Assumed Liabilities by Buyer in accordance with the terms of this Agreement, as full consideration for the Purchased Assets and the Restrictive Covenant Agreement, Buyer shall pay, subject to adjustment at and following the Closing in accordance with this <u>Section 1.3</u> and <u>Section 1.4</u>, an amount up to Three Million Dollars ($3,000,000) *plus* the value of the Inventory Payment determined pursuant to <u>Section 1.5</u>, (collectively, the "<u>Purchase Price</u>"), in accordance with the terms of this Agreement as follows:

(a)     At the Closing, Buyer shall pay an amount equal to One Million Seven Hundred Fifty Thousand Dollars ($1,750,000), (the "<u>Closing Date Payment</u>"), which such amount shall be confirmed by the Parties in a closing statement ("<u>Closing Statement</u>") executed and delivered at Closing, as follows:

7

(i) *first*, to each Person identified on Schedule 1.3(a)(i) of the Seller Disclosure Schedules, on behalf of Seller, by wire transfer of immediately available funds to an account designated in writing by each such Person prior to the Closing, an amount equal to the Indebtedness owed to such Person as set forth on Schedule 1.3(a)(i) of the Seller Disclosure Schedule (collectively, the "Indebtedness Payoff"); and

(ii) *second*, to Seller, by wire transfer of immediately available funds to an account designated in writing by Seller prior to the Closing, an amount equal to (A) the Closing Date Payment *minus* (B) the aggregate amount of the Indebtedness Payoff.

(b) within five (5) Business Days after Closing, following the Parties' determination of the amount of Inventory Payment pursuant to Section 1.5, Buyer shall pay to Seller the Inventory Payment.

(c) if applicable, within five (5) days after the determination of the final Deferred Payment Statement (as determined pursuant to Section 1.4), Buyer shall pay to Seller the sum of One Million Two Hundred Fifty Thousand Dollars ($1,250,000), or such lesser amount as is determined in accordance with Section 1.4, (such amount, the "Deferred Payment Amount").

1.4. Deferred Payment.

(a) Subject to adjustment for any amount owed to Buyer pursuant to the terms of this Agreement, Buyer shall pay to Seller, as the Deferred Payment Amount, an amount calculated as follows:

(i) If, at the two (2) year anniversary of the Closing Date, (the "Two Year Anniversary"), the Actual Gross Profit (as defined in Section 1.4(b)), is greater than or equal to Two Million Two Hundred Thousand Dollars ($2,200,000) or such lesser amount as determined pursuant to Section 1.4(g) below, (the "Target Gross Profit"), Buyer shall pay to Seller the maximum Deferred Payment Amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000); or

(ii) If, at the Two Year Anniversary, the Actual Gross Profit is less than One Million Eight Hundred Seventy Thousand Dollars ($1,870,000) or such lesser amount as determined pursuant to Section 1.4(g) below, (the "Target Gross Threshold"), then the Deferred Payment Amount shall be reduced to Zero Dollars ($0); or

(iii) If at the Two Year Anniversary, the Actual Gross Profit is less than the Target Gross Profit but greater than the Target Gross Threshold, then the Deferred Payment Amount shall be reduced by an amount equal to: (A) the Target Gross Profit less the Actual Gross Profit, multiplied by (B) the Reduction Multiplier (as defined in Section 1.4(c)), rounded to the nearest whole dollar.

By way of example, if at the Two Month Anniversary the Actual Gross Profit were Two Million Thirty-Five Thousand Dollars ($2,035,000), then the Deferred Payment Amount would be reduced an amount equal to (A) One Hundred Sixty-Five Thousand Five Hundred Dollars ($165,000), multiplied by (B) the Reduction Multiplier, rounded to the nearest whole dollar; in

8

this event, the Deferred Payment Amount would be reduced by Three Hundred Twelve Thousand Five Hundred Dollars ($312,500); and accordingly, the Deferred Payment Amount would be reduced to Nine Hundred Thirty-Seven Thousand Five Hundred Dollars ($937,500).

(b)     As used herein, "Actual Gross Profit" means, subject to Section 1.4(g) below, the Gross Profit earned by the Pharmacy Business for the period between the one (1) year anniversary of the Closing Date (the "One Year Anniversary"), and the Two Year Anniversary, from each of the Qualified Customer Accounts that Buyer actively services as of the Two Year Anniversary. Notwithstanding the foregoing, Actual Gross Profit shall not include Gross Profit from (i) any Qualified Customer Account that is an Affiliate of Seller or Shareholder, (ii) any Qualified Customer Account if either Buyer or the Customer has terminated the applicable Pharmaceutical Services Agreement or provided notice of termination with respect to such Qualified Customer Account on or prior to the Two Year Anniversary, and (iii) any account transferred after the Closing by Buyer or its Affiliates to the Pharmacy Business for servicing.

(c)     As used herein, "Reduction Multiplier" means 1.89394, which has been calculated utilizing the following formula:

$$[\$1,250,000 - \$625,000] \div [\text{Target Gross Profit} - \text{Target Gross Threshold}]$$

Note 1: $1,250,000 represents the maximum Deferred Payment Amount (based on an Actual Gross Profit equal to or in excess of Target Gross Profit).

Note 2: $625,000 represents fifty percent (50%) of the maximum Deferred Payment Amount (based on an Actual Gross Profit equal to the Target Gross Threshold).

(d)     Within ninety (90) days after the end of the Two Year Anniversary, Buyer shall calculate the Actual Gross Profit and deliver to Seller a statement (the "Deferred Payment Statement") setting forth such calculation with reasonable supporting documentation. The Deferred Payment Statement shall be deemed accepted by Seller unless Seller delivers to Buyer a notice specifying Seller's objections to the Deferred Payment Statement in reasonable detail within twenty (20) days of its receipt thereof (the "Deferred Payment Objection Notice"). If Seller delivers a timely Deferred Payment Objection Notice, Buyer and Seller shall use good faith efforts to resolve the matters in dispute, but if Buyer and Seller are unable to resolve all disputed items within such twenty (20)-day period, Buyer and Seller shall promptly engage an independent certified public accounting firm as mutually agreed by Buyer and Seller (the "Accounting Firm"), acting as an expert and not an arbiter, to resolve the items remaining in dispute (the "Disputed Items"). Buyer and Seller agree to execute such customary documents, agreements and arrangements as are reasonably requested by the Accounting Firm in connection with such engagement. Within ten (10) days following the engagement of the Accounting Firm, each of Seller and Buyer shall submit to the Accounting Firm its respective position with regard to the Disputed Items. The Accounting Firm shall be instructed to use all reasonable efforts to resolve all the Disputed Items within twenty (20) days following its receipt of the respective positions of Seller and Buyer. The determination by the Accounting Firm shall be conclusive and binding on Seller and Buyer, absent manifest error. In connection with the Accounting Firm's determinations hereunder, (i) the scope of the Accounting Firm's review shall be limited to only the Disputed Items, (ii) the Accounting Firm shall not assign a value to any Disputed Item greater than the greatest value for such Disputed Item claimed by Seller or Buyer or less

9

than the lowest value for such Disputed Item claimed by Seller or Buyer, in each case as presented to the Accounting Firm and (iii) the Accounting Firm shall conduct its determination activities in a manner wherein all materials submitted to it are held in confidence and shall not be disclosed to third parties. After the Accounting Firm has resolved the Disputed Items, Buyer and Seller shall be deemed to have accepted as final a revised Deferred Payment Statement, which shall be prepared by the Accounting Firm and which shall reflect (A) the Disputed Items, if any, resolved by agreement of Seller and Buyer and (B) the Disputed Items resolved by the Accounting Firm, setting forth the basis for its resolution of each of the Disputed Items. The Parties agree that judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party or Parties against which such determination is to be enforced.

(e)     Within five (5) days after the determination of the final Deferred Payment Statement, Buyer shall pay to Seller the Deferred Payment Amount; provided, however, in accordance with Section 6.5(d) or otherwise in the event that Seller or Shareholder does not timely make payment of any amount owed to the pursuant to this Agreement, Buyer may reduce accordingly the Deferred Payment Amount or any amount otherwise payable to the Seller pursuant to this Agreement.

(f)     Each of the Parties shall bear its own fees and expenses (including the fees and expenses of its own lawyers, accountants, appraisers and other advisers) in connection the determination of the Deferred Payment Statement. All fees and expenses of the Accounting Firm shall be allocated one-half to Buyer, on the one hand, and one-half to Seller, on the other hand.

(g)     Notwithstanding anything to the contrary contained herein, if Buyer decides to terminate an Assumed Contract prior to the Two Year Anniversary for any reason other than (i) the failure of the Customer party to such Assumed Contract to comply with the terms of such Assumed Contract or (ii) the obligation of Buyer to terminate such Assumed Contract in order to comply with applicable Law, then, upon such termination, the Gross Profit represented by such Assumed Contract shall be deducted from the Target Gross Profit, the Target Gross Threshold and the Actual Gross Profit.

1.5.     Inventory Payment.  On the evening prior to the Closing Date a mutually acceptable inventory valuation firm (the "Inventory Service") shall conduct a physical count and valuation of the Inventory to determine the aggregate value of the Inventory as of the Closing Date, utilizing Seller's acquisition cost for the Inventory reduced by any discount given to Seller for prompt pay or volume purchases (such aggregate value is collectively the "Inventory Value"). The inventory payment (the "Inventory Payment") shall equal the Inventory Value as set forth on the Physical Inventory Valuation Report, the form of which is attached hereto as Exhibit A (the "Physical Inventory Valuation Report"). The Inventory Payment shall be paid following Closing in accordance with Section 1.3(b). The Parties shall each execute the Physical Inventory Valuation Report at the conclusion of the inventory valuation.

1.6.     Tax Treatment; Allocation of Purchase Price.  Attached as Schedule 1.6 is a schedule allocating for Tax purposes, and in accordance with the principles set forth in Section 1060 of the Code, the Purchase Price and the amount of the Assumed Liabilities (to the extent required by Tax Law) among Seller and then further among the Purchased Assets and the

10

covenants set forth in the Restrictive Covenant Agreement, which schedule shall be binding among the Parties. To the extent the Purchase Price is adjusted pursuant to <u>Section 1.4</u>, Buyer and Seller shall amend such allocation to reflect such adjustments. Buyer and Seller shall file their Tax Returns (and IRS Forms 8594) on the basis of such allocation, as it may be amended pursuant to the preceding sentence, and no Party shall thereafter take a position on a Tax Return or in an audit or other proceeding inconsistent with such allocation except upon a final determination by a Taxing Authority.

      1.7.    <u>Allocation of Certain Items</u>. With respect to certain expenses incurred in the operation of the Pharmacy Business, the following allocations shall be made between Seller and Buyer at the Closing if necessary: At the Closing, the following shall, if necessary, be prorated between Seller and Buyer: (a) personal property and similar Taxes assessed against the Acquisition Assets for the tax year in which the Closing Date occur, and (b) any other expense items mutually agreed upon by the Parties, such that Seller bears the expense of, and pays, such sums payable for the period prior to the Closing Date, and Buyer bears the expense of, and pays, such sums payable for the period on and after the Closing Date. In the event any amount is due from Seller to Buyer or from Buyer to Seller as a result of any such proration, the resulting amount shall be paid promptly following the request of such Party.

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES OF SELLER & SHAREHOLDER**

      Except as set forth on the disclosure schedules delivered by Seller to Buyer in connection with this Agreement (the "<u>Seller Disclosure Schedules</u>"), Seller and Shareholder, jointly and severally, hereby represents and warrants to Buyer that the statements contained in this <u>Article II</u> are correct and complete as of the date hereof and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Article II</u>):

      2.1.    <u>Organization; Good Standing</u>. Seller is a corporation, duly formed, validly existing and in good standing under the laws of the State of New Mexico, with full power and authority to carry on its business as it is now being conducted (and proposed to be conducted), and to own, operate and lease its properties and assets and Seller is duly qualified to transact business as a foreign limited liability company or corporation, as applicable, in each jurisdiction in which its operations or the ownership of its properties and assets requires such qualification. True and correct copies of the organizational documents of Seller have been made available to Buyer prior to the date of this Agreement. Shareholder owns all of the issued and outstanding capital stock of Seller, and Shareholder has all requisite capacity to enter into this Agreement, and to carry out and perform the transactions contemplated hereby.

      2.2.    <u>Authorization; Binding Effect</u>. This Agreement, and each of the other agreements to be executed and delivered pursuant to this Agreement (the "<u>Ancillary Agreements</u>") to which Seller is a party, has been duly authorized by all requisite action on the part of Seller and Shareholder, assuming due authorization, execution and delivery by the other parties thereto, constitute the legal, valid and binding obligation of Seller and/or Shareholder, as the case may be, enforceable in accordance with their respective terms, except to the extent limited by applicable bankruptcy, insolvency, creditors' rights and similar laws now or hereafter

11

in effect, and except insofar as the availability of equitable remedies may be limited by applicable law (collectively, the "Enforceability Exceptions").

2.3.    Non-Contravention.

(a)    Except as set forth on Schedule 2.3(a) of the Seller Disclosure Schedules, none of the execution and delivery by Seller or Shareholder of this Agreement or the Ancillary Documents (when executed), the consummation of the transactions contemplated hereby or thereby, or compliance by Seller or Shareholder with any of the provisions hereof or thereof, will result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, termination or cancellation under, or result in the creation of any Lien upon any of the Purchased Assets under, any provision of (i) the organizational documents of Seller, (ii) any Assumed Contract, (iii) any Order applicable to Seller or Shareholder or by which any Purchased Assets are bound, or (iv) any applicable Law.

(b)    Except as set forth on Schedule 2.3(b) of the Seller Disclosure Schedules, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller or Shareholder in connection with the execution and delivery of this Agreement or the Ancillary Documents or the compliance by Seller or Shareholder with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, to avoid a breach or violation of, or any right of termination, cancellation or acceleration of any right or obligation under, or loss of any benefit under, any (i) Order applicable to Seller or Shareholder or by which any Purchased Assets are bound, (ii) applicable Law or (iii) Permit.

2.4.    Financial Statements.

(a)    Schedule 2.4(a)(i) of the Seller Disclosure Schedules sets forth (i) the unaudited balance sheet of Seller (the "Balance Sheet") as of July 31, 2013 (the "Balance Sheet Date") and the related unaudited statements of income for the five (5) months then ended (together with the Balance Sheet, the "Interim Financial Statements") and (ii) the unaudited balance sheets of Seller at December 31, 2012 and the related unaudited statements of income, owner's equity, and cash flows for the period then ended (together with the Interim Financial Statements, the "Financial Statements"). The Financial Statements (including the notes thereto) have been prepared from the books and records of Seller and present fairly, in all material respects, the financial condition of Seller and the results of operations, owners' equity and cash flow at the dates or for the respective periods then ended, as applicable, and have prepared by Seller in a historically consistent manner. The books and records of Seller have been maintained in accordance with good business and bookkeeping practices, consistently applied.

(b)    Except as and to the extent set forth on Schedule 2.4(b) of the Seller Disclosure Schedules, Seller has no Liabilities other than: (i) Liabilities set forth in the Financial Statements or (ii) Liabilities and obligations that have arisen after the Balance Sheet Date in the Ordinary Course of Business (none of which is a Liability resulting from breach of Contract, breach of warranty, tort, infringement or Action).

12

(c)     Except as set forth on Schedule 2.4(c) of the Seller Disclosure Schedules, Seller has no Indebtedness.

2.5.     Real Property.

(a)     Seller does not own any real property.  Schedule 2.5(a) of the Seller Disclosure Schedules contains a complete list of all leases and subleases of real property (the "Leased Real Property") pursuant to which Seller is the lessee (the "Leases").

(b)     Seller has a valid and existing leasehold interest in each parcel of Leased Real Property and the right to occupy and use the real property that is the subject of each such Lease, together with the buildings, structures, fixtures and improvements thereon (the "Improvements" and, together with the underlying real property, the "Facilities").  To Seller's Knowledge each Lease is in full force and effect. Neither Seller, nor to Seller's Knowledge, the other parties thereto, have failed to comply with their obligations thereunder.  The Facilities have received all required approvals of Governmental Authorities (including Permits and a certificate of occupancy or other similar certificate permitting lawful occupancy of the Facilities) required in connection with the operation of the Facilities.  The Improvements are in good operating condition and repair, subject to ordinary wear and tear, and scheduled maintenance and replacement in the Ordinary Course.

(c)     Except as set forth on Schedule 2.5(c) of the Seller Disclosure Schedules, neither Seller nor Shareholder has received any written notice that it is in violation of any zoning, use, occupancy, building, ordinance or other Law or requirement relating to the Facilities.

2.6.     Intellectual Property.

(a)     Seller owns or possesses all right, title and interest in and to each item of Intellectual Property (or applications related thereto) and software used in the conduct of the Pharmacy Business as currently conducted (the "Seller Intellectual Property"), free and clear of any Liens.  The rights of Seller in the Seller Intellectual Property are valid, effective and enforceable, and, together with the IP Licenses and any unregistered Intellectual Property in which Seller owns all right, title and interest, constitute all of the Intellectual Property rights necessary to the conduct of the Pharmacy Business as currently conducted.

(b)     Except as set forth on Schedule 2.6(b) of the Seller Disclosure Schedules, Seller has not (i) received written notice of any infringement by Seller of the rights of any Person with respect to such Person's Intellectual Property or (ii) infringed, misappropriated or otherwise violated any Intellectual Property rights of any Person.  To Seller's Knowledge, no Person has infringed, misappropriated or otherwise violated the Seller Intellectual Property.  Except as set forth on Schedule 2.6(b) of the Seller Disclosure Schedules, no Action by any Person contesting the validity, enforceability, use, registration or ownership of any of the Intellectual Property owned by Seller is pending or, to Seller's Knowledge, threatened.

(c)     All agreements related to Intellectual Property licensed by Seller and used in the operation of the Pharmacy Business as currently conducted (other than off-the-shelf Intellectual Property or Intellectual Property subject to shrink-wrap, click-through or similar

13

licenses), (each, an "IP License," and collectively, the "IP Licenses"), are valid and enforceable against Seller and, to Seller's Knowledge, each IP License is valid and enforceable against the other parties thereto, in each case as subject to the Enforceability Exceptions.

(d)     Except as set forth on Schedule 2.6(d) of the Seller Disclosure Schedules, Seller has either (i) good title to and otherwise own all rights, title and interest in and to, or (ii) the right to use: (A) all software and applications developed by or on behalf of Seller and used in the operation of the Pharmacy Business as currently conducted, including all enhancements, versions, releases and updates of such products (the "Seller Software"), and (B) all documentation associated with the Seller Software, free and clear of any and all Liens.  To Seller's Knowledge, there are no viruses, worms, Trojan horses, self help code or similar programs that would restrict in any respect the proper use or access to any code in Seller Software identified on Schedule 2.6(d) of the Seller Disclosure Schedules.  Seller maintains and follows a disaster recovery plan designed to minimize interruptions in access to the Seller Software and to protect against the unintended destruction of the Seller Software.

(e)     No employee of Seller is in default of any assignment of invention, non-compete or similar agreement between such employee and a third party.

(f)     To Seller's Knowledge, the operation of the Pharmacy Business as currently conducted does not result in any interference with, infringement upon or misappropriation of any Intellectual Property rights of any other Person.

2.7.     Title to Purchased Assets; Sufficiency and Condition of Purchased Assets.

(a)     Seller has good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of any Lien, other than the Liens set forth on Schedule 2.7(a) of the Seller Disclosure Schedules (which Liens shall be terminated and released in connection with the Closing).

(b)     The Purchased Assets are sufficient for the continued conduct of the Pharmacy Business after the Closing in substantially and materially the same manner as conducted prior to the Closing with respect to such Purchased Assets.

(c)     The Inventory is good, usable, merchantable and saleable in the Ordinary Course, and has been reflected on the balance sheets contained in the Financial Statements at the lower of cost or market value (taking into account the usability or saleability thereof) in accordance with GAAP.  The Inventory does not consist of any expired goods or goods which have been returned by the buyer thereof that have been not been restocked for resale in accordance with applicable Laws. All of the Included Personal Property is in good operating condition and repair, except for ordinary wear and tear, and scheduled maintenance and replacement in the Ordinary Course.

2.8.     Permits; Compliance with Law.

(a)     Except as set forth on Schedule 2.8(a) of the Seller Disclosure Schedules, Seller is presently in compliance in all respects with regard to their operations, practices, real property, structures, machinery, equipment and other property, and all other aspects of the

14

Pharmacy Business, with all applicable Laws, Healthcare Laws and Orders, including, but not limited to, all Laws or Orders relating to the safe conduct of business, quality and labeling, antitrust, consumer protection, equal opportunity, discrimination, health, sanitation, fire, zoning, building and occupational safety. Except as set forth on Schedule 2.8(a) of the Seller Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened, nor has Seller or Shareholder received written notice, regarding any violations of any Laws, Healthcare Laws or Orders enforced by any Governmental Authority claiming jurisdiction over Seller, including any requirement of the Occupational Safety and Health Administration.

(b)     Except as set forth on Schedule 2.8(b) of the Seller Disclosure Schedules, to Seller's Knowledge, Seller has been and currently is in compliance in all respects with any and all immigration laws that may be applicable to Seller and its operations, including, but not limited to, the Immigration Reform and Control Act of 1986, as amended from time to time.

(c)     Seller holds, and is in compliance with in all respects, all Permits required for the conduct of the Pharmacy Business and the ownership of its properties used therein by Seller.  Schedule 2.8(c) of the Seller Disclosure Schedules sets forth a list of all such Permits, bonds and accreditations.  Each such Permit is in full force and effect and no suspension or cancellation of such Permit is, to Seller's Knowledge, threatened.  No unresolved written notice from a Governmental Agency has been received by Seller alleging the failure to hold any of the foregoing.

(d)     Seller has not unlawfully influenced or attempted to influence any provider's opinion about a patient's clinical condition or the medical necessity of the services, drugs or equipment provided in connection with Seller's business.  Seller has filed all requisite claims and other reports required to be filed in connection with all state and federal Medicare and Medicaid programs, as applicable, due on or before the date hereof (subject to any permitted extensions), all of which are complete and correct in all respects.  Seller has not received notice of any Actions pending before any commission, board or agency, including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board, the Center for Medicare and Medicaid Services, or other Governmental Authority, with respect to any federal or state Medicare and Medicaid or other governmental reimbursement program claims filed by Seller on or before the date hereof or any disallowances by any commission, board or agency in connection with any audit or review of such claims, except as specifically described and set forth on Schedule 2.8(d) of the Seller Disclosure Schedules, and Seller has delivered to Buyer true and correct copies of any such claims, actions or appeals.  Seller has not received notice of any validation review, program integrity review or other investigation related to Seller has been conducted by any Governmental Authority, including, without limitation, the Federal Health and Human Services Office of Inspector General or the United States Department of Justice, in connection with the Medicare, Medicaid, or other governmental reimbursement program, and to Seller's Knowledge, no such reviews or investigations are scheduled, pending or, to Seller's Knowledge, threatened against or affecting Seller or its operations or the consummation of the transactions contemplated by this Agreement.

2.9.     Litigation.  Except as set forth on Schedule 2.9 of the Seller Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened against or involving Seller (at law or in equity, or before or by any Governmental Authority) or any of its

15

properties or assets (including the Purchased Assets), or any officer or employee of Seller, in his or her capacity as such, nor, to Seller's Knowledge, is there any basis for any such Action. Seller is not identified by name as a party to, or is in any way subject to any restrictions or limitations under any Order.

      2.10.     <u>Employees</u>.

      (a)    Except as set forth on <u>Schedule 2.10(a)</u> of the Seller Disclosure Schedules, (i) Seller is not a party or subject to or bound by any collective bargaining or other similar agreement, (ii) no current officers or employee of Seller is a party to any employment agreement, (iii) neither Seller, nor any Affiliate of Seller, is a party to any "change-in-control," retention or other similar Contract that requires the payment of any amount to any Person as a result of the transactions contemplated by this Agreement, (iv) no union has been certified or recognized as the collective bargaining representative of any of such employees or has attempted to engage in negotiations with Seller regarding terms and conditions of employment, (v) no unfair labor practice charge, work stoppage, picketing or other concerted protected activity relating to labor matters has occurred or is pending, (vi) to Seller's Knowledge, no executive or key employee of Seller or any group of employees of Seller has any plans to terminate employment with Seller as a result of the transactions contemplated by this Agreement; (vii) Seller has no independent contractors who have provided services to Seller for a period of six (6) consecutive months or longer; and (viii) no employee of Seller is subject to any noncompete, nondisclosure, confidentiality, employment or consulting agreements that adversely affects or is in conflict with the present business activities of Seller. There are no current or, to Seller's Knowledge, threatened attempts (and, to Seller's Knowledge, there has been no threatened attempt within the past two (2) years) to organize or establish any labor union to represent any employees of Seller.

      (b)    Except as set forth on <u>Schedule 2.10(b)</u> of the Seller Disclosure Schedules, to Seller's Knowledge, Seller is in compliance in all respects with all federal, state and local Laws or Orders governing employee relations that are applicable to Seller, including anti-discrimination laws, wage and hour laws, labor relations laws and occupational safety and health laws, and no Actions, grievances or controversies relating to any such Law or Order are pending or, to Seller's Knowledge, have been threatened. <u>Schedule 2.10(b)</u> of the Seller Disclosure Schedules sets forth the bonuses paid to the officers and employees of Seller for the fiscal years ended December 31, 2011 and 2012, or accrued on the books and records of Seller for the fiscal year ended December 31, 2013.

      (c)    <u>Schedule 2.10(c)</u> of the Seller Disclosure Schedules sets forth as of the date of this Agreement (i) a correct and complete list of each employee of Seller including the name, position, annual base and incentive compensation, and employment status (either full-time or part-time) and (ii) an estimate of total accrued paid time off as of the date of this Agreement for each employee of Seller.

      2.11.     <u>Employee Benefits</u>.

      (a)    Seller is not a plan sponsor of any Benefit Plans that are subject to ERISA.

(b)     Each Benefit Plan that Seller maintains or to which it contributes or with respect to which it otherwise has Liability (each, a "Seller Benefit Plan") (and each related trust, insurance contract or fund) complies in all material respects in form and, in administration, with the applicable requirements of ERISA, the Code and other Law.

(c)     All contributions required in connection with each Seller Benefit Plan by Law, by the terms of any Seller Benefit Plan (including all employer contributions and employee salary reduction contributions, if any) or any agreement relating thereto have been made.  There are no unfunded Liabilities or benefits under any Seller Benefit Plan that have not been properly reserved, accrued for, or otherwise reflected in, the Financial Statements.

(d)     Each Seller Benefit Plan that is an employee pension benefit plan that is intended to be qualified under Section 401(a) of the Code is, to Seller's Knowledge, so qualified, and if so qualified, has received a favorable determination letter from the IRS, or may rely on a favorable opinion letter, as to its qualification under Section 401(a) of the Code.

(e)     Seller has made available to Buyer copies of the plan documents and summary plan descriptions, the most recent determination letter received from the IRS, if any, the most recent Form 5500 Annual Report, actuarial reports and plan financial statements and all related trust agreements, insurance contracts and other funding arrangements that implement each Seller Benefit Plan.

(f)     There are no Actions (other than benefit claims made in the ordinary course) that are pending or, to Seller's Knowledge, threatened, by or on behalf of any Seller Benefit Plan, or by or on behalf of any participants or beneficiaries of any Seller Benefit Plan, alleging any violation of ERISA or other applicable law.  No Seller Benefit Plan is the subject of any pending investigation or audit by the Internal Revenue Service, the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any other regulatory agency.

(g)     Neither Seller nor any ERISA Affiliate has maintained or contributed to, or has been obligated to maintain or contribute to, or had any Liability with respect to, any multiemployer plan, multiple employer plan or defined benefit plan subject to Title IV of ERISA (as each term is defined in ERISA) in which any former, retired or current employees of Seller has or have had any right to participate.  No Benefit Plan provides any retiree or post-employment benefits to any person other than as required by COBRA.  Except as set forth on Schedule 2.11(g) of the Seller Disclosure Schedules, as of the date hereof Seller, has no Liability to any current or former employee under COBRA.

(h)     Except as set forth on Schedule 2.11(h), Seller is not a party to any oral or written (i) agreement with any officer or employee, (A) the benefits of which are contingent, or the terms of which are altered, upon the occurrence of a transaction involving Seller of the nature of any of the transactions contemplated by this Agreement (including any change-in-control, retention or other similar Contract with any Person), (B) that provides any term of employment or compensation guarantee or (C) that provides severance benefits or other benefits after the termination of employment of such director or employee; or (ii) agreement or plan binding Seller or any ERISA Affiliate, any of the benefits of which shall be increased, or the vesting of the benefit of which shall be accelerated, by the occurrence of any of the transactions contemplated

17

by this Agreement or the value of any of the benefits of which shall be calculated on the basis of any of the transactions contemplated by this Agreement. None of the Benefit Plans promises or provides retiree medical or other retiree welfare benefits to any person, except as required by applicable Law.

(i)      Nether Seller nor any plan fiduciary of any Seller Benefit Plan has engaged in any transaction in violation of Section 406(a) or (b) of ERISA or a "prohibited transaction" (as defined in Section 4975(c)(1) of the Code) that would subject Seller to any Taxes, penalties or other Liabilities resulting from such prohibited transaction.

(j)      Seller does not maintain or have any obligation under a nonqualified deferred compensation plan within the meaning of Code Section 409A that fails to meet the requirements of paragraph (2), (3), or (4) of Code Section 409A(a) or with respect to which assets are subject to Code Section 409A(b).

18

2.12.    Insurance.  Schedule 2.12 of the Seller Disclosure Schedules sets forth a list of all insurance policies currently in effect that insure the assets (including the Purchased Assets), business and operations of Seller, potential liabilities of Seller to third parties, and all general liability policies maintained by or for the benefit of Seller (each a "Policy").  All premiums due and payable in respect of each Policy have been paid in full.  Since the respective date of each Policy, no notice of cancellation or non-renewal with respect to, or notice of disallowance of any claim under, any such Policy has been received by Seller.  Seller has not received written notice of any breach of its obligations under any Policy, and each Policy is in full force and effect.  Since January 1, 2013, Seller has not been refused any insurance with respect to its assets, business and operations, nor has coverage been limited by any insurance carrier to which Seller has applied in connection with the operation of the Pharmacy Business.

2.13.    Taxes.  Seller has filed all income and other Tax Returns of Seller required to be filed, all such Tax Returns are accurate, true and complete in all respects, and Seller has paid all Taxes due or payable by Seller (whether or not shown or required to be shown on any Tax Return). All Taxes that have been required to be withheld or collected by Seller, including, but not limited to, in connection with any amounts paid or owing to any employee, independent contractor, creditor, partner or other third party, have been duly withheld or collected and, to the extent required, have been paid to the proper Taxing Authority or properly segregated or deposited as required by applicable laws. To Seller's Knowledge, there are no Liens for Taxes upon the Purchased Assets. Seller does not have in force any waiver of the statute of limitations on the right of the IRS or any other Taxing Authority to assess additional Taxes or to contest the income or loss with respect to any Tax Return of Seller. No Taxing Authority is now asserting in writing or, to Seller's Knowledge, threatening to assert against Seller any deficiency or claim for additional Taxes or any adjustment of any Tax Return of Seller. No claim has been made in writing within the last five (5) years by a Taxing Authority in a jurisdiction in which Seller does not file a Tax Return that Seller is or may be subject to taxation by that jurisdiction. Seller is not currently subject to an audit by a Taxing Authority. Seller has, since its formation, been properly treated as a s-corporation for U.S. federal income Tax purposes.

2.14.    Pharmaceutical Services Agreements.

(a)    Schedule 2.14(a) of the Seller Disclosure Schedules sets forth each Pharmaceutical Services Agreement of Seller.

(b)    Seller has provided Buyer with true, complete and accurate copies of all Pharmaceutical Services Agreements listed or required to be listed on Schedule 2.14(a) of the Seller Disclosure Schedules, including all amendments thereto, and Schedule 2.14(a) of the Seller Disclosure Schedules sets forth a description of each oral Pharmaceutical Services Agreements required to be listed on Schedule 2.14(a) of the Seller Disclosure Schedules. Each of the Pharmaceutical Services Agreements is in full force and effect, is enforceable in accordance with its terms and constitutes a valid, legal and binding obligation of Seller (subject to the Enforceability Exceptions). Neither Seller nor, to Seller's Knowledge, any other party thereto, is in breach or default of any of the Pharmaceutical Services Agreements. Except as set forth on Schedule 2.14(b) of the Seller Disclosure Schedules, neither Seller nor Shareholder has received any notice (written or oral) of or, to Seller's or Shareholder's Knowledge, any threat to terminate or modify any of the Pharmaceutical Services Agreements.  Except as set forth on

19

Schedule 2.14(b) of the Seller Disclosure Schedules, there is no event that has occurred or condition existing (including the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby) that (i) constitutes, or that with notice, the happening of an event and/or the passage of time would reasonably be expected to constitute, a breach, default or event of default of any of the Pharmaceutical Services Agreements by Seller, (ii) would cause the acceleration of any obligation under any of the Pharmaceutical Services Agreements of Seller, or (iii) would give rise to any right or termination or cancellation of any of the Pharmaceutical Services Agreements by any party other than the applicable Seller. Except as set forth on Schedule 2.14(b) of the Seller Disclosure Schedules, neither Seller nor Shareholder has received any notice (written or oral) of any breach or default by any other party to a Pharmaceutical Services Agreement, and no Seller or Shareholder has made such a claim with respect to any such breach or default.

(c)     Each Pharmaceutical Services Agreement complies, in all respects, with all Laws and Orders applicable to Seller or to the Pharmacy Business. All goods and services sold or provided to the customers that are a party to a Pharmaceutical Services Agreement are sold or provided by Seller pursuant to, and in accordance with the terms and conditions of, the relevant Pharmaceutical Services Agreement, and no such customer purchases goods or services from Seller except pursuant to the relevant Pharmaceutical Services Agreement.

(d)     To Seller's Knowledge, there are no accrued claims, defenses or offsets against payments due or to become due under any of the Pharmaceutical Services Agreements, and all customer parties to the Pharmaceutical Services Agreements are in compliance with the terms of their respective agreements as written.

2.15.     Environmental Compliance.

(a)     To Seller's Knowledge, Seller has been in the past and currently is in compliance in all respects with all Environmental Laws. To Seller's and Shareholder's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) (i) would constitute or result in a violation by Seller of, or a failure on their part to comply with, any Environmental Law or (ii) would give rise to any obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)     (i) Seller does not and has not, owned, leased or operated properties or operations that are the subject of any Action, settlement or Contract relating to Environmental Laws or Hazardous Substances, (ii) neither Seller nor Shareholder has received written notice of any investigation that has been commenced or a written request for information concerning Hazardous Substances or Seller's compliance with Environmental Laws, (iii) to Seller's and Shareholder's Knowledge, no Action is threatened against Seller alleging any violation or liability under any Environmental Law and (iv) no written notice has been received by Seller or Shareholder alleging any violation of or liability under any Environmental Law, or requiring or seeking to impose upon Seller or Shareholder, any property currently or formerly owned, leased or operated by Seller, or any operation of Seller, any investigatory or remedial action or obligation under any Environmental Law.

2.16.   Healthcare Law Compliance.

(a)   Except as set forth on Schedule 2.16(a) of the Seller Disclosure Schedules, each of Seller and Shareholder is and has been in compliance with all Healthcare Laws.

(b)   Except as set forth on Schedule 2.16(b) of the Seller Disclosure Schedules, (i) neither Seller nor Shareholder has received written notice of any investigation that has been commenced or a written request for information concerning Seller's compliance with Healthcare Laws, (ii) to Seller's and Shareholder's Knowledge, no Action is threatened against Seller alleging any violation or liability under any Healthcare Law, (iii) no notice has been received by Seller or Shareholder alleging any violation of or liability under any Healthcare Law, or requiring or seeking to impose any investigatory or remedial action or obligation under any Healthcare Law upon Seller, or any property currently or formerly owned, leased or operated by Seller during such period of ownership, lease or operation, or any operation of Seller, (iv) Seller is neither subject to any corporate integrity agreement with the Office of the Inspector General of the Department Health and Human Services nor has any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, and (v) to Seller's or Shareholder's Knowledge, neither Seller nor any of its respective employees, officers, directors, managers or Shareholder is excluded, suspended or debarred from participation or otherwise ineligible to participate in a federal health care program defined in 42 U.S.C. § 1320a-7b(f).

(c)   In the conduct of the Pharmacy Business, neither Seller nor any of its officers, employees, directors, Shareholder or representatives has (i) directly or indirectly, given, or agreed to give, any illegal gift, contribution, payment or similar benefit to any supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder Seller (or assist in connection with any actual or proposed transaction) or made, or agreed to make, any illegal contribution, or reimbursed any illegal political gift or contribution made by any other Person, or any candidate for federal, state, local or foreign public office, or (ii) established or maintained any unrecorded fund or asset or made any false entry on any book or record for any purpose.

2.17.   Brokers. Except as set forth on Schedule 2.17 of the Seller Disclosure Schedules, neither Seller nor Shareholder, nor any Person acting on Seller's or Shareholder's behalf has become obligated to pay any fee or commission to any broker, finder or intermediary for, or on account of, the transactions contemplated by this Agreement.

2.18.   Operations Since Balance Sheet Date. Since the Balance Sheet Date, Seller has operated in the Ordinary Course of Business and there has not been a Material Adverse Effect.

2.19.   Customers and Suppliers. Except as set forth on Schedule 2.19 of the Seller Disclosure Schedules, Seller maintains good relations with all suppliers and Customers and no such Customer or supplier has currently or during the past year canceled, terminated or, made any threat to Seller or Shareholder to cancel or otherwise terminate its relationship with Seller or to decrease its services or supplies to Seller or its direct or indirect purchase or usage of the products or services of Seller.

2.20.   Product Liability. To Seller's Knowledge, Seller has no Liabilities arising out of any injury to individuals or property as a result of the ownership, possession or use of any product manufactured, sold, leased or delivered by Seller.

2.21.   Customer Accounts Receivable. The Customer Accounts Receivable reflected in the Financial Statements and such additional Customer Accounts Receivable as are reflected on the books of Seller are good and collectible. Except as set forth on Schedule 2.21 of the Seller Disclosure Schedules, all such Customer Accounts Receivable will be collected in full in accordance with the terms of such Customer Accounts Receivable (and in any event within six (6) months following the Closing) at the aggregate recorded amounts thereof, except to the extent reserved against thereon (which reserves have been determined based upon actual prior experience and are consistent with prior practices). All such Customer Accounts Receivable (except to the extent so reserved against) (i) are valid, genuine and subsisting, arise out of *bona fide* sales and deliveries of goods, performance of services or other business transactions and, to Seller's Knowledge, are not subject to defenses, set-offs or counterclaims and (ii) have not been assigned or pledged to any Person. Except to the extent relating to Indebtedness of Seller, no Person has any Lien on such receivables or any part thereof, and no agreement for deduction, free goods, discount or other deferred price or quantity adjustment has been made with respect to such receivables.

2.22.   Affiliate Transactions. Schedule 2.22 of the Seller Disclosure Schedules sets forth a complete and accurate list, including the parties, of all Contracts to which Seller, on the one hand, and any Affiliate or employee of Seller or Shareholder, on the other hand, is a party, including all Affiliated Customers. Neither Seller nor Shareholder has made any payments, loaned any funds or property or made any credit arrangement with Seller, any Affiliate of Seller or any employee of Seller except for the payment of employee salaries in the Ordinary Course of Business.

2.23.   Payment Programs. Schedule 2.23(a) of the Seller Disclosure Schedules sets forth an accurate and complete list of all Payment Programs under which Seller is currently receiving any third-party payment or reimbursement for good or services offered by or with Seller to patients or health care providers. During the past six (6) years, Seller has not received written notice of any threatened or pending or concluded investigation of any civil, administrative or criminal proceeding relating to Seller or to Seller's participation in any Payment Program. Except as described on Schedule 2.23(b) of the Seller Disclosure Schedules, since July 31, 2013: (i) other than in the Ordinary Course of Business, Seller is not subject to, nor has it ever been subjected to, any pre-payment utilization review or other utilization review by any Payment Programs, except for such utilization review rights of the provider contained any Contract; (ii) other than in the Ordinary Course of Business, no governmental agency, intermediary or carrier has requested or, to Seller's Knowledge, threatened any recoupment, refund or set-off from Seller in connection with any Payment Program; (iii) other than in the Ordinary Course of Business, there is no, and there has not been any, basis for any claim or recoupment, refund or set-off from Seller as to any Payment Program; (iv) no fine, penalty or sanction in connection with a Payment Program has ever been imposed by any Governmental Authority on Seller or, to Seller's Knowledge, any employees of Seller; (v) Seller nor any of its employees has been excluded from participation in any Payment Program; (vi) Seller nor any of its employees has submitted to any Payment Program any false or fraudulent claim for payment;

TPADOCS 19895592 6

(viii) Seller nor any of its employees has at any time violated in any respect any condition for participation, or any rule, policy or standard of, any Payment Program, and (viii) all cost reports submitted to any Payment Programs for the period prior to the Closing Date have been accurately completed and timely filed, in all respects.

2.24.    Disclosure. To Seller's Knowledge, all documents delivered or to be delivered by or on behalf of Seller and Shareholder in connection with this Agreement, the Ancillary Agreements and the transactions contemplated hereby are true, complete and correct. Neither this Agreement, nor any of the other Ancillary Agreements contains any untrue statement of a material fact or omits a material fact necessary to make the statements made by Seller or Shareholder herein or therein, in light of the circumstances in which made, not misleading.

2.25.    Disclaimer of Other Representations and Warranties. Except for the representations and warranties expressly contained in this Article II, Seller and Shareholder make no other representations or warranties, express or implied, and hereby disclaim any such other representations or warranties, whether by Seller, Shareholder or any other Person, with respect to this Agreement and the transactions contemplated hereby, notwithstanding the delivery or disclosure to Buyer of any documentation or other information by Seller or Shareholder or any other Person with respect to any of the foregoing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller and Shareholder as follows:

3.1.    Organization; Good Standing. Buyer is a corporation duly formed, validly existing and in good standing under the laws of the State of California and is duly qualified to transact business as a foreign limited liability company in each jurisdiction where its operations or the ownership of its properties and assets requires such qualification.

3.2.    Authorization; Binding Effect. This Agreement and the Ancillary Agreements to which Buyer is a party have been duly authorized by all requisite action on the part of Buyer and, assuming due authorization, execution and delivery by the other parties thereto, constitute the legal, valid and binding obligation of Buyer enforceable in accordance with their respective terms, except to the extent limited by the Enforceability Exceptions.

3.3.    Non-Contravention. The execution, delivery and performance of this Agreement and the Ancillary Agreements, when executed, and the consummation of the transactions contemplated hereby and thereby by Buyer does not and will not: (a) result in a breach of any provision of the charter, bylaws or other organizational documents of Buyer; (b) violate any applicable Law or any Order to which Buyer is a party; (c) result in a breach of or default under, or give a third party the right to accelerate, terminate or suspend any obligations under, any material Contract to which Buyer is a party, except to the extent as would not adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated hereby; or (d) require any Governmental Approval or any Third Party Approval.

23

     3.4.    <u>Litigation</u>. There are no Actions pending or, to Buyer's Knowledge, threatened against or involving Buyer, at law or in equity, or before or by any Governmental Authority, that would adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated hereby.

     3.5.    <u>Brokers</u>. Neither Buyer nor any Person acting on Buyer's behalf has become obligated to pay any fee or commission to any broker, finder or intermediary for, or on account of, the transactions contemplated by this Agreement.

     3.6.    <u>Disclaimer of Other Representations and Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u>, Buyer makes no other representations or warranties, express or implied, and hereby disclaims any such other representations or warranties, whether by Buyer or any other Person, with respect to this Agreement and the transactions contemplated hereby, notwithstanding the delivery or disclosure to Seller of any documentation or other information by Buyer or any other Person with respect to any of the foregoing.

## ARTICLE IV
## COVENANTS

     4.1.    <u>Employees</u>.

     (a)    At the Closing, the Transition Services Agreement shall provide for, among other things, the provision of transition services by Seller's employees in connection with Buyer's operation of the Pharmacy Business after the Closing. Seller shall continue to employ the employees after the Closing in accordance with the Transition Services Agreement and, except as provided for in the Transition Services Agreement, Seller shall remain responsible for, and pay, all costs, expenses or Liabilities associated with any Benefit Plans, severance obligations, accrued payroll related Liabilities, vacation or paid time off Liabilities, accrued bonuses, pension or other retirement plan obligations, COBRA rights or requirements, WARN Act Liability and any other Liabilities associated with Seller's employment of its employees and any termination of its employees.

     (b)    Following the Closing and pursuant to the Transition Services Agreement, Buyer, at its discretion, may offer employment to any of the Seller's employees on such terms and conditions as may be agreed to by Buyer and such employee, (each such employee a "<u>Continuing Employee</u>"); <u>provided</u>, <u>however</u>, Buyer shall give each Continuing Employee (i) credit for service with Seller for the purpose of eligibility and vesting (but not benefit accrual) under each employee benefit plan of Buyer (or Affiliate of Buyer) that is made available to such Continuing Employee, (ii) with respect to vacation days, sick days and paid time off with Buyer (or Affiliate of Buyer), credit for service with Seller for the purposes of eligibility and level of benefits (*i.e.*, days per year) and (iii) credit under Buyer's paid time off program for the paid time off each Continuing Employee has accrued with Seller through the Closing Date up to a maximum of 80 hours for each Continuing Employee. Buyer shall, or shall cause its Affiliates to, or use commercially reasonable efforts to make appropriate arrangements with its insurance carrier(s) to, (A) waive any limitations on benefits under its group health plans relating to any pre-existing conditions or waiting periods of the Continuing Employees and their eligible

dependents to the extent such limitation would have been satisfied under Buyer's group health plans had such Continuing Employee's service with Seller and participation in the group health plan of Seller prior to the Closing constituted service with Buyer and participation in benefits plans of Buyer (or Affiliate of Buyer) and (B) recognize, for purposes of annual deductibles and out-of-pocket limits under the group health plans applicable to the Continuing Employees, deductible and out-of-pocket expenses paid by the Continuing Employees and their respective dependents under the group health plans of Seller in the calendar year in which the Closing occurs. For purposes of this <u>Section 4.1</u>, Seller will, and will cause its Affiliates to, cooperate in providing relevant data to Buyer and Buyer and Seller will, and will cause its Affiliates to, cause their group health plan vendors to execute and deliver any documentation required by the HIPAA in order to facilitate such transfer.

4.2.    <u>Performance of Agreement</u>.    Subject to the terms of this Agreement, during the Interim Period each Party shall use commercially reasonable efforts to take all actions and do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement as soon as practicable following the date hereof.

4.3.    <u>Interim Operations</u>.    During the Interim Period, Seller will continue to conduct the Pharmacy Business in the Ordinary Course of Business. In addition, during the Interim Period, Seller will: (i) use best efforts to retain Seller's employees and sales and other agents and preserve the existing business relationships with Seller's employees, customers and suppliers, and continue to compensate Seller's employees and sales and other agents in accordance with past custom and practice; and (ii) maintain Seller's books, accounts and records in accordance with past custom and practice. Notwithstanding the foregoing, except as contemplated or permitted by this Agreement or with the prior written approval of Buyer, during the Interim Period Seller will not do any of the following: (a) create, incur, assume, guarantee or agree to create, incur, assume or guarantee, any Indebtedness, except in the Ordinary Course of Business; (b) institute any increase in, amend, enter into, terminate or adopt any Seller Benefit Plan, other than as required by any such existing plan or by Law; (c) make any changes in the compensation of the officers or employees of Seller other than changes required by existing employment agreements or by Law; (d) make any material change in the accounting principles, methods, practices or policies applied in the preparation of the Financial Statements, unless such change is required to conform with Seller's historical practices; (e) sell, lease, transfer, license, pledge or otherwise dispose of tangible or intangible assets having a fair market value in excess of Five Thousand Dollars ($5,000), individually, and/or Ten Thousand Dollars ($10,000) in the aggregate; or create or suffer to exist any Lien on any of its assets or properties; (f) enter into any employment, severance or similar Contract or agreement with any partner, officer, consultant or employee of Seller or Shareholder involving any payments for an amount in excess of Five Thousand Dollars ($5,000), individually, or Ten Thousand Dollars ($10,000), in the aggregate; (g) enter into any other transaction or Contract or agreement with any Affiliate of Seller or Shareholder, except in the Ordinary Course of Business, or enter into any collective bargaining agreement; (h) make any loan, advance or capital contribution to or cash investment in any Person, other than advances to employees in the Ordinary Course of Business for travel and similar business expenses; (i) write-down or write-up the value of any asset by more than Five Thousand Dollars ($5,000), individually, or Ten Thousand Dollars ($10,000) in the aggregate, except as required by or in accordance with Seller's historical accounting practices as consistently applied; (j) accelerate the collection of any accounts receivable, or write-off any

25

accounts receivable or notes receivable for a principal amount in excess of Five Thousand Dollars ($5,000), individually, or Ten Thousand Dollars ($10,000) in the aggregate; (k) delay or postpone the payment of accounts payable and other Liabilities or accelerate the collection of accounts receivable; (l) commence or settle any Action asserting Losses in excess of Five Thousand Dollars ($5,000), individually, or Ten Thousand Dollars ($10,000), in the aggregate against any other Person; (m) except in the Ordinary Course of Business, amend, modify, extend, renew, terminate or enter into any Pharmaceutical Services Agreement; or (n) enter into any Contract or agreement to do any of the actions described in clauses (a) through (m) above.

4.4.     Access. During the Interim Period, subject to the Parties' compliance with all applicable privacy laws, including HIPAA, Seller and Shareholder will permit representatives of Buyer (including legal counsel and accountants) to have full access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Seller, to all premises, properties, personnel, books, records (including tax records), Contracts, and documents of or pertaining to Seller or the Pharmacy Business.  Buyer will treat any confidential information it receives from Seller and Shareholder in the course of the reviews contemplated by this Section 4.4, in accordance with the terms of the Confidentiality Agreement.  In addition, Buyer will not contact any vendor, customer or employee of Seller regarding Seller without the prior written consent of Seller.

4.5.     Governmental Approvals. During the Interim Period, subject to the terms and conditions of this Agreement, the Parties shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under Law to consummate the transactions contemplated by this Agreement, including promptly make any filings or submissions required under any applicable Law to obtain any necessary Governmental Approvals.

4.6.     Confidentiality. Any information provided to or obtained by the Parties in connection with the transactions contemplated by this Agreement will be subject to the Confidentiality Agreement, and shall be held by the Parties in accordance with, and be subject to the terms of, the Confidentiality Agreement. The Parties agree to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference.

4.7.     Exclusivity. Immediately upon the execution of this Agreement and until the Closing Date or termination of this Agreement only as herein provided, Seller and Shareholder shall cease any and all efforts to, and shall not, directly or indirectly, through any member, manager, officer, employee, representative, parent, Affiliate, broker, adviser, owner, or agent of Seller or Shareholder or otherwise, (a) seek, solicit, initiate or encourage the submission of inquiries, proposals or offers from any Person or group of Persons relating to any acquisition or purchase of the equity or assets of, or any other interest or profit-sharing interest in, Seller, or any tender or exchange offer, merger, reverse merger, consolidation, business combination, recapitalization, spin-off, liquidation, dissolution or similar transaction involving, directly or indirectly, Seller or the Pharmacy Business (each, an "Acquisition Proposal"); (b) participate in any negotiations regarding any Acquisition Proposal or furnish to any Person or entity information concerning Seller for any Acquisition Proposal, or (c) otherwise solicit or encourage any effort or attempt by any Person to make or enter into an Acquisition Proposal. Seller and

TPADOCS 19895592 6

Shareholder shall cause all of their other agents, partners, shareholders, officers, managers, members, representatives, parents, and Affiliates to abide by the terms of this provision. Seller and Shareholder shall notify Buyer in writing of any breach of this provision within one (1) Business Day after any officer of Seller and/or Shareholder becomes aware of such breach. Such written notification shall describe in reasonable detail any such occurrence and identify the Person(s) involved.

4.8.     Tail Insurance. If available on commercially reasonable terms acceptable to Seller, Seller will purchase and maintain professional and general liability insurance through "tail" or extended endorsement coverage for Seller and its employees and officers for a period of at least two (2) years after the Closing with coverage and deductibles that are consistent with those in effect under Seller's professional and general liability insurance as of the Closing Date.

4.9.     Pharmaceutical Services Agreements. Seller and Shareholder shall use best efforts to cause each Person that is party to a Pharmaceutical Services Agreement identified on Schedule 4.9 of the Seller Disclosure Schedules to enter into an amendment to such Pharmaceutical Services Agreement on terms reasonably acceptable to Buyer (each, a "Services Agreement Amendment").

4.10.    Tax Matters.

(a)     Transfer Taxes.  Buyer shall be liable for, and shall indemnify and hold Seller harmless against, any sales, use, transfer, value added, stock transfer, stamp or similar Taxes (including real property transfer and gains taxes, but excluding any Taxes on any income of Seller or Shareholder) and any transfer, recording, registration or other similar fees imposed or payable in connection with the purchase and sale of the Purchased Assets, and shall file such applications and documents as shall permit any such Tax to be assessed and paid in accordance with this Agreement. Seller shall execute and deliver all instruments and certificates necessary to enable Buyer to comply with the foregoing.

(b)     Employee Wages Tax Reporting.  The Parties agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Section 4 of Revenue Procedure 2004-53, 1994-2 C.B. 320 for wage reporting with respect to the Continuing Employees.

(c)     Assistance and Records.  The Parties shall provide each other with such assistance as each may reasonably request in connection with (i) the preparation of Tax Returns required to be filed with respect to Seller, (ii) any audit or other examination by any Taxing Authority, (iii) any judicial or administrative proceedings relating to liability for Taxes or (iv) any claim for refund in respect of such Taxes.  Such assistance shall include making employees available to the other Parties and their counsel, providing additional information and explanation of any material to be provided and furnishing to, or permitting the copying by, any Party or its counsel of any records, returns, schedules, documents, work papers or other relevant materials that might reasonably be expected to be used in connection with any such return, audit, examination, proceeding or claim.

4.11.    Consents. Subject to the terms and conditions of this Agreement, nothing

27

in this Agreement or any of the Ancillary Agreements shall require Seller to assign to Buyer any Assumed Contract for which a necessary consent or payment is required and not obtained by Seller prior to the Closing (a "Non-Assignable Contract"). The Parties shall, during the remaining term of each Non-Assignable Contract, use commercially reasonable efforts to (a) obtain the consent of the third parties required thereunder, (b) make the benefit of such Non-Assignable Contract available to Buyer so long as Buyer fully cooperates with Seller and promptly reimburses Seller for any payments made or expenses incurred by Seller in connection therewith and (c) enforce, at the request of Buyer and at the sole expense and for the account of Buyer, any right of Seller arising from such Non-Assignable Contract against the other party or parties thereto (including the right to elect or terminate any such Non-Assignable Contract in accordance with the terms thereof). With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to Buyer is obtained following the Closing, Seller shall transfer such Non-Assignable Contract to Buyer by execution and delivery of an instrument of conveyance reasonably satisfactory to Buyer within five (5) Business Days following receipt of such approval or consent. Nothing in this Section 4.11 shall require Buyer to pay any amount to Seller or any other Person in order to obtain any consent required under any Non-Assignable Contract not obtained by Seller prior to the Closing.

4.12.    Transition Services Agreement. At the Closing, Buyer and Seller shall enter into a Transition Services Agreement in the form attached hereto as Exhibit B (the "Transition Services Agreement"), which shall provide for the provision of certain transition services by Seller in connection with Buyer's operation of the Pharmacy Business after the Closing.

4.13.    Excluded Accounts Receivable. If, at any time after the Closing Date, Buyer shall collect or receive any monies, in any manner whatsoever, in payment of any of Seller's Excluded Accounts Receivable, Buyer shall forward such amount(s) to Seller.

## ARTICLE V
## CONDITIONS TO CLOSING

5.1.    Conditions to Buyer's Obligations. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the completion, satisfaction or, at Buyer's option, waiver of the following conditions on or prior to the Closing Date:

(a)    The representations and warranties in Article II shall be true and correct in all respects at and as of the Closing Date, except (i) to the extent that such representations and warranties are qualified by the term "material," "materially" or contain terms such as "Material Adverse Effect," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date; and (ii) to the extent such representations and warranties specifically related to an earlier date, in which case such representations and warranties shall only be true and correct as of such earlier date;

28

(b)     Each of the covenants and obligations of Seller and Shareholder to be performed at or before the Closing Date shall have been performed in all respects, in each case at or before the Closing Date;

(c)     There shall not be any injunction, judgment, Order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)     Since the date of this Agreement, there has been no Material Adverse Effect on the Pharmacy Business;

(e)     All necessary Third Party Approvals and Governmental Approvals, including those necessary for the assignment of any Assumed Contract shall have been obtained in written instruments reasonably satisfactory to Buyer and delivered to Buyer;

(f)     Lien releases from all secured parties that hold Liens that encumber any of the Purchased Assets shall have been obtained in written instruments reasonably satisfactory to Buyer and delivered to Buyer;

(g)     Buyer's shall have satisfactorily completed its due diligence investigation of Seller and the Pharmacy Business including Buyer's verification of all financial, legal and regulatory information of the Pharmacy Business delivered to Buyer;

(h)     Seller and Shareholder, as the case may be, shall have delivered, or caused to be delivered, to Buyer each of the items required by Section 7.4(a).

5.2.     Conditions to Seller's Obligations. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions at or prior to the Closing:

(a)     The representations and warranties in Article III shall be true and correct in all respects at and as of the Closing Date, except (i) to the extent that such representations and warranties are qualified by the term "material," materially" or contain terms such as "Material Adverse Effect," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date; and (ii) to the extent such representations and warranties specifically related to an earlier date, in which case such representations and warranties shall only be true and correct as of such earlier date;

(b)     Each of the covenants and obligations of Buyer to be performed at or before the Closing Date shall have been performed in all respects, in each case at or before the Closing Date;

(c)     There shall not be any injunction, judgment, Order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement; and

29

(d)     Buyer shall have delivered to Seller those items required to be so delivered pursuant to Section 7.4(b).

## ARTICLE VI
## INDEMNIFICATION

6.1.     Survival of Representations and Warranties.

(a)     The representations and warranties in this Agreement shall survive the Closing as follows:

(i)     The representations and warranties in Sections 2.1, 2.2, 2.7(a), 2.17, 3.1, 3.2 and 3.5 shall survive the Closing indefinitely;

(ii)     The representations and warranties in Sections 2.11, 2.13 and 2.15 shall terminate the date that is three (3) years and thirty (30) days after the Closing Date;

(iii)     The representations and warranties in Sections 2.14(c) and 2.16(a) shall terminate the date that is five (5) years and sixty (60) days after the Closing Date;

(iv)     All other representations and warranties in this Agreement, and all covenants and agreements required to be performed in full prior to the Closing (the "Pre-Closing Covenants"), shall terminate on the date that is two (2) years after the Closing Date (the "Survival Date");

(v)     All covenants and agreements, other than the Pre-Closing Covenants, shall expire when so stated in accordance with their express terms.

(b)     Notwithstanding the above, all claims on or prior to the survival dates set forth above and the indemnity with respect thereto, shall survive the time at which such claim would otherwise terminate pursuant to this Section 6.1 if notice of the inaccuracy or breach giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time.

6.2.     Indemnification.

(a)     Indemnification by Seller and Shareholder.  Subject to the terms and conditions of this Article VI, from and after the Closing Date, Seller and Shareholder, jointly and severally, hereby agree to indemnify, defend and hold harmless Buyer and its Affiliates and each of their respective officers, directors, employees, stockholders, members, partners and agents ("Buyer Indemnified Parties") from and against all Losses asserted against, resulting to, imposed upon or incurred by any of Buyer Indemnified Parties, directly or indirectly, by reason of, arising out of or resulting from:

(i)     any breach of any representation or warranty of Seller contained in or made pursuant to this Agreement;

30

(ii)     any non-fulfillment or breach of any Pre-Closing Covenant of Seller or any covenant or agreement of Seller contained in this Agreement; or

(iii)    any Excluded Liability and any Liability arising from the conduct of the Pharmacy Business by Seller or Shareholder prior to the Closing.

(b)     Indemnification by Buyer.  Subject to the terms and conditions of this Article VI, from and after the Closing Date, Buyer hereby agrees to indemnify, defend and hold harmless Seller and their its Affiliates and each of their respective officers, directors, employees, stockholders, members, partners and agents ("Seller Indemnified Parties") from and against all Losses asserted against, resulting to, imposed upon or incurred by Seller Indemnified Parties, directly or indirectly, by reason of, arising out of or resulting from:

(i)     any breach of any representation or warranty of Buyer contained in or made pursuant to this Agreement;

(ii)     any non-fulfillment or breach of any covenant or agreement of Buyer contained in this Agreement; or

(iii)    any Assumed Liability and any Liability arising from the conduct of the Pharmacy Business by Buyer following the Closing.

6.3.     Notice of Claims.

(a)      Any of Buyer Indemnified Parties or Seller Indemnified Parties seeking indemnification hereunder (in each case, the "Indemnified Party") shall, within the period provided for in Section 6.1, give to the Party obligated to provide indemnification (the "Indemnitor") a written notice (a "Claim Notice") describing in reasonable detail the facts giving rise, or that would reasonably be expected to give rise, to the claim for indemnification hereunder that is the subject of the Claim Notice.  The Claim Notice shall include (if and to the extent then known) the amount and the method of computation of the amount of such claim, a reference to the provision of this Agreement or any agreement, certificate or instrument executed pursuant hereto or in connection herewith upon which such claim is based and all material documentation relevant to the claim (to the extent not previously provided under this Section 6.3(a).  A Claim Notice shall be given promptly following the Indemnified Party's determination that facts or events are reasonably expected to give rise to a claim for indemnification hereunder; provided that the failure to give such written notice shall not relieve any Indemnitor of its obligations hereunder, except to the extent it shall have been prejudiced by such failure.

(b)     An Indemnitor (acting through Buyer, in the case of indemnification sought by Seller Indemnified Parties, and acting through Seller, in the case of indemnification sought by any of Buyer Indemnified Parties) shall have twenty (20) days after the giving of any proper Claim Notice pursuant hereto to (i) agree to the amount or method of determination set forth in the Claim Notice and to pay or cause to be paid such amount to such Indemnified Party in immediately available funds or (ii) provide such Indemnified Party with written notice that it disagrees with the amount or method of determination set forth in the Claim Notice (the "Dispute Notice").  For a period of twenty (20) days after the giving of any Dispute Notice, a representative of the Indemnitor and the Indemnified Party shall negotiate in good faith to

31

resolve the matter. In the event that the controversy is not resolved within twenty (20) days after the date the Dispute Notice is given, the Parties may thereupon proceed to pursue any and all available remedies at law. If the Indemnitor agrees to the Claim Notice pursuant to clause (i) above or fails to provide a timely Dispute Notice pursuant to clause (ii) above, then the Indemnitor shall make payment to the Indemnified Party in accordance with the provisions of Section 6.5 below.

    6.4.  <u>Limitations of Liability</u>. Notwithstanding anything in this Agreement to the contrary:

    (a)  Buyer Indemnified Parties shall not be entitled to indemnification pursuant to Section 6.2(a) until the sum of the aggregate amount of all claims under Section 6.2(a) exceeds Fifty Thousand Dollars ($50,000) (the "<u>Basket Amount</u>"), after which Buyer Indemnified Parties shall be entitled to full indemnification, including the Basket Amount.

    (b)  Seller Indemnified Parties shall not be entitled to indemnification pursuant to Section 6.2(b) until the aggregate amount of all claims under Section 6.2(a)(ii) exceeds the Basket Amount, after which Seller Indemnified Parties shall be entitled to full indemnification, including the Basket Amount.

    (c)  In no event shall the aggregate liability of Seller under Section 6.2(a)(i) or (ii) or Buyer under Sections 6.2(b)(i) or (ii) exceed the amount of the Purchase Price actually paid by Buyer to Seller hereunder.

    (d)  Notwithstanding any other provision of this Agreement to the contrary, the indemnification obligations of Seller or Shareholder for any Losses resulting from any of the following shall not be subject to the limitations set forth in Sections 6.4(a)-(c) above: (i) fraud on the part of Seller or Shareholder, (ii) the breach of any Fundamental Representation or the representations and warranties in Sections 2.11 or 2.14(d), or (iii) any non-fulfillment or breach of any Pre-Closing Covenant of Seller or any covenant or agreement contained in this Agreement.

    6.5.  <u>Manner of Payment</u>.

    (a)  Seller and Shareholder shall be jointly and severally liable for the amount of any indemnification pursuant to Section 6.2(a) which shall be made as a payment by Seller and Shareholder to the relevant Buyer Indemnified Party.

    (b)  Any indemnification pursuant to Section 6.2(b) shall be made as a payment by Buyer to the relevant Seller Indemnified Party.

    (c)  Any payment for indemnification pursuant to this Article VI shall be effected by wire transfer of immediately available funds to an account designated by Buyer Indemnified Parties or Seller Indemnified Party, as applicable, within ten (10) days after the final determination thereof in accordance with the terms of this Agreement.

    (d)  Buyer's indemnification remedy pursuant to this Article VI shall be cumulative and in addition to any and all other remedies available to Buyer under law, equity or

otherwise. Buyer may set off any claim for indemnification against any amount that Buyer owes to Seller from time to time, including without limitation the Deferred Payment Amount.

## ARTICLE VII
## TERMINATION; CLOSING

  7.1. <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing only as follows:

    (a) by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

    (b) by Buyer if there has been a material misrepresentation or breach by Seller or Shareholder of a representation or warranty contained in this Agreement (including, but not limited to, any misrepresentation, breach or failure to comply that is evidenced in any the Seller Disclosure Schedule delivered hereunder) or a material breach, failure to comply with or non-fulfillment of a covenant by Seller or Shareholder of covenants set forth in this Agreement and such event has not been cured within ten (10) days after written notification thereof by Buyer to Seller;

    (c) by Seller if there has been a material breach by Buyer of a representation or warranty contained in this Agreement or material breach, failure to comply with or non-fulfillment of a covenant of Buyer set forth in this Agreement and such event has not been cured within ten (10) days after written notification thereof by Seller to Buyer; or

    (d) by Buyer or Seller if the transactions contemplated hereby have not been consummated by 12:01 a.m. December 31, 2013 (the "<u>Outside Date</u>").

    <u>provided</u>, <u>however</u>, that the Party electing termination pursuant to clause (b), (c) or (d) of this <u>Section 7.1</u> is not in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement. In the event of termination by Buyer or Seller pursuant to this <u>Section 7.1</u>, written notice thereof (describing in reasonable detail the basis therefor) shall forthwith be delivered to the other Parties.

  7.2. <u>Effect of Termination</u>. In the event of termination of this Agreement by Buyer or Seller as provided above, this Agreement shall forthwith terminate and have no further force and effect, except (i) that the covenants and agreements set forth in this <u>Section 7.2</u>, and <u>Section 4.7</u> (Confidentiality), and <u>Article VIII</u> (Miscellaneous) shall survive such termination indefinitely, and (ii) nothing in this <u>Section 7.2</u> shall be deemed to release any Party from any liability for any willful breach by such Party of the terms and provisions of this Agreement or to impair the right of any Party to all avail itself of all rights, power and remedies now or hereafter existing at law or in equity or by statute including the right to compel specific performance of this Agreement.

7.3.   Closing.

(a)   The closing of the transactions contemplated by this Agreement (the "Closing") shall take place (a) at the offices of Shutts & Bowen LLP located at 4301 West Boy Scout Road, Suite 300, Tampa, Florida 33607, (b) electronically or (c) at such other place and in such manner as is mutually agreeable to the Parties, on the second Business Day following the day on which the last of the conditions set forth in Article VI shall be satisfied or waived in accordance with this Agreement (other than conditions that by their terms may only be satisfied at the Closing (the "Closing Date").

(b)   All documents and other instruments required to be delivered at the Closing shall be regarded as having been delivered simultaneously, and no document or other instrument shall be regarded as having been delivered until all have been delivered. The Closing shall be deemed to be effective as of 11:59 p.m. New Mexico time on the Closing Date.

7.4.   Closing Deliveries.

(a)   At the Closing, Seller shall deliver, or cause to be delivered, to Buyer the following items, each in the form attached to this Agreement as an Exhibit or in form and substance reasonably acceptable to Buyer, as applicable: (i) a good standing certificate of Seller, dated no earlier than fifteen (15) days prior to the Closing Date, from its jurisdiction of formation, and from each other jurisdiction that Seller is qualified or registered to do business as a foreign company, (ii) a certificate from Seller to the effect that each of the conditions set forth in Sections 5.1(a) and (b) have been satisfied in all respects; (ii) a certificate of an officer of Seller certifying to Buyer the resolutions of the members, shareholders, board of managers or board of directors, as applicable, of Seller approving this Agreement and the transactions contemplated hereby; (iii) a bill of sale substantially in the form of Exhibit C, duly executed by Seller; (iv) an assignment and assumption agreement substantially in the form of Exhibit D (the "Assignment and Assumption Agreement"), duly executed by Seller; (v) a statement pursuant to Treasury Regulation §1.1445-2(b)(1) from Seller in form reasonably acceptable to Buyer certifying that Seller is not foreign person; (vi) a Consulting Agreement between Buyer (or an Affiliate of Buyer) and Shareholder substantially in the form of Exhibit E, duly executed by Shareholder (collectively, the "Consulting Agreement"); (vii) a Restrictive Covenant Agreement between Buyer (or an Affiliate of Buyer) and Shareholder substantially in the form of Exhibit F, duly executed by Shareholder (the "Restrictive Covenant Agreement"); (viii) each of the Services Agreement Amendments, each duly executed by each of the parties thereto; (ix) a payoff letter from each Person receiving an Indebtedness Payoff in connection with the Closing, and a termination statement or other similar document evidencing the termination and release of all Liens on the Purchased Assets effective as of the Closing Date; (x) the consents and Lien releases required by Sections 5.2(e) and (f); (xi) the Physical Inventory Valuation Report, duly executed by Seller; (xii) the Closing Statement, duly executed by Seller; (xiii) the Transition Services Agreement, duly executed by Seller; (xiv) a Drug Enforcement Administration and Pharmacy License Power of Attorney in a form acceptable to Buyer; (xv) a notification letter in respect of each of Seller's National Council for Prescription Drugs Program provider number and its National Provider Identifier number in a form acceptable to Buyer; and (xvi) a sublease in the form agreed to by Buyer and Seller with respect to the lease on the Operations Location, duly executed by Seller and the landlord of the Operations Location (the "Sublease").

TPADOCS 19895592 6

(b)     At the Closing, Buyer shall deliver to Seller the following items, each in the form attached to this Agreement as an Exhibit or in form and substance reasonably acceptable to Seller, as applicable: (i) a good standing certificate of Buyer dated no earlier than fifteen (15) days prior to the Closing Date, from its jurisdiction of formation; (ii) a certificate from an officer of Buyer to the effect that each of the conditions set forth in Sections 5.2(a) and (b) have been satisfied in all respects; (iii) the Assignment and Assumption Agreement, duly executed by Buyer; (iv) the Consulting Agreement, duly executed by Buyer (or an Affiliate of Buyer); (v) the Restrictive Covenant Agreement, duly executed by Buyer (or an Affiliate of Buyer); (vi) the Physical Inventory Valuation Report, duly executed by Buyer; (vii) the Closing Statement, duly executed by Buyer; (viii) the Transition Services Agreement, duly executed by Buyer; (ix) the Sublease, duly executed by Buyer; and (x) the Closing Date Payment.

## ARTICLE VIII
## MISCELLANEOUS

8.1.     Entire Agreement; Amendments. The Confidentiality Agreement, this Agreement, the Seller Disclosure Schedules, the Exhibits referred to herein and the documents delivered pursuant hereto contain the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersede all other prior agreements, understandings, term sheets, or letters of intent among the Parties, including the term sheet dated as of April 20, 2013.  No amendment to or modification of this Agreement shall be effective unless it shall be in writing and signed by each of the Parties.

8.2.     Invalidity. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and, to such end, the provisions of this Agreement are agreed to be severable.

8.3.     Specific Performance. Each of the Parties acknowledges and agrees that each of the other Parties would be damaged irreparably in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, in addition to any and all other remedies that may be available at law or in equity, the Parties agree that each of the other Parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court in the United States or in any state having jurisdiction over the Parties and the matter, in addition to any other remedy to which such Party may be entitled pursuant hereto.

8.4.     Amendment; Extension; Waiver. At any time prior to the Closing Date, each Party may (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document, certificate or writing delivered pursuant hereto or (c) waive compliance by any other Party with any of the agreements or conditions contained herein. Any agreement on the part of any Party to any such extension or waiver shall be valid only if set forth in an instrument, in writing, signed on behalf of such Party.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of such rights.  This Agreement may not be amended, modified or supplemented except by written agreement of the Parties.

TPADOCS 19895592 6

8.5.     Expenses. Except as otherwise provided herein, including Section 7.2, each Party will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel, accountants, advisors and consultants.

8.6.     Public Announcements. All press releases or other public communications of any nature whatsoever relating to the transactions contemplated by this Agreement, and the method of the release for publication thereof, shall be subject to the prior mutual approval in writing of Buyer and Seller.  Notwithstanding anything herein to the contrary, Buyer have the right to publicly disclose this Agreement and the transactions contemplated hereby as required by applicable securities laws without the prior written approval of Seller or Shareholder; provided, however, that in the event that Buyer is required to publicly disclose this Agreement and the transactions contemplated hereby as required by applicable securities laws, Buyer shall provide Seller, to the extent legally permitted, a reasonable opportunity to review and comment on any such required public disclosure.

8.7.     Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by facsimile, by nationally recognized overnight courier or by registered or certified mail (postage prepaid, return receipt requested) to each other Party as follows:

If to Seller or Shareholder:

Integrated Concepts, Inc.
11907 San Rafael N.E.
Albuqueuerque, NM 87122
Attn: Ross K. Huntingford
Facsimile: (505) 341-0154

with a copy (which copy shall not constitute notice) to:

Freedman Weisz, LLP
2029 Century Park East, 19th Floor
Los Angeles, CA 90067
Attn: Barry M. Weisz, Esq.
Facsimile: (310) 282-2501

If to Buyer, to:

c/o PharMerica Corporation
1901 Campus Place
Louisville, KY 40299
Attention:  General Counsel
Facsimile:  (502) 261-2388

with a copy (which copy shall not constitute notice) to:

36

Shutts & Bowen LLP
4301 West Boy Scout Blvd., Suite 300
Tampa, FL 33609
Attention: David A. Gemunder, Esq.
Facsimile: (813) 227-8133

Such notice shall be deemed to be received when delivered if delivered personally, or the next Business Day after the date sent if sent next Business Day service by a United States national overnight delivery service, or three (3) Business Days after the date mailed if mailed by certified or registered mail, or upon receipt of confirmation of delivery if sent by facsimile. Any notice of any change in such address shall also be given in the manner set forth above. Whenever the giving of notice is required under this Agreement, the giving of such notice may be waived in writing by the Party entitled to receive such notice.

8.8.     Successors and Assigns; No Third-Party Beneficiaries. The rights of a Party under this Agreement shall not be assignable by such Party without the written consent of the other Parties. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person, except and as provided in Article VI, any right, remedy or claim under or by reason of this Agreement.

8.9.     Seller Disclosure Schedules. Seller and Shareholder, jointly and severally, have prepared, reviewed and approved the Disclosure Schedules hereto. Notwithstanding Section 8.4, from time to time prior to the Closing Date, Seller may supplement and update any of the Seller Disclosure Schedules delivered pursuant to this Agreement to make the information set forth therein complete and accurate, so long as such supplement or update does not disclose any event, fact or condition that (a) was in existence prior to the date of this Agreement (whether or not known by Seller or Shareholder on the date of this Agreement) or (b) individually or in the aggregate, would reasonably be expected to constitute a Material Adverse Effect on the Pharmacy Business. Any such supplement or update that is permitted by this Section 8.9 will have the effect of curing any misrepresentation or breach of warranty that otherwise might have existed hereunder on the Closing Date. The disclosure of any information, event, fact or condition contained in any purported supplement or update of the Seller Disclosure Schedules delivered by Seller pursuant to this Section 8.9 that is not permitted by this Section 8.9 will not affect Buyer's rights under Article V or Article VI.

8.10.    Compliance with Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer, it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

37

8.11.   Interpretation.

(a)   Titles and headings to articles, sections and subsections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(b)   For the purposes of this Agreement, (i) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires, (ii) the terms "hereof," "herein" and "herewith" and words of similar import shall be construed to refer to this Agreement and the Seller Disclosure Schedules in their entirety and not to any particular provision, unless otherwise stated, and all references to Sections and Schedules shall refer to this Agreement and the Seller Disclosure Schedules respectively, unless otherwise stated, (iii) the term "including" shall mean "including, without limitation," (iv) unless otherwise stated, the term "day" means a calendar day, and (v) references in this Agreement to dollar amount thresholds shall not, for purposes of this Agreement, be deemed to be evidence of materiality or a Material Adverse Effect.

8.12.   Governing Law. This Agreement and any disputes hereunder shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

8.13.   Jurisdiction; Waiver of Jury Trial. The Parties hereby agree that any dispute or controversy arising out of or related to this Agreement or the transactions contemplated hereby shall be conducted only in the state and federal courts located in New Castle County, Delaware. Each Party hereby irrevocably consents and submits to the exclusive personal jurisdiction of and venue in the federal and state courts located in the State of Delaware. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY. Each Party agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in Section 8.7. Nothing in this Section 8.13, shall affect the right of any Party to serve such summons, complaint or initial pleading in any other manner permitted by Law.

8.14.   Execution in Counterparts; Facsimile. This Agreement may be executed in two (2) or more counterparts, via facsimile, .pdf or electronic delivery, each of which shall be considered an original instrument, but all of which shall be considered one (1) and the same agreement, and shall become binding when one (1) or more counterparts have been signed by each of the Parties and delivered to the other Parties.

TPADOCS 19895592 6

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed and delivered as of the day and year first above written.

**BUYER:**

PHARMACY CORPORATION OF AMERICA,
a California corporation


By:_____
Name: Gregory S. Weishar
Title: President

**SELLER:**

INTEGRATED CONCEPTS, INC., d/b/a
PharmaCare Health Services, a New Mexico
corporation


By:_____
Name: Ross K. Huntingford
Title: President


**SHAREHOLDER:**


_____
Ross K. Huntingford

TPADOCS 19895592 6

**ANNEX A**

**DEFINITIONS**

(a)     Certain Definitions.

As used herein, the terms below shall have the following meanings:

"Action" means any action, administrative enforcement, petition, complaint, claim, suit, litigation, arbitration, mediation, hearing, investigation, review or other proceeding commenced, brought or heard by or before any Governmental Authority.

"Affiliate" means any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with the Person specified; it being understood that, for purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Affiliated Customer Accounts" means those Customers (and the addresses related thereto) listed and designated on Schedule 2.22 that are an Affiliate of Seller or Shareholder.

"Agreement" means this Asset Purchase Agreement, together with the Schedules and Exhibits attached hereto.

"Assumed Contracts" means those Pharmaceutical Services Agreements to which Seller is a party, that relate to the Pharmacy Business and that are set forth on Schedule A-1.

"Benefit Plan" means each "pension plan" (as defined in Section 3(2) of ERISA) and each "welfare plan" (as defined in Section 3(1) of ERISA), determined without regard to whether such plans are subject to ERISA, or any other plan, policy, practice, fund, program, agreement, arrangement, understanding or scheme that is at any time sponsored or maintained by Seller or any ERISA Affiliate (as defined below) for the  benefit of the employees, former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of Seller or such ERISA Affiliate or the dependents of any of them, including each deferred compensation, bonus, incentive compensation, pension, retirement, stock purchase, stock option and other equity compensation.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the Commonwealth of Kentucky are authorized or obligated to close.

"Cash" means all cash and all cash equivalents held by Seller (including marketable securities and short term investments), as determined in accordance with GAAP.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

TPADOCS 19895592 6

"Confidentiality Agreement" means the Confidentiality and Non-Disclosure Agreement, dated March 8, 2013, between PharMerica Corporation and Seller.

"Contract" means any lease, sublease, mortgage, obligation, license, sublicense or other binding contract or agreement, in each case whether written or oral.

"Current Non-Affiliated Customer Accounts" means those Customers that are actively serviced by Seller as of the Closing, each of which are listed on Schedule A-2 of the Seller Disclosure Schedules, none of which are Affiliated Customer Accounts or are presently serviced by Buyer or any of its Affiliates.

"Customer" means nursing homes, assisted living facilities, group homes and other long-term care or institutional care facilities, and residents of such homes or facilities who are customers of the Pharmacy Business.

"Customer Accounts Receivable" means, (i) for the one hundred twenty (120) day period following the Closing, all accounts and accounts receivable payable to Seller, existing at the Closing, from skilled nursing facilities, consulting fees, group homes, medical record fees and individual patients paid by nursing homes only, excluding the Excluded Accounts Receivable, and (ii) for the period thereafter, all accounts and accounts receivable payable to Seller by Customers.

"Deferred Payment Amount" means the amount, if any, paid by Buyer to Seller pursuant to Section 1.4.

"Environmental Laws" means any Law in effect as of the Closing Date relating to the generation, production, use, treatment, storage, transportation or disposal of Hazardous Substances or the protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means with respect to Seller, any entity that is a member of a "controlled group of corporations" with, or is under "common control" with, or is a member of the same "affiliated service group" with Seller pursuant to Sections 414(b), (c), (m) or (o) of the Code.

"Excluded Accounts Receivable" means all accounts and accounts receivable payable to Seller that are not a Customer Accounts Receivable.

"Excluded Assets" means, collectively, (i) cash, cash equivalents, marketable securities and intercompany receivables and all rights to any bank or deposit accounts (other than the Transferred Accounts); (ii) the Leases for the Leased Real Property and all Permits related to the Leases for the Leased Real Property, easements, improvements and other rights relating thereto; (iii) all Intellectual Property, all goodwill associated therewith, and all claims, causes of action, and rights to sue at law or in equity for any past, present, or future infringement of the Intellectual Property; (iv) all Permits related to the operation of the Pharmacy Business and held in the name of Seller; (v) all deposits, advances, pre-paid expenses and credits of the Seller

relating to the operation of the Pharmacy Business; (vi) accounts and accounts receivable payable to Seller other than the Customer Accounts Receivable; (vii) all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by Seller other than the Included Personal Property; (viii) ownership and other rights with respect to the Benefit Plans of Seller; (ix) the articles of incorporation, operating agreements, and bylaws of Seller, minute books, stock ledgers and stock records, qualifications to conduct business, taxpayer and other identification numbers, Tax Returns, Tax information, Tax records related to Seller or any of its Affiliates, corporate seals and any other document relating to the organization, maintenance and existence of Seller; (x) deposits, advances, pre-paid expenses and credits that do not relate to the operation of the Pharmacy Business; (xi) causes of action, lawsuits, judgments, claims and demands relating to any of the Excluded Liabilities or the Excluded Assets, whether arising by way of counterclaim or otherwise; (xii) all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Excluded Liabilities or the Excluded Assets, including third party warranties and guarantees and all related claims, credits, rights of recovery and set-off as to third parties which are held by or in favor of Seller and relate to the Excluded Liabilities or the Excluded Assets; (xiii) the rights that accrue to Seller hereunder and under the Ancillary Agreements to which Seller is a party; (xiv) claims, causes of action and rights relating to Tax credits and refunds or recovery of Taxes, to the extent such Taxes are Excluded Liabilities or were paid by Seller (whether paid directly by Seller or indirectly by a third party on Seller's behalf) regardless of whether such claims, causes of action or rights have arisen or hereafter arise; (xv) all records prepared in connection with the sale of the Purchased Assets, including bids received from third Persons and analyses relating to the Purchased Assets; (xvi) insurance policies (and any cash or surrender value thereon); (xvii) any Contract to which Seller is a party or by which Seller is bound other than the Assumed Contracts, (xviii) any assets of Seller relating to its enterprises other than the Pharmacy Business; and (xiv) any equity interest in any Person and the assets, properties and rights identified on Schedule A-3 of the Seller Disclosure Schedules.

"Excluded Liabilities" means (i) any Liability for the Seller's employees, former employees and other service providers of Seller; (ii) any product Liability claims with respect to the conduct of the Pharmacy Business that occurred on or prior to the Closing Date; (iii) any Liability under or with respect to any Benefit Plan of Seller, including any Liability of Seller under Code Section 4980B and any similar state law; (iv) any Liability related to any actual or alleged violation or Liability arising under any Environmental or Healthcare Law regardless of whether such Liability related to any act or omission of Seller; (v) any Indebtedness of Seller; (vi) any Liability of Seller to the extent related to or arising in connection with the Excluded Assets; (vii) any Liability of Seller to any Affiliate of Seller; (viii) any Liability of Seller under this Agreement or the Ancillary Agreements to which Seller is party and any costs and expenses incurred by Seller incident to the negotiation and preparation of this Agreement and Seller's performance and compliance with the agreement and conditions contained herein, including any sale or transaction bonuses payable to any employee, independent contractor, advisor or other representative of Seller; (ix) any Liability of Seller to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement; and (x) any Liability for Taxes of Seller or Seller's Affiliates (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability), except as expressly provided in this Agreement.

TPADOCS 19895592 6

"Fundamental Representations" means those representation and warranties identified in Section 6.1(a)(i).

"GAAP" means United States generally accepted accounting principles, as in effect from time to time, consistently applied.

"Governmental Approvals" means all consents, authorizations or approvals of or by, and all filings with, all Governmental Authorities that are necessary to consummate the transactions contemplated hereby.

"Governmental Authority" means any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, multi-national organization or other similarly recognized organization or body of any federal, state, county, municipal, local or foreign government.

"Gross Profit" means the gross revenues of the Pharmacy Business from each Qualified Customer Account *less* the cost of Inventory *less* the aggregate amount of uncollected accounts receivable of any Qualified Customer Accounts. For purposes of calculating Gross Profit (i) no corporate overhead of Buyer or its parent or Affiliates shall be deducted and (ii) all expenses, including the purchase of pharmaceuticals, shall be at Buyer's actual invoiced cost and (iii) no pharmaceutical rebates or rebates receivable of Buyer or its Affiliates shall be included.

"Hazardous Substances" means (i) any and all substances, wastes, pollutants, contaminants and materials regulated, defined or designated as hazardous, dangerous or toxic under any Environmental or Healthcare Law; (ii) gasoline, diesel fuel or other petroleum hydrocarbons; (iii) PCBs, asbestos, mold or urea formaldehyde foam insulation; and (iv) natural gas, synthetic gas and any mixtures thereof.

"Healthcare Laws" means all federal, state and local healthcare laws applicable to Seller or the operation of the Pharmacy Business, including applicable pharmacy laws and regulations, patient privacy laws, including HIPAA and regulations promulgated pursuant thereto, and all federal and state fraud and abuse laws including, without limitation, 42 U.S.C. § 1320a-7b (including the statutory exceptions and applicable safe harbor regulations) and 42 C.F.R. § 3729 et seq. (federal False Claims Act) and any applicable state false claims act.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"Included Personal Property" means all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by Seller or used in connection with servicing of Customers in respect of the Pharmacy Business.

"Indebtedness" means, as of a particular date and without duplication, (i) all indebtedness (including the principal amount thereof, the amount of accrued and unpaid interest thereon, and all applicable prepayment penalties) of Seller, whether or not represented by bonds, debentures, notes or other securities, for the repayment of money borrowed, (ii) all obligations of Seller to pay rent or other payments under a lease of real property or personal property that is

TPADOCS 19895592 6

43

required to be classified as a capital lease in accordance with GAAP, (iii) any liability for the deferred purchase price of any property or services outside the Ordinary Course of Business, (iv) all obligations under any interest rate, currency or other hedging agreement, (v) prepayment premiums of any change of control premiums, if any, "breakage" costs or similar payments associated with the repayments of such Indebtedness and accrued interest, if any, and fees and expenses and all other amounts owed in respect of the foregoing, (vi) any reimbursement obligation of Seller that is then due and payable with respect to direct-pay letters of credit, surety bonds, bankers' acceptances or similar facilities issued for the account of Seller, (vii) any obligation of another Person in respect of any of the foregoing that is unconditionally guaranteed by Seller, and (viii) any obligation of another Person in respect of any of the foregoing that is secured by a Lien on any asset of Seller.

"Indebtedness Payoff" means, an amount in cash equal to the Indebtedness owed to such Person as set forth on Schedule 1.3(a)(i) of the Seller Disclosure Schedule.

"Intellectual Property" means, collectively, all United States, foreign and international industrial and intellectual property and other proprietary rights, including patents, patent applications, rights to file for patent applications (including continuations, continuations-in-part, divisionals, reissues and reexaminations), trademarks, logos, service marks, trade names and service names (in each case whether or not registered) and applications for and the right to file applications for registration thereof, Internet domain names or applications for Internet domain names, Internet and World Wide Web URLs or addresses and web site content, copyrights (whether or not registered), applications for and the right to file applications for registration thereof, works of authorship, moral rights, mask work rights, mask work registrations, applications and rights to file applications therefor, franchises, licenses, inventions, trade secrets, trade dress, know-how, confidential information, customer lists, supplier lists, proprietary processes and formulae, software source code and object code, database, algorithms, net lists, architectures, structures, screen displays, layouts, development tools, designs, blueprints, specifications, technical drawings (or similar information in electronic format), publicity and privacy rights and any other intellectual property rights arising under the laws of the United States of America, any state thereof, or any country or province, and all documentation and media (in whatever form) constituting, describing or relating to the foregoing, including programmers' notes, memoranda and records.

"Interim Period" means the period between the date of this Agreement and the Closing Date.

"Inventory" means any inventory, including finished goods, supplies, raw materials, work in progress, spare, replacement and components, or goods or products used, held for use or related to the conduct of the Pharmacy Business, whether located on Seller's property or located at any third-party locations, including inventories of pharmaceutical products and medical products and supplies.

"IRS" means the United States Internal Revenue Service or any successor organization thereto.

TPADOCS 19895592 6

44

"Knowledge," or phrases of similar import, means, (i) when referencing Seller, the actual knowledge of Shareholder or executive officer of Seller after a reasonable investigation of the subject matter in question, or all facts that any of the foregoing Persons should have known with respect to the matters at hand if such Person had exercised reasonable diligence and made due inquiry; (ii) when referencing Shareholder, the actual knowledge of such Shareholder after a reasonable investigation of the subject matter in question, or all facts that a shareholder of Seller should have known with respect to the matters at hand if such shareholder had exercised reasonable diligence and made due inquiry and (iii) when referencing Buyer, the actual knowledge of the executive officers of PharMerica Corporation after a reasonable investigation of the subject matter in question.

"Law" means any law, statute, rule, regulation or ordinance enacted or promulgated by any Governmental Authority.

"Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, known or unknown, whether absolute or contingent, matured or unmatured, conditional or unconditional, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, or due or to become due.

"Lien" means, with respect to any assets, any lien, encumbrance, claim, charge, security interest, mortgage, deed of trust, pledge, conditional sale or other title retention agreement or other restriction of a similar kind.

"Loss" means any loss, damage, Liability, reasonable amount paid in settlement, penalty, fine, fee, cost or expense, including court costs and reasonable attorneys' fees, expenses and disbursements.

"Marketed Customer Account" means those Persons listed on Schedule A-4 of the Seller Disclosure Schedules that that are not Customers of Buyer as of the Closing Date that reasonably may be anticipated to enter into a Pharmaceutical Services Agreement with a term of not less than two (2) years with Buyer after the Closing Date as a consequence of the active sales and marketing efforts of Seller prior to the Closing; provided, however, the term shall not include (i) any Affiliate of Seller or Shareholder or (ii) any Person serviced by Buyer or any of its Affiliates (including PharMerica Corporation and its Affiliates), as of the Closing.

"Material Adverse Effect" means, with respect to any Person, any change, event, development, circumstance or effect that has had, or could reasonably be expected to have, a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of such Person, taken as a whole, except for any such changes, events, developments, circumstances or effects to the extent directly or indirectly resulting from (i) the public announcement of (except to the extent made in violation of this Agreement by such Person, any Affiliate of such Person or their respective authorized representatives), or performance of the transactions contemplated by or pursuant to, this Agreement (including any action or inaction by Seller's customers, suppliers, employees or competitors whether by reason of the identity of Buyer or communication by Buyer or any of its Affiliates of their plans or intentions regarding operation of the Pharmacy Business); (ii) changes in GAAP or any applicable Law; (iii) changes in the respective industries in which such Person operates, including the 2010 Healthcare Reform

Act, that do not disproportionately affect such Person; (iv) in the case of Seller, any act or omission of Buyer; (v) in the case of Seller, any act or omission of Seller taken with the prior written consent of Buyer; (vi) any actions required or permitted to be taken under this Agreement, including to obtain the approval of any other Person, including any Governmental Approval; (vii) any act of God or other *force majeure* type event; (viii) any attack on, or by, any outbreak or escalation of hostilities, or any acts of terrorism, in any case involving the United States, any declaration of war by Congress or any other national or international calamity, in each case that does not disproportionately affect such Person; (ix) any breach, default or violation of this Agreement that is cured before the date of any termination of this Agreement; or (x) changes in general economic conditions or the financial or securities markets generally that do not disproportionately affect such Person.

"Order" means any binding and enforceable judgment, order, writ, decision, injunction, verdict, ruling, award (including arbitration awards), decree or other similar binding determination or finding by, before or under the supervision of any Governmental Authority, arbitrator or mediator of competent jurisdiction.

"Ordinary Course of Business" or "Ordinary Course" means the ordinary course of business consistent with the past custom and practice (including with respect to quantity and frequency to the extent applicable under the circumstances) of Seller in the operation of the Pharmacy Business.

"Party" means each of Buyer, Seller and Shareholder, and referred to collectively as the "Parties."

"Payment Programs" shall mean Medicare, TRICARE, Medicaid, worker's compensation programs, Blue Cross/Blue Shield programs, and all other third-party reimbursement and payment programs, including those offered or administered by health maintenance organizations, preferred provider organizations, health benefit plans, or health insurance plans.

"Permits" means any licenses, permits, registrations, certificates, franchises, approvals, authorizations, consents of, or filings with, any Governmental Authority or other Person (including those issued under Environmental and Healthcare Laws and those relating to the Leased Real Property) necessary for the conduct of, or relating to the operation of, the Pharmacy Business.

"Person" means an individual, partnership, limited liability company, corporation, association, business trust, joint stock company, trust, unincorporated organization, joint venture, Governmental Authority or other entity of whatever nature.

"Pharmaceutical Services Agreement" means any Contract to which Seller is a party or by which Seller is bound that relates to the provision of pharmacy services.

"Qualified Customer Accounts" means the Current Non-Affiliated Customer Accounts and the Marketed Customer Accounts.

"Tax" or "Taxes" means any federal, state, local, foreign or other taxes of any kind, including, without limitation, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A ·of the Code), capital stock, branch, franchise, profits, net profits, net worth, withholding, social security, payroll, unemployment, disability, real property, Personal Pproperty, tangible, intangible, commercial activity, sales, use, transfer, registration, value-added, goods and services, alternative or add-on minimum, estimated or other tax of any kind whatsoever, and any similar custom, duty, levy, impost, governmental fee or like assessment, and, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, or information return or statement relating to Taxes, including any schedule, attachment thereto or amendment thereof, required to be filed with a Taxing Authority.

"Taxing Authority" means any Governmental Authority having jurisdiction over the assessment, determination, collection or other imposition of any Tax.

"Third Party Approvals" means all approvals, consents, licenses and waivers from third parties that are required to effect the transactions contemplated by this Agreement, that are required for the transfer of the Purchased Assets (including each Assumed Contract) to Buyer or that are required in order to prevent a breach of or a default under or a termination or modification of or any right of acceleration of any obligations under any Assumed Contract.

(b)     Terms Defined Elsewhere.

The following is a list of additional terms used in this Agreement and a reference to the Section in which such term is defined:

| Term | Section |
|------|---------|
| Accounting Firm | Section 1.4(d) |
| Acquisition Proposal | Section 4.7 |
| Ancillary Agreements | Section 2.2 |
| Assignment and Assumption Agreement | Section 7.4(a)(iv) |
| Actual Gross Profit | Section 1.4(b) |
| Assumed Liabilities | Section 1.2 |
| Balance Sheet | Section 2.4(a) |
| Balance Sheet Date | Section 2.4(a) |
| Basket Amount | Section 6.4(a) |
| Buyer | Preamble |

| Term | Section |
|------|---------|
| Buyer Indemnified Parties | Section 6.2(a) |
| Claim Notice | Section 6.3(c) |
| Closing and Closing Date | Section 7.3(a) |
| Closing Date Payment | Section 1.3(a) |
| Closing Statement | Section 1.3(a) |
| Consulting Agreement | Section 7.4(a)(vi) |
| Continuing Employees | Section 4.1(b) |
| Deferred Payment Objection Notice | Section 1.4(d) |
| Deferred Payment Statement | Section 1.4(d) |
| Dispute Notice | Section 6.3(b) |
| Disputed Items | Section 1.4(d) |
| Enforceability Exceptions | Section 2.2 |
| Facilities | Section 2.5(b) |
| Financial Statements | Section 2.4(a) |
| Improvements | Section 2.5(b) |
| Indebtedness Payoff | Section 1.3(a)(i) |
| Indemnified Party | Section 6.3(c) |
| Indemnitor | Section 6.3(c) |
| Interim Financial Statements | Section 2.4(a) |
| Inventory Payment | Section 1.5 |
| Inventory Service | Section 1.5 |
| Inventory Value | Section 1.5 |
| IP Licenses | Section 2.6(c) |
| Leased Real Property | Section 2.5(a) |
| Leases | Section 2.5(a) |
| One Year Anniversary | Section 1.4(c) |

| Term | Section |
|---|---|
| Operations Location | Background |
| Outside Date | Section 7.1(d) |
| Pharmacy Business | Background |
| Physical Inventory Valuation Report | Section 1.5 |
| Policy | Section 2.12 2.11(j) |
| Pre-Closing Covenants | Section 6.1(a)(iv) |
| Purchase Price | Section 1.3 |
| Purchased Assets | Section 1.1 |
| Reduction Multiplier | Section 1.4(c) |
| Restrictive Covenant Agreement | Section 7.4(a)(vii) |
| Seller | Preamble |
| Seller Indemnified Parties | Section 6.2(b) |
| Seller Disclosure Schedules | Article II |
| Seller Benefit Plan | 2.11(a) |
| Seller Intellectual Property | Section 2.6(a) |
| Seller Software | Section 2.6(d) |
| Services Agreement Amendments | Section 4.9 |
| Shareholder | Preamble |
| Sublease | Section 7.4(a)(xiv) |
| Survival Date | Section 6.1(a)(iv) |
| Target Gross Profit | Section 1.4(a)(i) |
| Target Gross Profit Threshold | Section 1.4(a)(ii) |
| Two Year Anniversary | Section 1.4(a) |

# EXHIBIT A

## Form of Physical Inventory Valuation Report

(see attached)

EXHIBIT A

## PHYSICAL INVENTORY VALUATION REPORT

DATE OF INVENTORY _____

TIME STARTED _____

TIME COMPLETED _____

LOCATION _____

_____

SECTION TO BE COMPLETED BY INVENTORY SERVICE SUPERVISOR
------------------------------------------------------------------------------------

Pharmaceutical Inventory                    $_____

Generic Inventory                           $_____

Over-the-counter Inventory                  $_____

Miscellaneous Inventory                     $_____

**TOTAL INVENTORY VALUE**                   $_____

**\*\* The total inventory value represents the Parties' agreement on the value of the inventory utilizing Seller's acquisition cost for the inventory reduced by any discount given to Seller for prompt pay or volume purchases.**
------------------------------------------------------------------------------------

The above and foregoing is accepted by both Buyer and Seller as the final Inventory Value of the Inventory (as such terms are defined in the Asset Purchase Agreement between Buyer and Seller dated September 30, 2013).

SELLER:                          BUYER:
Integrated Concepts, Inc.        Pharmacy Corporation of America

By: _____        By: _____
    Authorized Representative            Authorized Representative

WITNESSED AND ACKNOWLEDGED BY:  Inventory Service Supervisor/Leader


    By: _____        DATE _____, 2013

**EXHIBIT B**

**Form of Transition Services Agreement**

(see attached)

**EXHIBIT B**

TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Services Agreement") is made and entered into effective as of _____, 2013 (the "Effective Date"), between PHARMACY CORPORATION OF AMERICA, a California corporation ("Buyer"), and Integrated Concepts, Inc. d/b/a PharmaCare Health Services, a New Mexico corporation ("Seller"). Reference is made to that certain Asset Purchase Agreement dated September 30, 2013 (the "Purchase Agreement") by and among, inter alia, Buyer and Seller. All capitalized terms used, but not otherwise defined, in this Services Agreement shall have the respective meanings ascribed to such terms in the Purchase Agreement.

## RECITALS

WHEREAS, Seller is engaged in the business of: (i) providing pharmaceutical products (including oral, topical, injectable and infusion products) and related services and supplies, (ii) providing clinical and consultant pharmacist services, (iii) providing nutritional products (including enteral nutritional products), and (iv) the generation, preparation and distribution of medical records with respect to the foregoing products and services, in each case to nursing homes, assisted living facilities, group homes and other long-term care or institutional care facilities, and to residents of such homes or facilities (the provision of such services and products to such homes or facilities, collectively, the "Business");

WHEREAS, Seller has, as of this date, sold and conveyed to Buyer, pursuant to the Purchase Agreement, certain of the assets which it used in the Business; and

WHEREAS, in order to provide for an orderly transition of the operations of the Business from Seller to Buyer, the parties have agreed to enter into this Services Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as set forth below.

Section 1. _Services_. Seller shall provide, to Buyer or its Affiliates (as defined below), as designated by Buyer, the services listed on Schedule 1 hereto (collectively, the "Services"). The Services shall be provided for the period set forth in the description thereof on Schedule 1 hereto or, if not stated in such description, the Term of this Services Agreement. Schedule 1 hereto may be updated from time to time during the Term hereof to include additional transition services as Buyer may reasonably request and which Seller is reasonably capable of providing. Seller shall provide the Services in accordance with the terms of this Services Agreement, in a manner and at a level of service consistent with its past practice, and in a commercially reasonable manner. For purposes of this Services Agreement, (i) "Affiliate" means, with respect to a particular Person, another Person who controls, is controlled by or is under common control with the Person in question, and (ii) "Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority, or individual.

Section 2.    Fees; Termination of Services.  In accordance with Section 3 below, Buyer shall pay Seller a fee for the Services equal to the actual, direct cost of such Service actually incurred by Seller in providing the Services to Buyer, or as otherwise set forth on Schedule 1 hereto.  At any time, Buyer may deliver written notice to Seller to terminate or reduce the scope of any Service or all of the Services, and Seller will thereafter terminate or reduce the scope of, as applicable, the provision or performance of such Service as set forth in Buyer's notice as soon as is reasonably practicable, but in any event not later than ten (10) days after such notice is given.  For any Services terminated or reduced at any time other than the last day of a calendar month, all monthly fees shall be prorated, or, in the case of the reduction in a level of service, reduced proportionately to reflect such reduction in service level, based on the actual number of days during which the applicable Services were performed or provided divided by the actual number of days in the calendar month in which such Services are terminated or reduced.

Section 3.    Invoicing; Payment.

(a)    The following terms used in this Services Agreement shall be defined as follows:

(i)    "Disbursement Account" means the disbursement account to be funded by Buyer in the amount of [$_____ ] for purposes of paying Eligible Expenses pursuant to the terms of this Services Agreement and the Disbursement Account Agreement. The Disbursement Account shall be administered by Buyer, pursuant to the terms and conditions of this Services Agreement.

(ii)    "Eligible Expenses" means Eligible Non-Payroll Expenses and Eligible Payroll Expenses.

(iii)    "Eligible Non-Payroll Expenses" means, other than eligible Payroll Expenses, any and all reasonable expenses assessed by or reasonably estimated to be assessed by third parties and incurred by Seller to provide the Services at the Operations Location, consistent with Seller's past practices, such as voice and data telecommunication services or software, hardware and other monthly operating, maintenance, or license fees; provided, however, that (A) any such expenses shall only be for services and products actually used by the Business during the Term and at the direct cost and rates paid (or reasonably estimated to be paid) by Seller and (B) Eligible Non-Payroll Expenses shall not include (1) amounts for which Buyer is responsible for under the terms of the Sublease, which shall be paid by Buyer pursuant to the terms thereof, (2) any expenses or costs of Seller relating to the Business prior to the Closing and (3) any expenses of Seller to the extent not relating to the Business or actually incurred and paid or payable by Seller for its provision of the Services.

(iv)    "Eligible Payroll Expenses" means the sum of the following costs attributable to each Transition Employee for Services provided by the Transition Employees to the Business during a Pay Period: (A) wages or salaries (including any applicable overtime, on-call or call-in pay), as the case may be, in an amount not to exceed the wage rates or salaries set forth on Annex A to Schedule 1 attached hereto; (B) the employer portion of the applicable employment taxes on such wages and salaries; (C) the employer portion of all premiums documented to be owed under Seller's current medical plan, as set forth on Annex A

2

to Schedule 1 attached hereto ("Seller's Medical Plan"); (D) workers' compensation and general and professional liability insurance premiums documented to be owed by Seller; and (E) third party administrative costs, if any, associated with processing payroll and employee-related reporting and filing. Eligible Payroll Expenses shall be reduced by the amount of wages or salaries for each Transition Employee that takes paid time off during a Pay Period unless and to the extent (y) a Transition Employee has first used all of his or her accrued paid time off existing as of the Effective Date, as set forth on Annex A to Schedule 1 attached hereto, and (z) the paid time off for such Transition Employee was accrued after the Effective Date. If any of the foregoing costs are incurred by Seller on anything other than a daily basis (*e.g.* monthly insurance premiums), then such costs shall be pro-rated for purposes of calculating the Eligible Payroll Expenses for each applicable Pay Period.

(v)     "Pay Period" means the two (2) week pay period for each Transition Employee during the Term (or such lesser period as may be occasioned by the commencement, termination or expiration of the Term).

(vi)     "Transition Employees" shall have the meaning ascribed to such term in Schedule 1.

(b)     Payment for the Services shall be made as follows:

(i)     Following Closing, Seller will submit to Buyer invoices (each an "Invoice") for payment for the Services once every two (2) weeks. For purposes of this Services Agreement, the date the Invoice is delivered to Buyer shall be deemed the "Invoice Date." Each Invoice will set forth (A) the Eligible Payroll Expenses for the immediately preceding Payroll Period, together with (B) any Eligible Non-Payroll Expenses incurred by Seller during the prior two (2) week period, or estimated to be incurred and payable by Seller prior to the next Disbursement Date, (collectively the "Requested Amount"). All estimated Eligible Expenses shall represent Seller's reasonable and best good-faith estimate of Eligible Expenses consistent with Seller's recent past practices. Each Invoice shall include all relevant documentation reasonably necessary to substantiate Seller's request for payment, which, in the case of Eligible Expenses actually incurred prior to the Invoice Date, shall include receipts and other reasonable evidence of payment of such expense by Seller and, in the case of estimated Eligible Expenses shall be individually itemized and accompanied by a explanation if any such expenses are inconsistent with or represent significant deviations from Seller's recent past practices. Unless otherwise agreed to by Buyer and Seller in writing, each Invoice shall be sent to Buyer, to the attention of [_____], via email ([_____]@pharmerica.com) and/or facsimile at [(__) _____] and with a confirming copy to sent the following address: [_____].

(ii)     Upon its receipt of each Invoice, Buyer shall review such Invoice and no later than two (2) business days after each Invoice Date, (such date, the "Disbursement Date"), shall disburse to Seller all undisputed portions of the Requested Amount.

(iii)     Payment of amounts disbursed from the Disbursement Account shall be made by wire transfer of immediately available funds to Seller's account pursuant to wire instructions provided by Seller to Buyer. Seller shall pay when due all sums owed by Seller that

3

relate to the Services provided by Seller hereunder.

(iv)     Following Seller's receipt of any funds from the Disbursement Account, if Seller determines any amounts received by it in respect of any Eligible Expense to have resulted in an overpayment to Seller for such Eligible Expense, then Seller shall immediately notify Buyer of such overpayment in writing and Buyer may, at its option, elect to either (A) receive an immediately refund of such amounts from Seller or, (B) apply the amount of such overpayment as a credit against future Eligible Expenses. If, on the other hand, following Seller's receipt of funds from the Disbursement Account, Seller determines any amounts received by it in respect of any Eligible Expense resulted in an underpayment to Seller for such Eligible Expense, then Seller shall immediately provide Buyer written notice of such underpayment together with supporting information verifying such underpayment and, unless disputed, Buyer shall disburse such additional amount to Seller in accordance with the procedures of Section 3(b)(ii) above.

(c)     Buyer reserves the right to conduct periodic audits of all Invoices and Eligible Expenses claimed by Seller. Seller shall submit supporting information and other verification of cost expenditures to Buyer within thirty (30) days from its receipt of Buyer's request.

Section 4.     Term.

(a)     Unless terminated earlier in accordance with the provisions of this Services Agreement, the term of this Services Agreement shall commence as of the Effective Date and shall end twelve (12) months from the Effective Date (the "Term").

(b)     Notwithstanding the foregoing paragraph (a):

(i)     Either Seller or Buyer may terminate this Services Agreement effective immediately upon the expiration of a ten (10) day cure period following written notice to the breaching party of a material breach or failure by the other party to perform its obligations arising under this Services Agreement, which material breach or failure is not cured to the reasonable satisfaction of the non-breaching party within such ten (10) day cure period; provided, however, that this clause shall not apply to Buyer's failure to pay any amount being disputed in good faith by Buyer after Seller's receipt of written notice of such dispute; and

(ii)     Buyer may terminate this Services Agreement at any time upon fifteen (15) days' prior written notice to Seller

(c)     Upon the earlier of the termination of this Services Agreement for any reason and the expiration of the Term, Seller will promptly and in any event no later than thirty (30) days thereafter, submit a final Invoice to Buyer for payment of any outstanding Eligible Expenses in accordance with the procedures set forth in Section 3(b) above.

Section 5.     Mutual Indemnification.

(a)     Buyer shall defend, indemnify and hold harmless Seller, and its officers, directors, agents, representatives, parent and subsidiary entities, Affiliates, successors and assigns (collectively, the "Seller Parties"), at all times from and after the date of this Services Agreement against and in respect to any and all damages, losses, liabilities, costs and expenses of

4

any nature whatsoever (including reasonable attorneys' fees and expenses), resulting to the Seller Parties from the conduct of the Buyer Parties under, and pursuant to, this Services Agreement. Seller's indemnification remedy pursuant to this Section shall be cumulative and in addition to any and all other remedies available to Seller under law, equity or otherwise.

(b)     Seller shall defend, indemnify and hold harmless Buyer, and its officers, directors, agents, representatives, parent and subsidiary entities, Affiliates, successors and assigns (collectively, the "Buyer Parties"), at all times from and after the date of this Services Agreement against and in respect to any and all damages, losses, liabilities, costs and expenses of any nature whatsoever (including reasonable attorneys' fees and expenses), resulting to the Buyer Parties from the conduct of the Seller Parties under, and pursuant to, this Services Agreement.  The Buyer Parties' indemnification remedy pursuant to this Section shall be cumulative and in addition to any and all other remedies available to the Buyer Parties under law, equity or otherwise.

Section 6.     Force Majeure.  None of the parties shall be liable for any expense, loss or damage whatsoever arising out of any delay or failure in the performance of its obligations pursuant to this Services Agreement to the extent such delay or failure results from events beyond the reasonable control of that party, including, without limitation, acts of God or of the public enemy, flood, storm, fire, earthquakes or terrorism, provided that each party shall use commercially reasonable efforts to mitigate the effects and resume performance as soon as practicable.

Section 7.     Independent Contractor.  Seller's status in relationship to Buyer is that of an independent contractor retained by Buyer to discharge certain responsibilities as set forth herein.  Seller's services under this Services Agreement shall not constitute or be construed as (i) a joint venture, partnership or lease between Seller and Buyer with respect to the Business or (ii) an equity interest of Seller in the Business.

Section 8.     Amendments or Supplements.  This Services Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by Buyer and Seller to be necessary, desirable or expedient to further the purposes of this Services Agreement or to clarify the intention of the parties hereto.

Section 9.     Successors and Assigns.  This Services Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither this Services Agreement nor any interest herein may directly or indirectly be transferred or assigned by any party, in whole or in part, without the written consent of the other parties; provided, however, that this Services Agreement and any of the provisions hereof may be assigned by Buyer, without the consent of Seller, to any Affiliate of Buyer, but such assignment shall not relieve Buyer of its duties and obligations contained in this Services Agreement.

Section 10.     Third Party Beneficiaries.  Nothing contained in this Services Agreement, express or implied, shall confer unto any person other than the parties hereto or their respective successors and permitted assigns any right, obligation, remedy or benefit hereunder.

5

Section 11.   <u>Applicable Law; Dispute Resolution</u>.  This Services Agreement shall be governed by and construed and enforced in accordance with, the laws of the State of Delaware, without regard to such jurisdiction's conflict of laws principles.  In the event the parties hereto are unable to mutually resolve any dispute, controversy or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement, such dispute, controversy or claim shall be resolved by litigation; in that connection, each of the parties hereto hereby (i) irrevocably and unconditionally consents to submit itself to the sole and exclusive personal jurisdiction of any federal or state court located within New Castle County, Delaware (the "<u>Applicable Courts</u>"), (ii) waives any objection to the laying of venue of any such litigation in any of the Applicable Courts, (iii) agrees not to plead or claim in any such court that such litigation brought therein has been brought in an inconvenient forum and agrees not otherwise to attempt to deny or defeat such personal jurisdiction or venue by motion or other request for leave from any such court, and (iv) agrees that it will not bring any action, suit, or proceeding in connection with any dispute, claim, or controversy arising out of or relating to this Agreement or the transactions contemplated hereby in any court or other tribunal other than any of the Applicable Courts.  Nothing in this Section shall prevent enforcement in another forum of any judgment obtained in the Applicable Courts.   Each party hereto hereby irrevocably and unconditionally agrees that service of process in connection with any dispute, claim, or controversy arising out of or relating to this Services Agreement or the transactions contemplated hereby may be made upon such party by prepaid certified or registered mail, with a validated proof of mailing receipt constituting evidence of valid service, directed to such party at the address specified in Section 8.7 of the Purchase Agreement.  Service made in such manner, to the fullest extent permitted by applicable law, shall have the same legal force and effect as if served upon such party personally within the State of Delaware.  Nothing herein shall be deemed to limit or prohibit service of process by any other manner as may be permitted by applicable law.   **EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND CONSENTS TO ANY AND ALL RELIEF ORDERED BY THE COURT, AFTER THE TIME FOR APPEAL HAS EXPIRED.**  The prevailing party in any litigation, including appeals, shall be entitled to an award of its reasonable attorneys' fees, including related costs and expenses.

Section 12.   <u>Execution in Counterparts</u>.  This Services Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement.  The exchange of copies of this Services Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Services Agreement as to the parties and may be used in lieu of the original for all purposes.  Signatures of the parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes.

Section 13.   <u>Titles and Headings</u>.  Titles and headings to Sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Services Agreement.

*[Signature page follows.]*

6

IN WITNESS WHEREOF, the parties hereto have caused this Transition Services Agreement to be duly executed and delivered as of the Effective Date.

BUYER:                                               SELLER:

PHARMACY CORPORATION OF                              INTEGRATED CONCEPTS, INC.
AMERICA, a California corporation                    d/b/a PHARMACARE HEALTH
                                                     SERVICES, a New Mexico corporation

By: _____                              By: _____
Name: Gregory S. Weishar                             Name: Ross K. Huntingford
Title:  President                                    Title:  President

Counterpart Signature Page

**SCHEDULE 1**

TRANSITION SERVICES

Seller will provide certain services to Buyer in the manner provided by Seller for its own benefit prior to Closing, which relate to its operation of the Business, including, but not limited to, the following:

Information Technology
Seller will provide Buyer with access upon request with respect to those computer systems and software of Seller which are not part of the Purchased Assets but which are used or utilized by Seller in connection with its operation of the Business including but not limited to the following:
- Electronic mail
- Docutrack
- QS1
- Qwikmar

Telecommunications
Seller will provide Buyer with any requested assistance to maintain existing telecommunications capabilities of Seller which are not part of the Purchased Assets and which are used or utilized by Seller in connection with its operation of the Business, including but not limited to telephone and data networks.

Account Management Support
Seller will provide introductions to and assistance with Customer accounts existing at Closing as requested by Buyer to facilitate the transition of account relationships to Buyer following the Closing.

Pharmacy Personnel
During the Term, or such lesser term as may be agreed upon in writing with Buyer (the "Employment Transition Period"), Seller will (a) continue to employ all current employees of Seller (including any temporary, contracted or leased personnel) whose primary responsibilities as of the Closing Date are in respect to the Business, all of who are listed on Annex A to this Schedule 1 (the "Transition Employees") at their current respective positions or job classifications and their current respective wage scales or salaries and bonuses, as the case may be, as of the Closing Date, which as are listed on Annex A to this Schedule 1, (b) maintain in full force and effect all benefit plans or arrangements maintained, contributed to or required to be contributed to by Seller during the Employment Transition Period for the benefit of the Transition Employees or their beneficiaries, including, without limitation, all health care benefits (collectively, "Benefit Plans") and (c) comply in all material respects with all Laws affecting the employment of the Transition Employees during the Employment Transition Period.

During the Employment Transition Period, Seller will cause the Transition Employees to provide services to Buyer in a manner consistent with the services provided by the Transition Employees prior to Closing, or otherwise as may be requested by Buyer, in connection with Buyer's operation of the Business post-Closing. In consideration of the foregoing arrangement, Buyer shall reimburse Seller the Eligible Payoll Expenses through and including the final date of the Employment Transition Period.

During the Employment Transition Period, at Buyer's request, Seller agrees to facilitate Buyer's ability to interview, and at Buyer's election, make offers of employment to the Transition Employees. Buyer may, but shall not be obligated to, negotiate the employment of and employ, upon terms and conditions satisfactory to Buyer, in its sole discretion, any of the Transition Employees; provided, however, that such employment shall commence no earlier than date immediately following the final date of the Employment Transition Period. Seller shall remain responsible for any severance payments, accrued bonuses, pension

or other retirement plan obligations, COBRA rights, WARN Act Liability and any other Liabilities associated with Seller's termination of any of the Transition Employees following the Employment Transition Period.

<u>Permits and Licenses</u>
At Closing Buyer shall notify Seller of those Permits to maintain following the Closing, and during the Term Seller will maintain such Permits as necessary and as instructed by Buyer.

<u>Use of Existing Trade Name(s)</u>
During the Term, Seller will grant to Buyer, at no cost to Buyer, the right to use those trade names of Seller, including "PharmaCare," and any copyrights, trade names and logos of Seller relating thereto, which are used or utilized by Seller in connection with its operation of the Business, as affixed to any pre-printed forms, label stock (pending approval of change of ownership by the New Mexico Board of Pharmacy) and supplies acquired by Buyer (the "<u>Acquired Supplies</u>") so that Buyer may use the Acquired Supplies in connection with its post-Closing operation of the Business.

**EXHIBIT C**

**Form of Bill of Sale**

(see attached)

**EXHIBIT C**

## BILL OF SALE

In connection with that certain Asset Purchase Agreement dated as of September 30, 2013, by and among INTEGRATED CONCEPTS, INC. d/b/a PHARMACARE HEALTH SERVICES, a New Mexico corporation ("Seller"), ROSS K. HUNTINGFORD ("Shareholder") and Pharmacy Corporation of America, a California corporation ("Buyer"), (the "Purchase Agreement;" all capitalized terms used, but not otherwise defined, in this Bill of Sale shall have the respective meanings ascribed to such terms in the Purchase Agreement), Seller does hereby sell, transfer, convey, assign and deliver to Buyer all right, title and interest of Seller in, to and under the Purchased Assets, which include, without limitation, the following:

(i)      all Inventory;

(ii)     all Included Personal Property;

(iii)    all of Seller's right, title and interest in and to each of the Assumed Contracts to be assigned to Buyer pursuant to the Assignment and Assumption Agreement;

(iv)     all Customer Accounts Receivable of Seller, the proceeds thereof, and any security therefor;

(v)      all causes of action, lawsuits, judgments, claims and demands relating to any of the Assumed Liabilities or the Purchased Assets, whether arising by way of counterclaim or otherwise; and

(vi)     all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Assumed Liabilities or the Purchased Assets, including third party warranties and guarantees and all related claims, credits, rights of recovery and set-off as to third parties which are held by or in favor of Seller and relate to the Assumed Liabilities or the Purchased Assets.

Notwithstanding anything contained in this Bill of Sale to the contrary, the Purchased Assets shall not include the Excluded Assets. This Bill of Sale is made, executed and delivered for and upon consideration provided for in the Purchase Agreement, the receipt and sufficiency of which hereby is acknowledged. This Bill of Sale shall be governed by the provisions of the Purchase Agreement, and such provisions are hereby incorporated into this Bill of Sale. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

This Bill of Sale and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted transferees and

assignees. No party hereto may assign this Bill of Sale or any of its rights under this Bill of Sale, whether directly or indirectly, in whole or in part, voluntary or involuntary, by merger, consolidation, dissolution, operation of law, through a change of control or any other manner without the written consent of the other parties; provided, however, that Buyer may effect any such assignment to a Buyer of substantially all of the Business (whether by merger, sale of assets or stock or otherwise) or to any Affiliate of Buyer without the written consent of the other parties hereto. Any purported assignment in violation of this Section is void.

This Bill of Sale shall be governed by and construed and enforced in accordance with, the laws of the State of Delaware, without regard to such jurisdiction's conflicts of law principles. Seller's signature hereto transmitted by facsimile or electronic transmission shall constitute effective execution and delivery of this Bill of Sale by Seller, may be used in lieu of the original Bill of Sale and shall be deemed to be its original signature for all purposes.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered as of the ____ day of _____, 2013.

SELLER:

INTEGRATED CONCEPTS, INC.
d/b/a PHARMACARE HEALTH SERVICES,
a New Mexico corporation

By:_____
Name:  Ross K. Huntingford
Title:  President

2

**EXHIBIT D**

**Form of Assignment and Assumption Agreement**

(see attached)

**EXHIBIT D**

ASSIGNMENT AND ASSUMPTION AGREEMENT

---

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective this ____ day of _____, 2013, by and between INTEGRATED CONCEPTS, INC. d/b/a PharmaCare Health Services, a New Mexico corporation ("Assignor"), and PHARMACY CORPORATION OF AMERICA, a California corporation ("Assignee").

RECITALS:

A.     Assignor is a party to, or otherwise has been assigned and has assumed, the agreements listed on Schedule 1 attached hereto (collectively, the "Assumed Contracts").

B.     Pursuant to the terms of Sections 1.1(a)(iii) and 4.11 of the Asset Purchase Agreement, dated as of September 30, 2013, among, inter alia, Assignor and Assignee (the "Purchase Agreement;" all capitalized terms used, but not otherwise defined, in this Agreement shall have the respective meanings ascribed to such terms in the Purchase Agreement), the Assumed Contracts are to be transferred from Assignor to Assignee upon the terms and conditions set forth therein and herein.

NOW THEREFORE, for valuable consideration paid, receipt of which hereby is acknowledged, effective as of the date first written above, the parties agree as follows:

1.     Assignor assigns to Assignee all of Assignor's right, title and interest in the Assumed Contracts, together with all rights arising under or by virtue of the Assumed Contracts. Notwithstanding the foregoing, with respect to any of the Assumed Contracts for which Assignor has not obtained the required consent of the applicable third party at or prior to Closing, Assignor conditionally assigns to Assignee all of Assignor's right, title and interest in such Assumed Contracts, each assignment to be effective upon the receipt of the applicable consent in accordance with the provisions of Section 4.11 of the Purchase Agreement.

2.     Assignee accepts this assignment, and assumes and agrees to perform all of the obligations of Assignor arising or accruing under the Assumed Contracts on or after the date of this Agreement, except those related to any default existing or accruing prior to the date of this Agreement.

3.     This Agreement shall be governed by the provisions of the Purchase Agreement, and such provisions are hereby incorporated into this Agreement. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

4.     This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted transferees and

assignees. No party hereto may assign this Agreement or any of its rights under this Agreement, whether directly or indirectly, in whole or in part, voluntary or involuntary, by merger, consolidation, dissolution, operation of law, through a change of control or any other manner without the written consent of the other parties; provided, however, that Assignee may effect any such assignment to a purchaser of substantially all of the Business (whether by merger, sale of assets or stock or otherwise) or to any Affiliate of Assignee without the written consent of the other parties hereto, but any such assignment shall not relieve Assignee of its duties and obligations contained in this Agreement. Any purported assignment in violation of this Section is void.

5.      This Agreement shall be governed by and construed and enforced in accordance with, the laws of the State of Delaware, without regard to such jurisdiction's conflicts of law principles.

6.      This Agreement may be executed in one or more counterparts, and all of which, when taken together, shall be deemed to constitute one and the same agreement. Signatures of the parties hereto transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes, shall constitute effective execution and delivery of this Agreement and may be used in lieu of the original Agreement for all purposes.

*[Signatures on the following page.]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment and Assumption Agreement to be duly executed and delivered as of the date first written above.

**ASSIGNOR:**

INTEGRATED CONCEPTS, INC.
d/b/a PHARMACARE HEALTH
SERVICES, a New Mexico corporation

By:_____
Name:   Ross K. Huntingford
Title:    President

**ASSIGNEE:**

PHARMACY CORPORATION OF
AMERICA, a California corporation

By:_____
Name:   Gregory S. Weishar
Title:    President

Schedule 1

See attached list of Assumed Contracts.

## EXHIBIT E

### Form of Consulting Agreement

(see attached)

**EXHIBIT E**

CONSULTING AGREEMENT
*Ross K. Huntingford*

---

**THIS CONSULTING AGREEMENT** (this "Agreement") is made and entered into effective this ____ day of _____, 2013 (the "Effective Date"), between Ross K. Huntingford, an individual ("Consultant"), and Pharmacy Corporation of America, a California corporation (herein the "Company").

**A.**     Pursuant to an Asset Purchase Agreement dated as of September 30, 2013 (the "Purchase Agreement"), the Company has acquired certain assets of the institutional pharmacy business of Integrated Concepts, Inc. d/b/a PharmaCare Health Services, a New Mexico corporation ("Seller").

**B.**     The Company is an indirect, wholly owned subsidiary of PharMerica Corporation (PharMerica Corporation and its subsidiaries and Affiliates are collectively referred to herein as, "PharMerica") and is engaged in the operation of the institutional pharmacy business (together with such other businesses as may be engaged in by it or Pharmerica during the Term of this Agreement, collectively, the "Business").

**C.**     As the sole shareholder and principal officer of Seller, Consultant has substantial knowledge and experience with the assets of Seller's business acquired by the Company. Consultant will have access to confidential financial information, customer and prospective customer relationships, trade secrets and other confidential and proprietary information of the Company and PharMerica. Consultant acknowledges and agrees that he will be retained by the Company in a position of trust and confidence and that this Agreement is necessary to protect the Company's and PharMerica's legitimate business interests and that the consideration received in connection with the Purchase Agreement and in this Agreement includes compensation that is reasonable and adequate to compensate Consultant for the restrictions set forth in this Agreement.

**D.**     This Agreement is executed in connection with and as an integral part of the acquisition of the assets of Seller's business purchased by the Company pursuant to the Purchase Agreement, to which Consultant is an owner of Seller and under which Consultant received financial consideration. As a material condition of and inducement to the Company to enter into the Purchase Agreement, Consultant agreed to enter into and abide by a separate Restrictive Covenant Agreement dated as of the date hereof, and also agreed to enter into and abide by this Agreement. Consultant agrees that the Company would not have entered into the Purchase Agreement but for Consultant's agreement to enter into and abide by this Agreement and the Restrictive Covenant Agreement.

**E.**     In order to retain the benefit of Consultant's services and to protect the Company's investment in the assets of Seller acquired pursuant to the Purchase Agreement, the Company now desires to retain Consultant, and Consultant desires to be retained by the Company, upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of these recitals and the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which hereby are expressly acknowledged, the parties hereto agree as follows:

## Section 1:  Retention

1.1     Duties.  The Company shall retain Consultant as a consultant upon the terms and conditions set forth in this Agreement. Consultant shall have such duties which may be assigned to Consultant from time-to-time by the Company. Consultant shall report to such individual or individuals as designated from time to time by the Company.  Consultant agrees to devote his best efforts and sufficient time and attention to the performance of his duties under this Agreement, and to perform such duties in an efficient, trustworthy and businesslike manner.  Consultant shall not act in any manner, directly or indirectly, that may damage the business of the Company or PharMerica or which would adversely affect the goodwill, reputation or business relations of the Company or PharMerica with their customers, the public generally or with any of their employees.

1.2     Independent Contractor Status.   The parties recognize that Consultant is an independent contractor and not an employee, agent, partner, joint venturer or representative of the Company or PharMerica, and that neither the Company nor PharMerica shall incur any liability as the result of Consultant's actions.  Consultant shall at all times represent and disclose that he is an independent contractor of the Company, and shall not represent to any third party that he is an employee, agent, partner, joint venturer or representative of the Company or PharMerica.  The Company shall not withhold any funds from Consultant for tax or other governmental purposes, and Consultant shall be responsible for the payment of same.  Consultant shall not be entitled to receive any employment benefits offered to employees of the Company or PharMerica, including, but not limited to, retirement benefits, health insurance coverage or workers' compensation insurance coverage.

## Section 2:  Term of Retention

2.1     Term.  The term of Consultant's retention by the Company shall commence as of the Effective Date and continue for a period of twenty-four (24) months from the Effective Date (the "Term").  This Agreement and Consultant's retention may be terminated at any time by the mutual written agreement of Consultant and the Company, or as provided for in Sections 2.2 or 2.4 of this Agreement.  Neither party has any obligation to renew this Agreement or continue Consultant's engagement with the Company at the expiration of the Term.

2.2     Termination for Cause.  The Company shall have the right to terminate Consultant's retention hereunder for the following causes (each a "Termination for Cause"):

　　　　　　(a)     commission by Consultant of, or entry of a plea of guilty or nolo contendere by Consultant with respect to, any felony or any crime involving an act of moral turpitude;

2

(b)     commission by Consultant of any act of dishonesty of a material nature or fraud;

(c)     conduct by Consultant that, in the sole discretion of the Company or PharMerica, amounts to harassment, discrimination or retaliation in violation of the Company's or PharMerica's policies or under applicable law;

(d)     conduct which is materially detrimental to the reputation, goodwill or business operations of the Company or PharMerica;

(e)     neglect by Consultant of his duties or breach by Consultant of his duties or intentional misconduct by Consultant in discharging such duties;

(f)     Consultant's continued absence from his duties without the consent of the Company after receipt of notification from the Company, other than absence due to bona fide illness or disability, as defined herein;

(g)     Consultant's failure or refusal to comply with the directions of the Company or PharMerica or with the policies, standards and regulations of the Company or PharMerica, provided that such directions, policies, standards or regulations do not require Consultant to (i) take any action which is illegal, immoral or unethical or (ii) fail to take any action required by applicable law, regulations or licensing standards; or

(h)     Consultant's breach of the restrictive covenants set forth in Section 5 of this Agreement;

provided, however, that termination of this Agreement and Consultant's retention for any act or omission described in subparagraphs (d) through (g) above shall not constitute a valid Termination for Cause unless Consultant shall have received written notice from the Company stating the nature of the conduct forming the basis for termination and affording Consultant thirty (30) days to correct the act or omission described. Unless Consultant cures such act or omission to the satisfaction of the Company, such Termination for Cause shall be effective immediately upon the expiration of said thirty (30) day period. Termination of Consultant for any reason described in subparagraphs (a), (b), (c) or (h) above shall be effective immediately upon written notice from the Company. Upon the effectiveness of any Termination for Cause by the Company, payment of all consulting fees and compensation to Consultant under this Agreement shall cease immediately, except for any payment of any earned Consulting Fee (as defined in Section 3.1) accrued but unpaid through the date of such Termination for Cause and reimbursement for any pending business expenses in accordance with Section 3.2.

2.3     Intentionally Omitted.

2.4     Termination upon Resignation, Disability or Death.  If Consultant should resign, become disabled or die during the Term, this Agreement shall terminate and payment of all consulting fees and any other compensation to Consultant under this Agreement shall cease immediately upon the occurrence of such event.

### Section 3:  Consulting Fee

3.1     Consulting Fee.  Subject to Sections 2 and 5.5 of this Agreement, during the Term the Company shall pay to Consultant a consulting fee of Ten Thousand Dollars ($10,000) per month for each month (or a pro rata amount for each portion thereof) of consulting services provided to the Company by Consultant pursuant to this Agreement (the "Consulting Fee"); provided, however, that in no event shall the aggregate amount of the Consulting Fee payable to Consultant during the Term exceed the sum of Two Hundred Forty Thousand Dollars ($240,000).  Consultant shall submit semi-monthly summaries to the Company which set forth a detailed description of the Services provided, including without limitation, an itemized log specifying the activities performed, the date and location the Services were provided and the corresponding amount of time Consultant spent providing such Services during the prior two weeks.  The Company shall pay Consultant the Consulting Fee on a semi-monthly basis until the earlier termination or expiration of the Agreement.

3.2     Reimbursement of Business Expenses.  During the Term and in accordance with PharMerica's policy on reimbursement of business expenses, the Company shall reimburse Consultant for all ordinary and necessary business expenses incurred by him in connection with the consulting services provided to the Company.  Reimbursement of such expenses shall be paid monthly, upon submission by Consultant to the Company of invoices itemizing such expenses in a form satisfactory to the Company, identifying the nature and business purpose of any such expenditures.

### Section 4:  Property of the Company or PharMerica; Assignment

4.1     Property of the Company or PharMerica.  Consultant agrees that the Business and all business developed by him relating to the Business during Consultant's prior employment with Seller and his consultancy with the Company, including, but not limited to, intellectual property, contracts, customer lists, prospective customer lists, referral lists, and any business developed or sought by the Company or PharMerica, or earned or carried on by Consultant for the Company or PharMerica, are and shall be the exclusive property of the Company or PharMerica for their sole use and benefit.

4.2     Assignment.   Consultant hereby grants and assigns to the Company (without additional compensation) Consultant's entire right, title and interest under applicable laws in and to all software products and modifications thereto, inventions, patents, patent applications, research, information, customer lists, all other intellectual property, technical and research data, and

4

copyrighted material made, conceived, developed or acquired by him solely or jointly with others during Consultant's prior employment with Seller and his consultancy with the Company, but only to the extent the foregoing pertains to the Business or his consulting engagement hereunder.

### Section 5:  Covenants of Non-Disclosure, Non-Solicitation and Non-Competition

5.1     Non-Disclosure.  During the Term and after the termination or expiration of his retention by the Company for any reason, Consultant shall not, and Consultant shall use his best efforts (which best efforts shall include, but not be limited to, notifying the Company of any suspected breach of this Section 5.1) to ensure that any Persons (as defined below) over which Consultant has control do not, directly or indirectly, use any of the Company's or PharMerica's proprietary, confidential or trade secret information for any purpose not associated with the Company's or PharMerica's activities, or disseminate or disclose any such information to any Person (other than the Company or its Affiliates) unless and to the extent that the Company's or PharMerica's proprietary, confidential or trade secret information is or becomes generally known to and available for use by the public other than as a result of Consultant's fault or the fault of any other Person bound by a duty of confidentiality with respect to such information.  Such Company or PharMerica proprietary, confidential or trade secret information includes, but is not limited to, sales methods, prospecting methods, customer lists, customer contacts, customer requirements, prospective customer lists, prospective customer contacts, referral source information, financial data, business strategies, computer technology, programs and data, whether on-line or off-loaded on disk format, methods of presentation and any other plans, programs and materials used in managing, marketing or furthering the Company's or PharMerica's business.  Upon termination and expiration of Consultant's retention by the Company, Consultant shall return immediately to the Company or PharMerica all documents, records, notebooks, manuals, computer disks and similar repositories of or containing the Company's or PharMerica's proprietary, confidential or trade secret information, including all copies thereof, then in Consultant's possession or control, whether prepared by Consultant or otherwise.  Consultant shall undertake all reasonably necessary and appropriate steps to insure that the confidentiality of the Company's and PharMerica's proprietary, confidential or trade secret information shall be maintained at all times during and after Consultant's retention by the Company.  For purposes of this Agreement, the term (i) "Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority, or individual, and (ii) "Affiliate" means any Person controlling, controlled by, or under common control with, such Person.

5.2     Non-Solicitation.  Consultant acknowledges and agrees that the Business is unique and was and will be conducted by the Company and PharMerica throughout the State of New Mexico and such other geographic areas in which Consultant provides his services to the Company or PharMerica pursuant to the terms of this Agreement (collectively, the "Restricted Area").  During the Term and for a period of two (2) years after the termination or expiration of Consultant's retention by the Company for any reason (the "Restricted Period"), Consultant shall not, directly or indirectly, as an employee, agent, consultant, advisor, director, equityholder, joint venturer, partner,

5

manager, or in any other individual or representative capacity: (i) solicit business from any Person (A) which is or was a client or customer of the Company or PharMerica in the Restricted Area at any time during the Term or the three (3) year period preceding the Effective Date, or (B) that was known to Consultant to be a customer or actively marketed prospect of the Company or PharMerica in the Restricted Area, or from any successor in interest to any of the foregoing Persons; (ii) induce or attempt to induce any customer, supplier, licensee or other party of the Company or PharMerica to cease doing business with the Company or PharMerica, or in any way interfere with the relationship between the Company and PharMerica and any such customer, supplier, licensee or other party; (iii) solicit, take away, hire, employ, induce or attempt to induce any employee or independent contractor of the Company or PharMerica to leave the employ or terminate their engagement with the Company or PharMerica; or (iv) publicly announce or advertise his former consultancy or connections with the Company or PharMerica without the prior written consent of the Company.  The customer non-solicitation provisions set forth in this Section 5.2 necessarily extend to all the Company's and PharMerica's customers and prospects that exist or that are marketed to, at any point during the Consultant's consultancy with the Company, including but not limited to those customers and prospects with whom or with which Consultant had actual contact, had indirect contact through his management of the Business, or about whom or which Consultant had access to confidential information during his consultancy with the Company.  Consultant agrees that the non-solicitation restrictions set forth in this Section 5.2 are reasonable and necessary, given Consultant's key role with the Business that is co-extensive with the entire scope of the Business.

   5.3   Non-Competition.  Consultant agrees that, during the Restricted Period, he shall not, directly or indirectly, as an employee, agent, consultant, advisor, director, equityholder, joint venturer, partner, manager, or in any other individual or representative capacity, own, operate, manage, control, direct, engage in, have any interest in, invest in, provide financing for, loan money to, underwrite expenses associated with, participate in any manner in, render services for (alone or in association with any Person), or otherwise assist any Person that engages in or owns, invests in, operates, manages or controls any venture or enterprise that directly or indirectly engages or proposes to engage in, the Proscribed Business (as defined below) anywhere in the Restricted Area. The term "Proscribed Business" means any business engaged in: (i) providing pharmaceutical products (including oral, topical, injectable and infusion products) or related services or supplies, (ii) providing clinical or consultant pharmacist services, (iii) providing nutritional products (including enteral nutritional products), or (iv) the generation, preparation or distribution of medical records with respect to the foregoing products or services, in each case to nursing homes, assisted living facilities, group homes or other long-term care or institutional care facilities, or to residents of such homes or facilities (collectively, the "Restricted Business").  Consultant further agrees that, during his consultancy with the Company, he shall use his best efforts to preserve the Business and the organization of the Company, to keep available to the Company and PharMerica the services of its employees, and to preserve for the Company and PharMerica its and his favorable business relationships with suppliers, customers and others with whom the Company, PharMerica and Consultant have business relationships.

Exh E - Consulting Agreement (PharmaCare) (v3)
TPADOCS 19949177 3

5.4     Applicability. The restrictive covenants set forth in Sections 5.1, 5.2 and 5.3 of this Agreement and the Company's remedies for the breach or threatened breach of such restrictive covenants shall survive and remain in effect notwithstanding the termination of this Agreement or the termination of Consultant's consultancy with the Company and shall apply to all terminations of Consultant's consultancy with the Company, regardless of the cause or circumstances thereof and whether such termination was voluntary or involuntary, and the term of Consultant's covenants contained in Sections 5.2 and 5.3 shall remain in effect for two (2) years following such termination. In the event Consultant violates any restrictive covenant in Section 5 of this Agreement as to which there is a specific time period during which Consultant is prohibited from taking certain actions or engaging in certain activities, then, in such event, the violation will toll the running of the time period from the date of the violation until the violation ceases.

5.5     Remedies. In view of the services which Consultant shall perform for the Company, which are special, unique, extraordinary and intellectual in character, which place him in a position of confidence and trust with the customers and employees of the Company and PharMerica, and which provide him with access to confidential financial information, trade secrets, "know-how" and other confidential and proprietary information of the Company and PharMerica, in view of the geographic scope and nature of the business in which the Company and PharMerica are engaged, and recognizing the value of this Agreement to him, Consultant expressly acknowledges that the restrictive covenants set forth in this Agreement, including, but not limited to, the geographic scope of such covenants, are necessary in order to protect and maintain the proprietary interests and other legitimate business interests of the Company and PharMerica, and that the enforcement of such restrictive covenants shall not prevent him from earning a livelihood. Consultant also acknowledges that the scope of the operations of the Company and PharMerica are such that it is reasonable that the restrictions set forth in this Agreement are not more limited as to geographic area than is set forth herein. Consultant further acknowledges that the remedy at law for any breach or threatened breach of this Agreement will be inadequate and, accordingly, that the Company and PharMerica, in addition to all other available remedies (including, but not limited to, seeking such damages as they have sustained by reason of such breach), shall be entitled to injunctive or any other appropriate form of equitable relief. Notwithstanding anything in this Agreement to the contrary, in the event Consultant breaches any of the covenants of non-disclosure, non-solicitation or non-competition set forth in Sections 5.1, 5.2 and 5.3 of this Agreement, he shall not receive any further payments from the Company pursuant to this Agreement.

7

**Section 6:  Miscellaneous Provisions**

6.1     Recitals; Assignment and Successors.  The statements contained in the recitals of fact set forth above are true and correct and by this reference are incorporated in and made a part of this Agreement.  The rights and obligations of the Company and PharMerica under this Agreement shall inure to the benefit of and be binding upon the successors, assigns and Affiliates of the Company and PharMerica, respectively.  The Company may assign its rights and obligations under this Agreement to any Affiliate of the Company or PharMerica without Consultant's consent, and if the Company or PharMerica sells all or substantially all of the assets of the Business, the rights and obligations of the Company under this Agreement may be assigned without Consultant's consent.  Consultant's obligation to provide services hereunder may not be assigned to, or assumed by, any other Person to any extent whatsoever.

6.2     Notices.  All notices, requests, demands, and other communications to be delivered hereunder shall be in writing and shall be deemed to have been given (i) when delivered by hand, (ii) when transmitted by facsimile or email if (A) the recipient provides written confirmation of receipt or (B) the sender on the same day sends a confirming copy of such notice by another means of delivery permitted hereunder, (iii) the day following the day (except if not a business day then the next business day) on which the same has been delivered prepaid to a reputable express mail or courier service, or (iv) the third business day following the day on which the same is sent by registered or certified mail, postage prepaid, at or to the each Party's respective address as shown on the signature page hereto.

6.3     Severability.  Any provision of this Agreement that is deemed invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction and subject to this Section 6.3, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.  If any covenant should be deemed invalid, illegal or unenforceable because its scope is considered to be overbroad, unreasonable, unnecessary to protect the legitimate business interests of the Company or PharMerica, an undue hardship on Consultant or injurious to the public interest, such covenant shall be interpreted so that the scope of the covenant is as broad as reasonable under the circumstances and reduced only to the minimum extent necessary to render the modified covenant valid, legal and enforceable.

6.4     Integration; Amendment and Waiver.  This Agreement and that certain Restrictive Covenant Agreement between the Company and Consultant dated as of the date hereof (the "Restrictive Covenant Agreement") constitute the entire agreements among the parties hereto with respect to the subject matter herein, superseding all prior arrangements and agreements; provided, however, the rights, obligations and interests of the parties under this Agreement are cumulative, and not alternative, to the rights, obligations and interests of the parties contained in the Restrictive Covenant Agreement. This Agreement may not be amended, supplemented, or otherwise modified

8

except by a written agreement executed by all of the parties hereto that identifies itself as an amendment to this Agreement.

6.5     Governing Law. This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of New Mexico applicable to contracts executed and wholly-performed within such state.

6.6     Interpretation. The headings contained in this Agreement are for reference purposes only, and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any party hereto. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

6.7     Non-Waiver of Rights and Breaches. No failure or delay of any party herein in the exercise of any right given to such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver by a party hereto of any default of any other party shall not be deemed to be a waiver of any subsequent default or other default by such party.

6.8     Attorneys' Fees. In the event of any action or proceeding arising out of or relating to this Agreement, including the termination, validity, interpretation, or enforcement of the restrictive covenants set forth in this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all costs and reasonable attorneys' fees incurred, including, but not limited to, fees incurred in both trial and appellate courts, and to that end, the Company or PharMerica shall be deemed to be the prevailing party and Consultant shall be deemed to be the non-prevailing party if, in an action challenging the termination, validity, interpretation or enforcement of a restrictive covenant, a court determines that the restrictive covenant at issue was or is enforceable, either as drafted or as modified by the court.

6.9     Dispute Resolution.

(a)     Any dispute, controversy or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement, including, but not limited to, (i) any claim based on contract, tort or statute and (ii) any claim by the Company or PharMerica to enforce the covenants and seek the remedies set forth in Section 5 of this Agreement through the courts as it deems necessary or desirable in order to (A) protect its confidential or proprietary information or (B) prevent the occurrence of any event which the Company or PharMerica believes will cause it to suffer immediate and irreparable harm or damage, such dispute, controversy or claim shall be resolved by litigation; in that connection, each of the parties hereto hereby (i) irrevocably and unconditionally consents to submit itself or himself to the sole and exclusive personal jurisdiction of any federal or state court located within Bernalillo County, New Mexico (the

"Applicable Courts"), (ii) waives any objection to the laying of venue of any such litigation in any of the Applicable Courts, (iii) agrees not to plead or claim in any such court that such litigation brought therein has been brought in an inconvenient forum and agrees not otherwise to attempt to deny or defeat such personal jurisdiction or venue by motion or other request for leave from any such court, and (iv) agrees that it or he will not bring any action, suit, or proceeding in connection with any dispute, claim, or controversy arising out of or relating to this Agreement or the transactions contemplated hereby in any court or other tribunal other than any of the Applicable Courts. Nothing in this Section shall prevent enforcement in another forum of any judgment obtained in the Applicable Courts. Each party hereto hereby irrevocably and unconditionally agrees that service of process in connection with any dispute, claim, or controversy arising out of or relating to this Agreement or the transactions contemplated hereby may be made upon such party by prepaid certified or registered mail, with a validated proof of mailing receipt constituting evidence of valid service, directed to such party at the address specified in Section 6.2 hereof. Service made in such manner, to the fullest extent permitted by applicable law, shall have the same legal force and effect as if served upon such party personally within the State of New Mexico. Nothing herein shall be deemed to limit or prohibit service of process by any other manner as may be permitted by applicable law.

(b)     **EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND CONSENTS TO ANY AND ALL RELIEF ORDERED BY THE COURT, AFTER THE TIME FOR APPEAL HAS EXPIRED.**

6.10     Drafting Information. All of the parties hereto have had access to, and assistance from, qualified and competent counsel in respect to the drafting and negotiation of this Agreement. Accordingly, all of the parties hereto shall be deemed the drafters of this Agreement, and no provision hereof shall be construed against any party hereto because such party provided the first, or any subsequent, draft of this Agreement or any part thereof.

6.11     Compliance with Law. The parties hereto shall comply with all applicable federal, state and local laws, rules, regulations and requirements. In addition, Consultant shall agree to the terms and obligations in the Regulatory Addendum attached hereto.

6.12     Counterparts. This Agreement may be executed in any number of counterparts by the parties hereto, each of which when so executed shall be deemed an original and all of which taken together shall constitute one and the same instrument.

6.13     Facsimile Signatures. A facsimile signature on this Agreement is as valid as an original signature.

Exh E - Consulting Agreement (PharmaCare) (v3)
TPADOCS 19949177 3

IN WITNESS WHEREOF, the parties hereto have caused this Consulting Agreement to be duly executed and delivered as of the date first written above.

**CONSULTANT:**

_____

Name:  Ross K. Huntingford

Address for Notice:
Integrated Concepts, Inc.,
d/b/a PharmaCare Health Services
11907 San Rafael N.E.
Albuquerque, NM 87122
Attn: Ross K. Huntingford

**COMPANY:**

Pharmacy Corporation of America,
a California corporation

By: _____
Name:  Gregory S. Weishar
Title:  President

Address for Notice:
c/o PharMerica Corporation
1901 Campus Place
Louisville, KY 40299
Attention:  General Counsel
Facsimile:  (502) 261-2388

REGULATORY ADDENDUM

1.    <u>Capitalized Terms</u>.  Capitalized terms not otherwise defined in this Regulatory Agreement shall have the meaning ascribed to them in the Agreement.

2.    <u>Conflict</u>.  In the event that there is a conflict between the terms and conditions in the Agreement and in this Medicare Agreement, the terms and conditions in this Medicare Agreement shall control.

3.    <u>Licensure.</u>  Consultant shall immediately notify the Company if the license, certification and/or registration of Consultant or, if applicable, of any of its employees, subcontractors or agents providing services to The Company lapses or is denied, suspended, revoked, terminated, relinquished, or made subject to terms of probation or other restriction.

4.    <u>Federal Funds</u>.  Consultant acknowledges that the Company may receive Federal funds and, as such, the Company may be subject to certain laws that are applicable to individuals and entities receiving Federal funds.

5.    <u>Privacy and Security</u>.  In performing the services under the Agreement, Consultant agrees to comply with all applicable Federal and State laws governing the privacy and security of PHI (as defined in the Agreement) and any confidentiality and security provisions stated in the regulations for Medicare Part D program at 42 CFR §423.136 and the Medicare Advantage program at 42 CFR §422.118, as applicable.  The Company hereby represents and warrants that Consultant's compliance with the privacy and security provisions set forth in the Agreement, and, if incorporated into the Agreement, the terms and conditions of any Business Associate Agreement, shall be deemed compliance with this Section 5.

6.    <u>Subcontractors</u>.  If Consultant engages a subcontractor,1 including an offshore subcontractor, to provide services under the terms of the Agreement, such subcontractor (and any downstream subcontractor) must agree, in writing, to comply with all of Consultant's obligations set forth in this Regulatory Addendum and in the Agreement, including those involving privacy and security of PHI.

7.    <u>Offshore Subcontractor Information</u>.  Consultant agrees that if it performs any services offshore or engages any "offshore subcontractors" to provide any services under the terms of the Agreement and such services involve receiving, processing, transferring, handling, storing, or accessing of a Medicare Advantage or Medicare Part D beneficiary's PHI then, in addition to

---

1      The term "subcontractor" as used in this Regulatory Addendum refers to any organization that Vendor contracts with to fulfill or help fulfill requirements under the Agreement.  Subcontractors include all first tier, downstream, and/or related entities.  The term "offshore" refers to any country that is not one of the fifty United States or one of the United States Territories (American Samoa, Guam, Northern Marianas, Puerto Rico, and Virgin Islands).  Subcontractors that are considered offshore can be either American-owned companies with certain portions of their operations performed outside of the United States or foreign-owned companies with their operations performed outside of the United States.  Offshore subcontractors provide services that are performed by workers located in offshore countries, regardless of whether the workers are employees of American or foreign companies.

complying with the terms and conditions set forth in the Business Associate Agreement governing use and disclosure of PHI by, and to, Consultant and/or Consultant's subcontractors, Consultant shall provide the Company, in writing, the name and address of each of Consultant's offshore locations or offshore subcontractor, the services provided at such offshore locations or by each offshore subcontractor, the effective date of the arrangement between Consultant and such offshore contractor and such other additional information regarding the arrangement that may be required for the Company's compliance with a Sponsor's request. In addition, if Consultant performs any services offshore, Consultant agrees that it shall not have access to any data that is not associated with Consultant's obligations pursuant to the Agreement. Furthermore, if Consultant utilizes an offshore subcontractor, it shall only provide such offshore subcontractor with access to the data that is necessary for the offshore subcontractor to perform its services under its subcontractor arrangement. Consultant shall also perform an annual audit of each offshore subcontractor, the results of which shall be used by Consultant to evaluate the continuation of its relationship with such offshore subcontractor. Consultant agrees to share such audit results with the Company, Sponsor, and/or CMS upon request. **[CMS Memoranda, "Sponsor Activities Performed Outside of the United States (Offshore Subcontracting)," dated July 23, 2007 and "Offshore Subcontractor Data Module in HPMS," dated August 26, 2008]**

8.    Exclusion from Federal Health Care Programs. Consultant hereby represents and warrants that neither it, nor any of its officers, directors, managers, or employees are currently excluded from, or have ever been excluded from, any Federal or State health care program, including, without limitation, Medicare Advantage or Medicare Part D, or, if previously excluded, have been fully reinstated, in which case Consultant shall provide the Company written proof of such reinstatement and such other information as the Company may require describing the reasons for the prior exclusion. Consultant hereby agrees to review the DHHS Office of Inspector General and General Services Administration exclusion list on a monthly basis for the duration of the Agreement to ensure that any officer, director, manager or employee responsible for providing services under this Agreement is not excluded from any Federal or State health care program. Consultant shall immediately notify the employee at the Company with whom Consultant has the closest working relationship, in writing, in the event that Consultant knows, or has reason to know, that any Federal or State health care program has initiated proceedings to sanction, bar, suspend or exclude Consultant, or any of its officers, directors, managers or employees. If Consultant fails to comply with any of the foregoing provisions, the Company may terminate the Agreement immediately upon written notice to Consultant.

9.    Code of Conduct. Consultant represents and warrants that it has a written Code of Conduct that, at a minimum, requires: (i) its officers, directors, employees, agents and other representatives to act in an ethical and legally compliant manner in performing their duties and functions; (ii) all such officers, directors, employees, agents and other representatives to report conduct that is in violations of such Code of Conduct; and (iii) Consultant to take action to address and remedy and such violation of its Code of Conduct, including, but not limited to, taking all appropriate disciplinary action. Consultant further represents and warrants that: (i) it shall maintain such written Code of Conduct in place throughout the entire term of the Agreement; (ii) it requires its officers, directors

and employees to acknowledge their obligation to comply with such written Code of Conduct at least annually; and (iii) it shall use its best efforts to ensure compliance with such Code of Conduct. Consultant shall provide a current copy of its written Code of Conduct to the Company upon request, and shall provide the Company with an updated version of its Code of Conduct upon any revisions thereto. If Consultant does not have a Code of Conduct, Consultant shall formally resolve to adopt a Code of Conduct that is substantially similar in scope to the Company's Code of Business Conduct and Ethics as its own and shall provide evidence of such resolution to the Company within 30 days of the Effective Date.

10.     Compliance Training.  Prior to the Effective Date of the Agreement, the Consultant, or if Consultant is an entity, the individual associated with the entity who is primarily responsible for Consultant's obligations under the Agreement ("Consultant's Representative"), shall complete the Company's compliance training program, consisting of web-based presentations, quizzes, and certifications that address: (1) the Company's Code of Business Conduct and Ethics and the accompanying acknowledgment form; (2) the Company's compliance with the Federal Anti-kickback Statute; and (3) the Company's compliance with the Federal Health Insurance Portability and Accountability Act (HIPAA) and the Federal Health Information Technology for Economic and Clinical Health (HITECH) Act.  Further, Consultant accepts that the Company may modify its compliance training program or some portion thereof from time to time during the Term of this Agreement. Upon the Company's reasonable request following such modification, Consultant, or, if applicable, Consultant's Representative, shall complete the modified version of the Company's compliance training program or, if directed by the Company, the relevant portion thereof.

11.     Medicare Advantage and Medicare Part D Obligations.  The Company enters into arrangements downstream from entities that contract directly with CMS ("Sponsors") to provide Medicare Advantage prescription drug benefits and/or Medicare Part D benefits to Medicare beneficiaries. Pursuant to these downstream arrangements ("CMS Subcontracts"), the Company is obligated to include certain provisions in its Agreement with Consultant required by Part C and/or Part D of the Medicare Modernization Act of 2003 ("MMA"), as may be applicable, and any subsequent amendments to the MMA and applicable regulations (the "Medicare Rules").  This Section 11 of the Regulatory Addendum applies to services provided by Consultant, but only as they relate to services provided to Medicare Advantage and Medicare Part D beneficiaries.

a.   Compliance with CMS Subontracts.  Consultant agrees to perform all services under the Agreement in a manner that is consistent with and complies with the Company's obligations under its CMS Subcontracts.  The Company hereby represents and warrants that the terms of the Agreement and this Medicare Agreement are consistent with and in compliance with its CMS Subcontracts.  The Company shall notify Consultant of any changes to its CMS Subontracts that are related to the services provided by Consultant under the Agreement and with which Consultant is expected to comply.  **[42 CFR 423.505(i)(3)(iii); 42 CFR 422.504(i)(3)(iii)]**

b. <u>Compliance with Laws</u>. In performing the services under the Agreement, Consultant agrees to comply with all applicable Medicare and other Federal and State laws, regulations, and CMS pronouncements and instructions. **[42 CFR 423.505(i)(3)(v); 42 CFR 423.505(i)(4)(iv); 42 CFR 422.504(i)(4)(v)]**

c. <u>Specialized Compliance Training</u>. Upon Sponsor's reasonable request, Consultant shall require all employees performing services under the Agreement to annually receive specialized compliance training from Sponsor concerning Medicare Advantage and Medicare Part D, as applicable ("Specialized Compliance Training"). Sponsor, at its cost, will provide the Specialized Compliance Training, subject to a mutually agreed upon training schedule. **[42 CFR 423.504 (b)(4)(vi); 42 CFR 422.503 (b)(4)(vi)]**

d. <u>Inspection of Books and Records</u>. Consultant agrees that: (i) the United States Department of Health and Human Services ("DHHS"), the Comptroller General, and/or their designees have the right to inspect, evaluate and audit pertinent contracts, books, documents, papers and records of Consultant involving transactions related to the CMS Subcontracts; and (ii) DHHS, the Comptroller General, the and/or their designees have the right to inspect, evaluate, and audit any pertinent information for any particular CMS Subcontract period for ten (10) years from the date of termination or expiration of the CMS Subcontract, or from the date of completion of any audit, whichever is later. **[42 CFR 423.505(i)(2)(i)-(ii); 42 CFR 422.504(i)(2)(i)-(ii)]**

e. <u>Inspection of Records</u>. Consultant shall produce, upon request by CMS or its designees, any books, contracts, records, including the medical records and documentation of any Sponsor relating to the Sponsor's Medicare Part C and Part D obligations, as applicable **[42 CFR 423.505(i)(3)(iv)]**

f. <u>Hold Harmless</u>. Consultant agrees that in no event including, but not limited to, nonpayment by the Company, the Company's insolvency, or breach of the Agreement, shall Consultant bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Medicare Advantage or Medicare Part D beneficiary of a Sponsor or persons acting on the beneficiary's behalf for payment of services that are the financial responsibility of a Sponsor. **[42 CFR 423.505(i)(3)(i); 42 CFR 422.504(i)(3)(i)]**

g. <u>Delegated Duties</u>. If the Company has delegated to Consultant any of the Company's activities and/or reporting requirements under its CMS Subcontracts, the Company and Consultant agree that (a) if CMS or Sponsor determines that Consultant has not satisfactorily performed such delegated activities or reporting responsibilities, CMS or Sponsor may revoke any such activities or reporting responsibilities; (b) Sponsor shall monitor the performance of such delegated activities or reporting responsibilities on an ongoing basis, and (c) Sponsor is ultimately responsible to

CMS for the performance of such delegated activities or reporting responsibilities. **[42 CFR 423.505(i)(preamble); 42 CFR 423.505(i)(4)(ii)-(iii); 42 CFR 422.504(i)(3)(ii); 42 CFR 422.504(i)(4)(ii)-(iii)]**

12.      Termination-Regulatory Issues. If during the term of the Agreement, the Company concludes that it is necessary to cancel any of the activities to be performed under the Agreement in order to comply with Federal or State laws, regulations, or policies, the Company may, at its discretion, cancel the activity and be relieved of any related obligations under the terms of the Agreement. If the Company or Consultant concludes that it is necessary to reorganize or restructure any of the activities to be performed under this Agreement in order to comply with Federal or State laws, regulations, or policies, the Company or Consultant may request to renegotiate such terms.

**EXHIBIT F**

**Form of Restrictive Covenant Agreement**

(see attached)

**EXHIBIT F**

### RESTRICTIVE COVENANT AGREEMENT
*Ross K. Huntingford & Integrated Concepts, Inc.*

**THIS RESTRICTIVE COVENANT AGREEMENT** (this "<u>Agreement</u>") is made and entered into effective this ____ day of _____, 2013, between Pharmacy Corporation of America, a California corporation ("<u>Buyer</u>"), Integrated Concepts, Inc. d/b/a PharmaCare Health Services, a New Mexico corporation ("<u>Seller</u>") and Ross K. Huntingford ("<u>Shareholder</u>"). All capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

### RECITALS:

A.      Shareholder is the sole shareholder of Seller.

B.      Seller has, as of this date, sold and conveyed to Buyer certain assets which it used in the business of: (i) providing pharmaceutical products (including oral, topical, injectable and infusion products) and related services and supplies, (ii) providing clinical and consultant pharmacist services, (iii) providing nutritional products (including enteral nutritional products), and (iv) the generation, preparation and distribution of medical records with respect to the foregoing products and services, in each case to nursing homes, assisted living facilities, group homes and other long-term care or institutional care facilities, and to residents of such homes or facilities (the provision of such services and products to such homes or facilities, collectively, the "<u>Business</u>").

C.      Buyer intends to carry on the Business formerly conducted by Seller utilizing the Purchased Assets.

D.      Each of Seller and Shareholder has had access to customer and client contacts, contracts and relationships related to the operation of the Business in the Restricted Area (as defined in Section 2(a) hereof), and considerable information (including trade secret and other confidential information) relating to the Business, which information is substantially valuable in the operation of the Business.

E.      In connection with the sale of the Purchased Assets to Buyer, the parties hereto also have become parties to an Asset Purchase Agreement, dated as of September 30, 2013 (the "<u>Purchase Agreement</u>"), which contemplates that the parties shall enter into this Agreement and which provides substantial direct and indirect financial benefit to Seller and Shareholder. In order to protect the assets purchased by Buyer pursuant to the Purchase Agreement, Shareholder and Seller have agreed to enter into and abide by the terms of this Agreement and acknowledge that Buyer would not have entered into the Purchase Agreement but for Seller and Shareholder's agreement to enter into and abide by the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual premises and covenants contained herein, the receipt and sufficiency of which hereby are expressly acknowledged, and in accordance with the Purchase Agreement, the parties hereto agree as follows:

*Section 1. Consideration; Rights of Buyer.* Shareholder and Seller acknowledge that (i) the consideration received in connection with the Purchase Agreement includes compensation that is reasonable and adequate to compensate both Seller and Shareholder for the restrictions set forth in this Agreement, (ii) in order to assure Buyer that the Business and the Purchased Assets will retain their value, it is necessary that Seller and Shareholder undertake not to utilize any special knowledge of the Business and Seller or Shareholder's relationship with clients or customers to compete with Buyer and (iii) the restrictions set forth in this Agreement are reasonable and necessary in all respects (including geography, time limitation, and scope of prohibited activity) to protect Buyer's legitimate interests in the assets that are being sold pursuant to the Purchase Agreement, are narrowly tied to the geographic scope and business activity scope of the assets of the Business being purchased, and that the restrictions are not oppressive and will not cause any undue hardship on Shareholder or Seller. Covenants contained herein are cumulative to the rights of Buyer under the laws of the State of Delaware, the State of California, the Commonwealth of Kentucky, the State of New Mexico and other jurisdictions as applicable respecting Buyer's right to protect the assets it purchased pursuant to the Purchase Agreement and to protect itself from the unfair competition of Shareholder or Seller or the disclosure of any trade secret or confidential information relating to the Business.

*Section 2. Covenants Not to Compete or Solicit.*

(a) __Non-Competition.__ For a period of seven (7) years from the Closing Date (the "Restricted Period"), neither Seller nor Shareholder shall, directly or indirectly, jointly or severally, as an employee, agent, consultant, advisor, director, equityholder, joint venturer, partner, manager, or in any other individual or representative capacity, own, operate, manage, control, direct, engage in, have any interest in, invest in, provide financing for, loan money to, underwrite expenses associated with, participate in any manner in, render services for (alone or in association with any Person), or otherwise assist any Person that engages in or owns, invests in, operates, manages or controls any venture or enterprise that directly or indirectly engages or proposes to engage in, the Proscribed Business (as defined below) anywhere in the Restricted Area (as defined below). The term "Proscribed Business" means any business engaged in: (i) providing pharmaceutical products (including oral, topical, injectable and infusion products) or related services or supplies, (ii) providing clinical or consultant pharmacist services, (iii) providing nutritional products (including enteral nutritional products), or (iv) the generation, preparation or distribution of medical records with respect to the foregoing products or services, in each case to nursing homes, assisted living facilities, group homes or other long-term care or institutional care facilities, or to residents of such homes or facilities. The term "Restricted Area" means the State of New Mexico, which Seller and Shareholder acknowledge is co-extensive with the geographic scope of the Business operated by Seller. The term "Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority, or individual. Nothing herein shall prevent Seller or Shareholder from becoming the owner of a nursing home, assisted living facility, group home or other long-term care or institutional care facility within the Restricted Area so long as Seller or Shareholder does not directly or indirectly engage in the Proscribed Business with any such nursing home, assisted living facility, group home or other long-term care or institutional care facility.

2

(b) **Non-Solicitation of Customers.** During the Restricted Period, neither Seller nor Shareholder shall, directly or indirectly, jointly or severally, as an employee, agent, consultant, advisor, director, equityholder, joint venturer, partner, manager, or in any other individual or representative capacity, (i) solicit business from any Person (A) which is or was a client or customer of the Business at any time during the three (3) year period preceding the Closing Date, or (B) that was known to Seller or Shareholder to be a customer or actively marketed prospect of Buyer (or any of its affiliates), or from any successor in interest to any of the foregoing Persons, or (ii) induce or attempt to induce any customer, supplier, licensee or other party of the Business to cease doing business with Buyer (or any of its affiliates), or in any way interfere with the relationship between Buyer (or any of its affiliates) and any such customer, supplier, licensee or other party. For purposes of this Agreement, an "affiliate" means any entity controlling, controlled by, or under common control with, such Person.

(c) **Non-Solicitation of Employees.** During the Restricted Period, neither Seller nor Shareholder shall, directly or indirectly, jointly or severally, as an employee, agent, consultant, advisor, director, equityholder, joint venturer, partner, manager, or in any other individual or representative capacity, (i) induce or attempt to induce any employee or independent contractor, if applicable, of Buyer (or any of its affiliates) working within the Restricted Area to leave the employ of Buyer (or any of its affiliates), (ii) in any way interfere with the relationship between Buyer (or any of its affiliates) and its employees working within the Restricted Area, or (iii) employ or otherwise engage as an employee, independent contractor or otherwise any employee of Buyer (or any of its affiliates) working within the Restricted Area. The posting of an advertisement of general solicitation shall not be deemed to be a violation of this subsection so long as such advertisement is not directed at employees engaged or to be engaged in the Restricted Business within the Restricted Area.

### Section 3.   Covenants Regarding Confidential Information.

(a)   For purposes of this Agreement, the term "Confidential Information" means the following, any and all of which constitute Confidential Information of Seller to the extent including, containing or relating to the Purchased Assets: (i) any and all information relating to the Purchase Agreement or the transactions contemplated thereby, (ii) any and all trade secrets concerning the Business, (iii) any and all product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing and distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, contractors, agents, suppliers and potential suppliers, personnel training, techniques and materials, purchasing methods and techniques, market studies, business plans, computer software and programs (including object code and source code), database technologies, systems and structures, improvements, devices, discoveries, concepts, methods and information of Seller, and (iv) any and all notes, analysis, compilations, studies, summaries and other material, however documented, prepared by or for Seller containing or based, in whole or in part, upon any information included in the foregoing.

3

(b)     Each of Seller and Shareholder acknowledge that the protection of the Confidential Information is necessary to protect and preserve the value of the Purchased Assets. Therefore, neither Seller nor Shareholder will disclose to any unauthorized Persons or use for Seller's or Shareholder's own account or for the benefit of any third party any Confidential Information, whether or not such information is embodied in writing or other physical form or is retained in the memory of Shareholder or any officer or employee of Seller, without Buyer's written consent, unless and to the extent that the Confidential Information is or becomes generally known to and available for use by the public other than as a result of Seller's or Shareholder's fault or the fault of any other Person bound by a duty of confidentiality with respect to such information.  Seller and Shareholder shall deliver to Buyer at the time of execution of this Agreement, and at any other time Buyer may request, all documents, memoranda, notes, plans, records, reports and other documentation, models, components, devices or computer software, whether embodied in a disk or in other form (and all copies of all of the foregoing), that contain Confidential Information and any other Confidential Information that Seller or Shareholder may then possess or have under Seller or Shareholder's control.

***Section 4.   Injunctive Relief; Attorneys' Fees.***  If Seller or Shareholder breaches any covenant set forth in this Agreement, whether such breach violates the covenant as drafted or as modified by a court, it is expressly agreed between the parties that monetary damages would be inadequate to compensate Buyer for such breach. Accordingly, Seller and Shareholder acknowledges that any such violation or threatened violation will cause irreparable injury to Buyer and that, in addition to any other remedies which may be available, Buyer immediately may obtain and enforce injunctive relief (in the form of a temporary restraining order, preliminary injunction and/or permanent injunction) prohibiting Seller or Shareholder (as the case may be) from violating this Agreement from any court of law or equity, without notice and without the posting of any bond.  In the event Shareholder or Seller violates any restrictive covenant in Section 2 of this Agreement as to which there is a specific time period during which Shareholder or Seller is prohibited from taking certain actions or engaging in certain activities, then, in such event, the violation will toll the running of the time period from the date of the violation until the violation ceases.  Buyer's right to injunctive relief shall be in addition to, and not in lieu of, any other legal or equitable remedies that may be available to Buyer, including, but not limited to, monetary damages to the extent they are calculable, lost profits, disgorgement of any profits obtained by Shareholder or Seller, and prejudgment interest in the amount of ten percent (10%) per annum.  In the event of any action or proceeding arising out of or relating to any breach by Shareholder or Seller of this Agreement or the termination, validity, interpretation, or enforcement of the restrictive covenants set forth in this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all costs and reasonable attorneys' fees incurred, including, but not limited to, fees incurred in both trial and appellate courts, and to that end, Buyer shall be deemed to be the prevailing party and Shareholder or Seller (as the case may be) shall be deemed to be the non-prevailing party if, in an action challenging the termination, validity, interpretation, or enforcement of a restrictive covenant, a court determines that the restrictive covenant at issue was or is enforceable either as drafted or as modified by the court.

***Section 5.  Miscellaneous.***

4

(a) **Severability.**  Any provision of this Agreement that is deemed invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction and subject to this Section 5(a), be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.  If any covenant should be deemed invalid, illegal or unenforceable because its scope is considered to be overbroad, unreasonable, unnecessary to protect the legitimate interests of Buyer, an undue hardship on Shareholder or Seller or injurious to the public interest, such covenant shall be interpreted so that the scope of the covenant is as broad as reasonable under the circumstances and reduced only to the minimum extent necessary to render the modified covenant valid, legal and enforceable.

(b) **Complete Agreement.**  This Agreement and that certain Consulting Agreement between Buyer and Shareholder dated as of the date hereof (the "Consulting Agreement") constitute the entire agreements among the parties hereto with respect to the subject matter herein, superseding all prior arrangements and agreements; provided, however, the rights, obligations and interests of the parties under this Agreement are cumulative, and not alternative, to the rights, obligations and interests of the parties contained in the Consulting Agreement. This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by all of the parties hereto that identifies itself as an amendment to this Agreement.

(c) **Governing Law.**  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New Mexico, without regard to such jurisdiction's choice or conflict of laws principles.

(d) **Dispute Resolution; Waiver of Jury Trial.**

(i)      Any dispute, controversy or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement, including, but not limited to, any claim based on contract, tort or statute, such dispute, controversy or claim shall be resolved by litigation; in that connection, each of the parties hereto (A) irrevocably and unconditionally consents to submit itself to the sole and exclusive personal jurisdiction of any federal or state court located within Bernalillo County, New Mexico (the "Applicable Courts"), (B) waives any objection to the laying of venue of any such litigation in any of the Applicable Courts, (C) shall not plead or claim in any such court that such litigation brought therein has been brought in an inconvenient forum and shall not otherwise to attempt to deny or defeat such personal jurisdiction or venue by motion or other request for leave from any such court, and (D) shall not bring any action, suit, or proceeding in connection with any dispute, claim, or controversy arising out of or relating to this Agreement or the transactions contemplated hereby in any court or other tribunal other than any of the Applicable Courts.  Nothing in this Section shall prevent enforcement in another forum of any judgment obtained in the Applicable Courts. Service of process in connection with any dispute, claim, or controversy arising out of or relating to this Agreement or the transactions contemplated hereby may be made upon such party by prepaid certified or registered mail, with a validated proof of mailing receipt constituting evidence of valid service, directed to a party hereto at the address specified on the signature page

5

of this Agreement. Service made in such manner, to the fullest extent permitted by applicable law, shall have the same legal force and effect as if personally served upon such party. Nothing herein shall be deemed to limit or prohibit service of process by any other manner as may be permitted by applicable law.

(ii) **EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND CONSENTS TO ANY AND ALL RELIEF ORDERED BY THE COURT, AFTER THE TIME FOR APPEAL HAS EXPIRED.**

(e) **Assignment.** No party hereto may assign this Agreement or any of its rights under this Agreement, whether directly or indirectly, in whole or in part, voluntary or involuntary, by merger, consolidation, dissolution, operation of law, through a change of control or any other manner without the written consent of the other party to this Agreement; provided, however, that Buyer, without the prior written consent of the other party, may effect any such assignment to any affiliate of Buyer or to a Buyer of substantially all of the Business (whether by merger, sale of assets or stock or otherwise) from Buyer. Any purported assignment in violation of this Section is void.

(f) **Non-Waiver of Rights and Breaches.** No failure or delay of any party herein in the exercise of any right given to such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver by a party hereto of any default of any other party shall not be deemed to be a waiver of any subsequent default or other default by such party.

(g) **Drafting Information.** All of the parties hereto have had access to, and assistance from, qualified and competent counsel in respect to the drafting and negotiation of this Agreement. Accordingly, all of the parties hereto shall be deemed the drafters of this Agreement, and no provision hereof shall be construed against any party hereto because such party provided the first, or any subsequent, draft of this Agreement or any part thereof.

(h) **Counterparts.** This Agreement may be executed in counterparts by the parties hereto, each of which when so executed shall be deemed an original and both of which taken together shall constitute one and the same instrument.

(i) **Signatures.** A facsimile signature on this Agreement or a signature sent via email attachment is as valid as an original signature.

*[Signatures on following page.]*

6

**IN WITNESS WHEREOF**, the parties hereto have caused this Restrictive Covenant Agreement to be duly executed and delivered as of the date first written above.

**BUYER:**

Pharmacy Corporation of America,
a California corporation

By: _____
Name:  Gregory S. Weishar
Title: President

Address for Notice:
c/o PharMerica Corporation
1901 Campus Place
Louisville, KY 40299
Attention:  General Counsel
Fax:  (502) 261-2388

**SELLER:**

INTEGRATED CONCEPTS, INC.
d/b/a PharmaCare Health Services,
a New Mexico corporation

By:_____
Name: Ross K. Huntingford
Title: President

Address for Notice:
Integrated Concepts, Inc.
d/b/a PharmaCare Health Services
11907 San Rafael N.E.
Albuquerque, NM 87122
Attn: Ross K. Huntingford
Fax: (505) 341-0154

**SHAREHOLDER:**

_____
Ross K. Huntingford

Address for Notice:
c/o Integrated Concepts, Inc.
d/b/a PharmaCare Health Services
11907 San Rafael N.E.
Albuquerque, NM 87122
Attn: Ross K. Huntingford
Fax: (505) 341-0154

7

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed and delivered as of the day and year first above written.

**BUYER:**

PHARMACY CORPORATION OF AMERICA,
a California corporation

By:_____
Name: Gregory S. Weishar
Title: President

**SELLER:**

INTEGRATED CONCEPTS, INC., d/b/a
PharmaCare Health Services, a New Mexico
corporation

By:_____
Name: Ross K. Huntingford
Title: President


**SHAREHOLDER:**

Ross K. Huntingford

39

EXHIBIT
B

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed and delivered as of the day and year first above written.

**BUYER:**

PHARMACY CORPORATION OF AMERICA, a California corporation

By:_____
Name: Gregory S. Weishar
Title: President

**SELLER:**

INTEGRATED CONCEPTS, INC., d/b/a PharmaCare Health Services, a New Mexico corporation

By:_____
Name: Ross K. Huntingford
Title: President

**SHAREHOLDER:**

_____
Ross K. Huntingford

39