# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROSS HUNTINGFORD,**

Plaintiff,

v.                                                                    **No: 1:17-cv-1210-RB-LF**

**PHARMACY CORPORATION OF AMERICA**
**d/b/a PHARMERICA,**

Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

In this contractual dispute, $1,250,000 hangs in the balance. Plaintiff Ross Huntingford believes he is entitled to a deferred payment in that amount after selling his pharmacy business to Defendant Pharmacy Corporation of America d/b/a PharMerica (PharMerica). PharMerica argues that business profits in the second year following the sale fell far short of the threshold required for Mr. Huntingford to earn that deferred payment, or even a reduced deferred payment contemplated by the contract. It has produced spreadsheets stating the same. Mr. Huntingford counters that the spreadsheets are peppered with mathematical errors. He believes that PharMerica intentionally mismanaged the business to deny him the chance of ever obtaining the $1,250,000 deferred payment.

After partially granting PharMerica's Motion for Summary Judgment on Mr. Huntingford's claims of quantum meruit and unjust enrichment (*see* Doc. 87), the Court must now determine if there are genuine disputes of fact that are material to resolving Mr. Huntingford's remaining claims of breach of contract and breach of the implied duty of good faith and fair dealing. Because the existence of genuine disputes of material fact on these issues depends on the

admissibility and sufficiency of various evidence offered by both parties, the Court will take up the parties' evidentiary motions before turning to the motion for summary judgment.

Having considered the submissions of counsel and relevant law, the Court will: (1) **grant** PharMerica's motion to exclude George Sandoval's expert testimony (Doc. 63); (2) **deny in part** PharMerica's motion in limine to exclude the testimony of Maureen Gant and Lori Carabajal but exclude certain statements from their affidavits (Doc. 62); (3) **deny** Mr. Huntingford's motion to strike the Earn-Out Reconciliations (Doc. 92); and (4) **deny** PharMerica's motion for summary judgment on all remaining counts (Doc. 39).

## I.    **Background**[1]

On September 30, 2013, Plaintiff Ross Huntingford and Defendant PharMerica entered into an Asset Purchase Agreement (APA) for Mr. Huntingford's pharmacy business. (Doc. 39-1 at 3.) The business provides pharmaceutical products, supplies, and consultation services to long-term care facilities in New Mexico. (*Id.*) The APA includes a deferred payment clause, which provides that if the Actual Gross Profit of the business meets a certain target amount at the two-year anniversary of the closing date, then PharMerica must make an additional payment to Mr. Huntingford. (*Id.* at 5.) The APA defines Actual Gross Profit as the gross profit earned between the one-year and two-year anniversaries of the closing date "from each of the Qualified Customer Accounts that Buyer actively services as of the Two Year Anniversary." (*Id.* at 6.) The Actual Gross Profit calculation does *not* include any customer accounts terminated before the two-year anniversary by either PharMerica or the customer. (*Id.*)

The deferred payment is to be calculated as follows: if, at the two-year anniversary, the Actual Gross Profit is greater than or equal to $2,200,000, PharMerica must pay Mr. Huntingford

---

[1] This section recites only the factual and procedural background necessary to resolve the motions currently before the Court.

$1,250,000. (*Id.* at 5.) If the Actual Gross Profit is less than $1,870,000 (the "Target Gross Threshold"), Mr. Huntingford will receive no deferred payment. (*Id.*) If the Actual Gross Profit at the two-year anniversary falls between $2,200,000 and $1,870,000, Mr. Huntingford will receive a lesser deferred payment calculated using a reduction multiplier. (*Id.* at 5–6.) If PharMerica terminated an account prior to the two-year anniversary for any reason (besides being required to do so by law or because the customer account was not complying with the terms of its contract), then the Target Gross Threshold is reduced by the gross profit earned on that account prior to its termination. (*Id.* at 7.)

At the two-year anniversary of the closing date, PharMerica must "calculate the Actual Gross Profit and deliver to [Mr. Huntingford] a statement (the "Deferred Payment Statement") setting forth such calculation with reasonable supporting documentation." (*Id.* at 6.) On January 6, 2016, PharMerica emailed Mr. Huntingford its Deferred Payment Statement, which included an "Earn-Out Summary" spreadsheet listing the gross profits from the purchased accounts and stating that the accounts fell short of the Target Gross Threshold. (Doc. 39-1 at 14, 19.) This initial Earn-Out Summary did not include accounting data for various consulting and pharmaceutical services that were part of the business and included accounting data for rebates, which the APA expressly excluded from the calculation of the Actual Gross Profit. (*Id.* at 14.) PharMerica subsequently revised the data and provided Mr. Huntingford with an updated copy of the spreadsheet, the "Earn-Out Reconciliation."[2] (Doc. 39-1 at 14–15, 37–40.) According to the calculations in the Earn-Out Reconciliation and an affidavit by PharMerica's Senior Vice President of Corporate Development

---

[2] The parties' briefings suggest that PharMerica prepared a second, updated version of the Earn-Out Reconciliation resulting in a total of three different versions of the document. (*See, e.g.*, Docs. 92 at 2 ("[t]hese three documents are contained in pages 19-40 of the Exhibits [Doc. 39-1] attached to Pharmerica's Motion for Summary Judgment"); 95-1 at 3–4 (Mr. Schaefer describing the second and third versions as having "the same underlying data" and varying only in format; 95-6 at 3–4.) The Court's references to the "Earn-Out Reconciliation" or the "Earn-Out Reconciliation spreadsheets" refer to the most recent version currently in the record.

Christopher Schaefer, "Mr. Huntingford fell $648,701.00 below the Target Gross Threshold and, as such, did not qualify for the Deferred Payment." (*Id.* at 16.)

Mr. Huntingford did not trust PharMerica's data calculations, and on November 7, 2017, filed suit in the Second Judicial District Court of New Mexico for the County of Bernalillo, which PharMerica removed to this Court. (Doc. 1 at 1.) The Complaint alleges that the original Earn-Out Summary omitted many accounts without explanation, and that "[i]f the threshold would have been reduced by the amount of profits from the omitted accounts, or if those profits would have been included in Defendant's calculations, Mr. Huntingford would have been entitled to a deferred payment." (Doc. 1-1 at 5.) The Complaint includes four counts: (1) Breach of Contract; (2) Specific Enforcement of Contract; (3) Breach of the Duty of Good Faith and Fair Dealing; and (4) Quantum Meruit and Unjust Enrichment. (*Id.* at 6–8.)

On May 7, 2018, nearly three months before the August 3, 2018 termination date for discovery, PharMerica filed its Motion for Summary Judgment on all four counts of Mr. Huntingford's Complaint. (*See* Docs. 39; 20 at 2.) PharMerica argues that there is no genuine dispute regarding the fact that the profits of the relevant customer accounts fell below the Target Gross Threshold. (Doc. 39 at 7.) Thus, it did not breach the APA by not paying Mr. Huntingford a deferred payment and Mr. Huntingford's claim for specific enforcement of the deferred payment provision must similarly fail (*Id.* at 8–9.) PharMerica urges the Court to rule in its favor on the good faith and fair dealing claim because Mr. Huntingford's argument that "PharMerica allegedly sabotaged the relevant customer accounts, causing customers to terminate their contracts before the two year anniversary . . ." makes no economic sense and was untimely asserted for the first time during an April 25, 2018 telephonic status conference. (*Id.* at 10; Doc. 95 at 2.)

In an earlier ruling, the Court granted partial summary judgment in PharMerica's favor on the claims of quantum meruit and unjust enrichment because such claims are not permitted where the parties have an express and valid contract. (*See* Doc. 87 at 8–9.) In that ruling, the Court also allowed Mr. Huntingford additional time to clarify his position as to summary judgment on the remaining claims since discovery had been completed. (*Id.* at 13.) The supplemental briefing is now complete, and the Court must determine whether there are genuine disputes of fact that are material to Mr. Huntingford's remaining claims of (1) Breach of Contract, and (2) Breach of the Duty of Good Faith and Fair Dealing,[3] or if PharMerica is entitled to judgment as a matter of law.

There are two main issues at the core of the parties' dispute in this case: First, whether the profits actually fell short of the Target Gross Threshold required to trigger a deferred payment; and second, whether PharMerica violated an implied duty of good faith and fair dealing by managing the accounts it purchased from Mr. Huntingford so poorly that clients terminated their accounts and reduced his chances of earning the deferred payment. PharMerica argues broadly that Mr. Huntingford has not presented any facts supported by admissible evidence that create a genuine dispute over either the accuracy of the Earn-Out Reconciliation spreadsheets or whether PharMerica managed the accounts in good faith, and thus his claims must fail. (Doc. 95 at 11–14.) Mr. Huntingford counters that his proffered expert witness, George Sandoval, has identified errors and discrepancies casting doubt on the accuracy of the spreadsheets (*see* Doc. 91 at 14), and that affidavits from two witnesses, Maureen Gant and Lori Carabajal, show that PharMerica employed poor management practices and refused to service accounts (*see id.* at 10–14). Finally, Mr.

---

[3] Mr. Huntingford does not address Count II—Specific Enforcement of the Contract— in his supplemental response and instead argues only that there are genuine disputes of material fact as to Counts I and III—Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing. As the specific enforcement claim appears to be redundant and better framed as a request for *relief* under the breach of contract claim, the Court will follow Mr. Huntingford's lead and consider only the two remaining claims he addressed in his supplemental response.

Huntingford argues that the Court should strike the Earn-Out Reconciliation spreadsheets from the record because they are summaries prepared for litigation and thus only admissible under Federal Rule of Evidence 1006 if the underlying data is made available for review. (Doc. 92 at 3.)

Each of these pieces of proffered evidence—Mr. Sandoval's expert report, Ms. Gant's and Ms. Carabajal's affidavits, and the spreadsheets themselves—are crucial to the determination of whether there is a genuine dispute of material fact regarding Mr. Huntingford's remaining claims. Thus, the Court will first address the admissibility of each piece of evidence described above, then turn to the question of whether summary judgment is proper here.

## II.     The Court will exclude the testimony of George Sandoval and his expert report.

As part of its evidentiary gatekeeping function under Federal Rule of Evidence 702, the Court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (extending the *Daubert* standard for evaluating scientific expert testimony to "technical" and "other specialized" knowledge). This requires a two-step inquiry, first determining whether the proffered expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *103 Inv'rs I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (quoting Fed. R. Evid. 702). Second, the Court must determine whether the proposed testimony "is sufficiently 'relevant to the task at hand[,]'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 597), and has "a reliable basis in the knowledge and experience of [the expert's] discipline[,]" *Daubert*, 509 U.S. at 592.

Federal Rule of Evidence 702 codifies the elements laid out in *Daubert* and *Kumho Tire Co.* that are required to meet the second prong of the Court's gatekeeping inquiry—relevance and reliability. Rule 702 provides that a qualified expert witness may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592–97; *Kumho Tire Co.*, 526 U.S. at 141–42.

Evidence is relevant if it "has any tendency" to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401. "Under Rule 702, reports from experts . . . are admissible only if necessary to aid in the interpretation of scientific, technical, or other specialized facts" and may be excluded if they waste time or simply point out the obvious when "the jury [is] fully capable of assessing the facts." *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 889 (10th Cir. 2006). The Court has "wide latitude . . . in exercising its discretion to admit or exclude expert testimony." *Bitler*, 400 F.3d at 1232.

To assist the Court in determining whether proposed testimony is reliable, *Daubert* sets out a non-exhaustive, "flexible" set of factors that trial courts may consider:

> (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

*United States v. Taylor*, 663 F. Supp. 2d 1170, 1173 (D.N.M. 2009) (citing *Daubert*, 509 U.S. at 593–94). However, "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co.*, 526 U.S. at 139.

PharMerica argues that Mr. Sandoval's testimony and expert report should be excluded under both prongs of the Court's gatekeeping function. (Doc. 63 at 2–6.) First, PharMerica asserts that Mr. Sandoval is not qualified to offer an opinion on mathematics or accounting. (*Id.* at 3.) Second, PharMerica argues that his opinions are not relevant or reliable because the report only offers an opinion regarding mathematical calculations that the jury could complete without the help of an expert, and Mr. Sandoval has not explained what methodologies he used to generate his opinion. (*Id.* at 3–6.) Mr. Huntingford counters that Mr. Sandoval's expert report is offered specifically to shed light on the accuracy of the spreadsheets, as "Mr. Sandoval's expert report states that PharMerica's Earn-Out Reconciliation documents provided to Mr. Huntingford contain 30 discrepancies." (Doc. 66 at 3.) He further asserts that the testimony "will help the trier of fact understand the evidence on which PharMerica bases its defense in this case. Specifically, this testimony will enlighten the jury about the lack of credibility and weight that it should afford to PharMerica's Earn-Out Reconciliation documents." (*Id.*)

The Court finds that Mr. Sandoval's expert testimony should be excluded because his report lacks relevance and reliability and fails to demonstrate that Mr. Sandoval is qualified as an expert in the area of his opinion. As an initial matter, the report is so short and generalized that it is even difficult to determine what exactly Mr. Sandoval is opining on. Mr. Sandoval's clearest "conclusion" is that the "document provided by PharMerica to Mr. Huntingford . . . had approximately 30 discrepancies between *Sales*, *Invoice COGS*, and *RX Gross Profit* labeled on the document." (Doc. 63-1 at 5.) These categories refer to columns in the Earn-Out Reconciliation spreadsheet, but that can only be deduced by referring to the spreadsheet itself, as Mr. Sandoval's report does not explain which categories have discrepancies nor what those discrepancies are. The report then states that "[m]ore information is needed to make judgement on the *RX Gross Profit*."

(*Id.*) The report does not explain, however, what "make judgement" refers to. Is Mr. Sandoval attempting to offer an opinion on the accuracy of the gross profit values themselves? Or the accuracy with which the values in some columns were added or subtracted to reach the gross profit values? Or the sufficiency of the categories of information presented in the spreadsheet? Mr. Sandoval's sparse report does not explain what exactly he is opining on and leaves the Court and PharMerica to guess.

The clearest opinion in the report is that the spreadsheets contain discrepancies, yet Mr. Huntingford admits that "the discrepancies that Mr. Sandoval has identified in the Earn-Out Reconciliation documents are based on calculations that could be made by a lay witness." (Doc. 66 at 5.) This cuts directly against admissibility under the relevance aspect of the Court's gatekeeping inquiry, which allows the Court to exclude a proffered expert opinion for lack of relevance if the opinion wastes time by reaching conclusions that the jury or lay witnesses could reach without assistance. *See Sims*, 469 F.3d at 889. Mr. Huntingford finally reveals the nature of some of the alleged discrepancies in his motion to strike the Earn-Out Reconciliation spreadsheets, offering an example of a discrepancy by explaining that one account "purportedly had $135,059 in sales and $123,924 in costs, which should total $11,135 in profits, but the document inaccurately shows $11,136 for the account's profits." (Doc. 102 at 2.) The jury will be fully capable of adding and subtracting columns on a spreadsheet to determine if there are mathematical discrepancies and an expert witness is unnecessary in making such a determination.

Next, Mr. Sandoval's testimony is not sufficiently reliable because, as PharMerica points out, "Mr. Sandoval does not identify any methodology used in determining that there are discrepancies in the Earn-out Reconciliation. Nor does he identify what the discrepancies are . . . ." (Doc. 63 at 5–6.) The report does lay out the basic elements of a proper expert report by

listing Mr. Sandoval's opinion, the facts and data he considered, his qualifications, his experience as an expert witness, and his compensation. (*See* Docs. 66 at 3; 63-1 at 4–5.) However, the report does not adequately explain what Mr. Sandoval's theories or conclusions are, what methodology he used to reach those conclusions, or how those conclusions are tied to his specific experience and expertise in the pharmacy industry. Thus, the Court is unable to find that his conclusions are "the product of reliable principles and methods" applied to the facts of the case. *See* Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 593–94.

To the extent that Mr. Huntingford attempts to argue that Mr. Sandoval's opinion would help the jury understand what information is usually needed to review and verify pharmacies' gross profits, this is simply not reflected in the report. Mr. Huntingford argues that "Mr. Sandoval opined in his expert report that PharMerica's Earn-Out Reconciliation documents do not contain sufficient information relating to the pharmacy accounts, such as adjudicated prescription information, to determine the accuracy of the gross profit calculation." (Doc. 66 at 5.) This would be the most compelling argument for the relevance of Mr. Sandoval's testimony if it was what the report actually stated. Instead, Mr. Sandoval's "conclusion" is comprised of four sentences stating that the spreadsheets contain discrepancies and that more information in the form of invoices and adjudicated prescription information would be needed to "make a judgement on the *RX Gross Profit*." (*See* Doc. 63-1 at 5.) The Court reads this as suggesting that Mr. Sandoval would need more information to continue checking the accuracy of the mathematical calculations in the spreadsheets, but it is not clear how Mr. Sandoval's experience as a pharmacy owner qualifies him to give an expert opinion on accounting discrepancies. (*See id.*) The Court will thus grant PharMerica's motion to exclude George Sandoval's expert report and testimony (Doc. 63.)

**III.    The Court will deny PharMerica's motion to entirely exclude Ms. Gant's and Ms. Carabajal's testimony but will exclude two inadmissible statements in their affidavits.**

Lay witness testimony is limited to opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The Tenth Circuit has held that opinion testimony about another individual's state of mind may be admissible when the opinion was "a means of conveying [the witness's] impression based on what she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1180 (10th Cir. 2001). "[C]ourts have been very liberal in admitting witnesses' testimony as to another's state of mind if the witness has had sufficient opportunity to observe the accused so as to draw a rational conclusion about the intent of the accused[,]" but "that does not mean that all such testimony ought to be indiscriminately admitted." *United States v. Hoffner*, 777 F.2d 1423, 1425–26 (10th Cir. 1985) (citations omitted).

PharMerica urges the Court to exclude the proffered testimony of Maureen Gant and Lori Carabajal as "untimely expert testimony" because their affidavits include opinions that "rely on specialized knowledge of the pharmaceutical industry . . . ." (Doc. 62 at 1.) PharMerica also argues that even if the testimony is considered lay testimony it is still not based on personal knowledge and is thus not admissible. (*Id.* at 5.) To the extent Ms. Carabajal's and Ms. Gant's affidavits are considered lay witness testimony, PharMerica urges the Court to exclude two specific statements in their affidavits that would require specialized knowledge:

> Based on my experience with PharMerica, I do not believe that PharMerica was prepared, equipped, or willing to provide the community-based services that Tresco, Inc. required. *See* Affidavit of Joan Maureen Gant, ¶ 6 [Doc. No. 47-5]; and

> PharMerica charged extraordinarily high prices for medications. *See* Affidavit of
> Lori Carabajal, ¶ 5 [Doc. No. 47-6].

(Doc. 70 at 2.)

According to PharMerica, "[o]nly someone trained in the pharmaceutical industry would understand what services Tresco required and whether PharMerica met those needs[,]" so Ms. Gant's testimony that PharMerica was not "prepared, equipped, or willing" to provide services is inadmissible expert testimony. (*Id.* at 3 (quoting Doc. 62 at 3 (quotation marks omitted)).) Similarly, PharMerica argues that calling prices "extraordinarily high" is an opinion which "requires a comparison to a base-line price deemed reasonable or customary[ t]hat is not within the common knowledge of the jury and would require an expert opinion to establish what the standard cost of a medication is." (*Id.*) Finally, PharMerica argues that Ms. Gant's and Ms. Carabajal's affidavits are based in part on hearsay and fail to show personal knowledge of or involvement in the events and decisions described in their testimony. (*Id.* at 6–7).

Mr. Huntingford counters that all the statements in Ms. Gant's and Ms. Carabajal's affidavits are based on personal observations of issues they perceived with PharMerica's management of the accounts it purchased from Mr. Huntingford, and that their observations are not based on "any form of specialized knowledge." (Doc. 65 at 1–2.) Mr. Huntingford points out that Ms. Gant worked as a "Program Support Manager at Tresco, Inc., one of the largest pharmacy accounts that PharMerica purchased from Mr. Huntingford" both before and after the sale, and that her affidavit shows she had personal knowledge of the service issues she describes following PharMerica's acquisition of the accounts. (*Id.* at 2.) He argues that Ms. Carabajal "was a consulting pharmacist for PharMerica for approximately one year after it purchased Mr. Huntingford's business[,]" and in that role she personally observed multiple problems with how PharMerica managed and serviced accounts. (*Id.* at 4–5.)

The Court finds that, overall, the affidavits are not expert testimony requiring specialized knowledge and most of Ms. Gant's and Ms. Carabajal's assertions appear to be rooted in personal knowledge that it would be reasonable for them to have based on their relative positions. Ms. Gant's affidavit lists specific observations of Tresco's relationship with PharMerica "based on [her] personal knowledge" while she was working as Tresco's Program Support Manager. (*See, e.g.*, Doc. 47-5 at 2 ("PharMerica did not resolve the problems that Tresco, Inc. experienced and reported to PharMerica multiple times. As a result, Tresco, Inc. terminated its account with PharMerica").) The Court is not persuaded that Ms. Gant's statements are inadmissible hearsay simply because she does not explain exactly when or how she obtained the personal knowledge underlying each statement. As Ms. Gant held a managerial position at Tresco at the time of these events, it seems plausible that she would have personal knowledge of these events, as her affidavit states that she does, and there is no evidence that this statement is hearsay. (*See id.* at 1.)

However, the Court agrees with PharMerica that Ms. Gant's statement that she does "not believe that PharMerica was prepared, equipped, or willing" to provide Tresco with the services it needed could be outside the scope of opinion rationally related to Ms. Gant's own observations. In *Gossett*, the Tenth Circuit held that an affidavit expressing an opinion that a nursing student's involuntary withdrawal and denial of readmission "was the result of school-wide gender discrimination," was admissible because the affidavit also included multiple, specific examples of incidents the affiant had witnessed that led her to the conclusion that the faculty were engaging in discrimination. *See* 245 F.3d at 1179. In *Hoffner*, on the other hand, the Tenth Circuit excluded lay witnesses' affidavits opining about a doctor's intent in issuing certain prescriptions because none of the witnesses personally observed the doctor writing the prescriptions or interacting with patients in the process of prescribing the medication. *See* 777 F.2d at 1425–26.

Here, Ms. Gant's statement that "based on my experience with PharMerica, I do not believe that PharMerica was prepared, equipped, or willing to provide the community-based services that Tresco, Inc. required" seems to fall somewhere between *Gossett* and *Hoffner* on the spectrum of personal knowledge. (*See* Doc. 47-5 at 2.) On one hand, Ms. Gant's affidavit includes references to specific issues she claims to have personal knowledge of that might rationally lead her to this conclusion—Tresco had difficulty receiving medications on weekends and some medications were untimely delivered. (*See id.*) These assertions are not as numerous or specific as those laid out in the lay opinion regarding discrimination in *Gossett*, but are not as clearly excludable as those in *Hoffner*, where there was evidence that the witnesses had not been present for the interactions on which they based their opinion of the doctor's intent. Because Ms. Gant's affidavit demonstrates personal knowledge but is notably light on details, the Court will exclude this statement from her affidavit and not consider it for purposes of ruling on the Motion for Summary Judgment, although Mr. Huntingford may of course attempt to lay a more robust foundation for Ms. Gant's testimony and elicit the evidence at trial.

Similarly, most of Ms. Carabajal's affidavit appears to the Court to be plausibly based on personal observations and knowledge that she would have as a consulting pharmacist who worked for the company before and after its transition to PharMerica. (*See, e.g.*, Doc. 47-6 at 1 ("[i]n the time that I worked for PharMerica, I observed problems relating to PharMerica's billing, delivery of medications, pricing for medications, and keeping of medical records").) However, the Court agrees with PharMerica that one of Ms. Carabajal's statements includes an assertion that requires specialized knowledge in the first sentence and verges on hearsay in the second sentence: "PharMerica charged extraordinarily high prices for medications. Many of the facilities that were previously served by PharmaCare were astounded by how high the prices were after the transition

to PharMerica." (*See id.*) Understanding what makes a medication's price "extraordinarily high" does require some baseline knowledge and information about standard prices in the pharmaceutical industry, and PharMerica's concern that "a jury may view Ms. Carabajal's testimony as that of an expert because of her experience working in the pharmaceutical industry" is warranted. (*See* Doc. 70 at 4.) Further, the assertion that clients were "astounded" by increasing prices appears to be hearsay without a clearer foundation for Ms. Carabajal's personal knowledge of that fact. The Court will thus exclude these statements from Ms. Carabajal's testimony for purposes of ruling on the Motion for Summary Judgment.

Any arguments that these witnesses are not credible or that their testimony is not relevant to determining whether PharMerica managed all its accounts in a similar manner (*see* Doc. 62 at 5) go to the weight of the evidence, not its admissibility. And PharMerica may of course cross-examine these witnesses and object to any hearsay statements or statements lacking foundation and personal knowledge that may be elicited at trial. For purposes of PharMerica's Motion for Summary Judgment, the Court must only determine whether the affidavits allege facts that may be presented in a form that is admissible at trial. *See* Fed. R. Civ. P. 56(c)(4). These affidavits meet this standard in large part, but the Court will exclude the two paragraphs noted above as inadmissible expert opinions and hearsay[4] and will not consider them in assessing whether there are any material disputes of fact regarding the remaining counts of Mr. Huntingford's Complaint.

---

[4] "Based on my experience with PharMerica, I do not believe that PharMerica was prepared, equipped, or willing to provide the community-based services that Tresco, Inc. required." (Doc. 47-5 (Affidavit of Joan Maureen Gant) ¶ 6.)

"PharMerica charged extraordinarily high prices for medications. Many of the facilities that were previously served by PharmaCare were astounded by how high the prices were after the transition to PharMerica." (Doc. 47-6 (Affidavit of Lori Carabajal) ¶ 5.)

**IV.    The Court will deny Mr. Huntingford's motion to strike the Earn-Out Reconciliations.**

Finally, Mr. Huntingford urges the Court to strike the Earn-Out Reconciliation spreadsheets attached to PharMerica's Motion for Summary Judgment (*see* Doc. 39-1), because they are "summary accounting records" for which "PharMerica has failed and refused to produce documents and [underlying] accounting data . . . as required by Fed. R. Evid. 1006." (Doc. 92 at 1.) PharMerica responds that the Earn-Out Reconciliation spreadsheets are not summaries prepared for litigation, but business records subject to the hearsay exception under Federal Rule of Evidence 803(6). (Doc. 97 at 1.) It argues that "the Deferred Payment Statements were not created for the purpose of litigation . . . [but] in the ordinary course of Defendant's business to comply with its contractual obligation under the [APA]." (*Id.* at 2.)

Under Federal Rule of Evidence 1006, a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Rule 803(6), on the other hand, excepts original "Records of a Regularly Conducted Activity" from the general hearsay prohibition, and defines such records as:

> A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

The Court recognizes that the Earn-Out Reconciliation spreadsheets do not fit perfectly into either category, as they were only prepared to fulfill the Deferred Payment Statement requirement in the APA and not necessarily as "a regular practice" of PharMerica's business. (*See* Doc. 1-1 at 17.) However, the spreadsheets are also not summaries of data prepared solely for litigation—PharMerica produced the Earn-Out Statement and subsequent Earn-Out Reconciliations to fulfill a contractual requirement in the APA. (*See id.*) Indeed, it was Mr. Huntingford's dissatisfaction with the spreadsheets that spurred this lawsuit in the first place. (*Id.* at 5.)

The Tenth Circuit recently weighed in on a similar issue in *United States v. Channon*, 881 F.3d 806 (10th Cir. 2018), in which defendants accused of defrauding OfficeMax through sham rewards accounts "objected to the use of summary exhibits regarding their accounts" in the form of data drawn from Excel spreadsheets. *Id.* at 809. "These exhibits summarized thousands of transactions and were drawn from three Excel spreadsheets containing OfficeMax records—which had been maintained by a third party . . . ." *Id.* Each day, OfficeMax sent the data it collected to the third-party company, which would then "place the data into a user-friendly Excel spreadsheet" if OfficeMax needed it for any reason. *See id.* The third-party company "would not alter the raw data, but would consolidate the necessary information from the larger database." *Id.*

The defendants in *Channon* argued on appeal that such records were summaries prepared for litigation and thus inadmissible because they had not been granted access to the broader OfficeMax database from which the spreadsheets were derived, and, in the alternative, that the records were hearsay. *Id.* The trial court found that the spreadsheets were originals, not summaries, and were admissible under the hearsay exception for business records. *Id.* The Tenth Circuit agreed, explaining that "Federal Rule of Evidence 1001(d) defines an 'original' of electronically

stored information as 'any printout—or other output readable by sight—if it accurately reflects the information.' In other words, the question is whether the spreadsheets accurately reflect the information found in the underlying database." *Id.* at 810. The court then explained that accuracy must be established at trial by the proponent of the evidence "lay[ing] a foundation to this effect." *Id.* (citation omitted). In *Channon*, the foundation for the accuracy of the spreadsheets was sufficiently established through testimony of a former manager of the third-party company that collected the data and produced the spreadsheet, notwithstanding defense witness testimony from a "forensic accountant, [who] testified that it was not possible to determine whether the spreadsheet was accurate without examining the main databases, given the potential for alteration." *Id.*

Finally, the Tenth Circuit explained that the spreadsheets could properly be considered business records since they derived from business records in the database:

> Defendants contend that transferring these records into spreadsheets for purposes of litigation eliminates the business records exception. We disagree. As we have previously held, business records in one form may be presented in another for trial. Here, we have just that—business records in one form, a database, simply presented in another form, a spreadsheet.

*Id.* at 811 (citing *United States v. Hernandez*, 913 F.2d 1506, 1512–13 (10th Cir. 1990)).

The Earn-Out Reconciliation spreadsheets here are similar to the spreadsheets in *Channon* because they represent a compilation of raw data from business records stored in a computer database that PharMerica consolidated into spreadsheet form to comply with the APA. (*See* Doc. 102-2 at 2 (Mr. Schaefer explaining during a deposition that "IBM Cognos allows us to pull data out of the data warehouse so that we can perform analytics like these . . . when the data comes from Cognos, it comes out in an Excel file. And those Excel files, I formatted them into this presentation, but . . . what you are looking at is the data.").) The Court finds that the Earn-Out

Reconciliation spreadsheets are more akin to the spreadsheets found to be original records in *Channon* than summaries prepared for litigation.[5] The records were prepared in the course of business to comply with the APA requirement to send Mr. Huntingford a "Deferred Payment Statement." (*See* Doc. 1-1 at 17.) Even though the Earn-Out Reconciliation was prepared for this single purpose, Mr. Schaefer has laid a foundation explaining that the underlying data was collected daily as a regular business practice using "a customized IBM AS400 platform[,]" into which PharMerica employees entered data including "accounts payable, accounts receivable, receipts, purchase orders," etc. (Doc. 95-3 at 4.) Mr. Schaefer's sworn testimony is that those records were then "incorporated into PharMerica's electronic records at or near the time of the activity . . . ." (*Id.*) That this original data was then downloaded and compiled into spreadsheets when PharMerica needed it for business purposes convinces the Court that, like in *Channon*, the spreadsheets are simply business records presented in a different form and fall under the Rule 803(6) hearsay exception. *See Channon*, 881 F.3d at 811.

The accuracy of the spreadsheets appears to be even more central to this case than it was in *Channon*, but the Tenth Circuit's holding that the foundation for such accuracy must be laid by the proponent and may then be attacked at trial is still controlling. *See id.* at 810. Through deposition testimony and affidavits, PharMerica has laid a sufficient foundation for the accuracy of the spreadsheets such that the Court will consider them for purposes of deciding PharMerica's Motion for Summary Judgment. (*See, e.g.*, Docs. 95-1 at 10–11 ("all three statements contain the correct underlying data . . . . it's an automated pull of the data"); 95-3 at 5 ("the underlying data was not edited").) Mr. Huntingford's arguments about the potential inaccuracy of the information

---

[5] The Court is not persuaded that, as Mr. Huntingford argues, the fact that the subsequent iterations of the spreadsheet were updated to include additional accounts as requested by Mr. Huntingford in the course of this litigation transform them into litigation-driven summaries. (*See* Doc. 102 at 3.)

and the relevance of discrepancies in the spreadsheets may be properly brought up at trial by cross-examining witnesses and alerting the jury to the errors. *See United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988) ("The district court recognized that the defense had brought out inaccuracies in the computer printouts but held that these inaccuracies went to the weight of the evidence, not to admissibility."). The Court is not convinced that the mathematical discrepancies Mr. Huntingford describes render the spreadsheets so untrustworthy that they are not business records and must be disregarded in ruling on the summary judgment motion. (*See* Doc. 102 at 2.)

Finally, the Court finds that Mr. Huntingford's request that if the Court declines to strike the Earn-Out Reconciliation spreadsheets it should order PharMerica to compel the underlying data is an unavailing attempt at additional and untimely discovery. (*See* Doc. 92 at 1) Though Mr. Huntingford acknowledges that this request runs afoul of Local Rule 26.6 and related discovery deadlines, he seeks "leniency in this case because of Pharmerica's refusal to participate in the discovery process in good faith." (*Id.* at 1, n.1.) The Court reminds Mr. Huntingford of its warning when it granted PharMerica's motion for summary judgment on the unjust enrichment and quantum meruit claims: "[D]espite warning PharMerica that he would move to compel the evidence if it did not produce the invoices by June 6, 2018 (*see* Doc. 42-2 at 3), Mr. Huntingford failed to do so" and "the Court will not be sympathetic to any further arguments about PharMerica's failure to produce this data since Mr. Huntingford did not take additional steps to compel the evidence." (Doc. 87 at 10–11.)

The Court recognizes that Mr. Huntingford formally attempted to obtain the underlying data three different times, in his first request for production and in two subsequent deposition duces tecum requests, and that his counsel repeatedly requested access to the raw data from PharMerica via email. (*See* Doc. 92 at 3.) Still, PharMerica objected each time to providing that data and Mr.

Huntingford never formally moved to compel the evidence or asserted a need to obtain the underlying data to confirm the cost of goods sold,[6] so the issue of whether such underlying data should have been produced was never properly before the Court.

## V.    Motion for Summary Judgment

Having resolved the evidentiary questions necessary to rule on PharMerica's Motion for Summary Judgment on the remaining counts in Mr. Huntingford's Complaint, the Court now turns to the parties' supplemental briefing and finds that there are genuine disputes of material fact regarding Count I (Breach of Contract) and Count III (Breach of the Duty of Good Faith and Fair Dealing). Thus, the Court will deny PharMerica's motion.

### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The moving party bears the initial responsibility of showing "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions,

---

[6] Mr. Huntingford asserts a new argument in his Motion to Strike Earn-Out Reconciliations and his Supplemental Response to the Motion for Summary Judgment—that PharMerica represented to Mr. Huntingford that gross profits would increase following the sale and he relied on those representations in agreeing to the Target Gross Threshold. (*See* Docs. 92 at 2; 91 at 14.) The Court is quite skeptical that this argument would have any bearing on the breach of contract claim or the admissibility of the spreadsheets, as Mr. Huntingford asserts, but declines to address it in this Order as this claim was not raised in Mr. Huntingford's Complaint nor any of his prior requests for production. *See Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (declining to address a claim on summary judgment that was not raised in the complaint).

answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted).

### B. Breach of Contract

Mr. Huntingford's Complaint lays out two explicit elements of his claim for breach of contract. "Defendant has failed to fulfill all of its promises and obligations under the contract by, including other things, failing to provide Mr. Huntingford with a detailed statement of the profits from all of its purchased accounts and failing to pay Mr. Huntingford the deferred payment to which he is entitled." (*See* Doc. 1-1 at 6.) The parties clearly dispute whether Mr. Huntingford was entitled to a deferred payment, and this question can be resolved only by calculating PharMerica's profits during the relevant timeframe. PharMerica argues that the Earn-Out Reconciliation spreadsheets are accurate and that the numbers clearly show Mr. Huntingford fell below the threshold to qualify for the deferred payment. (*See* Doc. 39 at 2.) In response, Mr. Huntingford objects to most of PharMerica's statement of undisputed facts on the ground that the spreadsheets are full of inaccuracies and thus the numbers cannot be trusted. (*See* Doc. 91 at 5.)

The Court has excluded Mr. Sandoval's expert report discussing inaccuracies (*see* Section II), but Mr. Huntingford has still pointed out some of the specific mathematical inaccuracies in the spreadsheets which are apparent without Mr. Sandoval's report. (*See* Doc. 102 at 2.) Thus, the Court finds that whether the spreadsheets demonstrating that Mr. Huntingford fell short of the Target Gross Threshold are accurate is a genuine dispute regarding a fact material to the breach of contract claim. PharMerica has presented deposition and affidavit evidence that the spreadsheets are based on accurate invoice and sales data compiled in a computer database and presented through the Earn-Out Reconciliation spreadsheets, while Mr. Huntingford has pointed to mathematical errors in the spreadsheets that suggest they are not accurate. Whether a

preponderance of the evidence shows that Mr. Huntingford met or fell short of the Target Gross Threshold is a factual question for the jury after considering the weight of the evidence.

The Court finds that the second element of the claim in Count I, that PharMerica "fail[ed] to provide Mr. Huntingford with a detailed statement of the profits from all of its purchased accounts[,]" appears to be another remaining and disputed question of fact. The dispute is clear from simply reviewing the heated discovery dispute over whether PharMerica should have produced all the data underlying the Earn-Out Reconciliation spreadsheets. The Deferred Payment Clause required PharMerica to "calculate the Actual Gross Profit and deliver to [Mr. Huntingford] a statement (the "Deferred Payment Statement") setting forth such calculation with *reasonable supporting documentation*." (Doc. 39-1 at 6 (emphasis added).) While the accuracy of the spreadsheets is one fact clearly still in dispute, the *sufficiency* of the spreadsheets in complying with PharMerica's obligations under the APA's Deferred Payment Clause appears to be another. Thus, the Court will deny PharMerica's Motion for Summary Judgment as to Count I, as there are genuine disputes of material fact relevant to determining whether PharMerica breached its contract with Mr. Huntingford.

### C. Breach of the Duty of Good Faith and Fair Dealing

Count III of Mr. Huntingford's Complaint alleges that PharMerica "denied Mr. Huntingford the benefit of the bargain that Mr. Huntingford reached with Defendant." (Doc. 1-1 at 7.) The parties have agreed that, per the terms of the APA, Delaware law governs disputes arising out of the contract.[7] (*See id.* at 47; Doc. 13 at 2.) "Under Delaware law, an implied covenant

---

[7] The parties agreed to the application of Delaware law to contractual disputes in their Joint Status Report and Provisional Discovery Plan (*see* Doc. 13 at 2) and Proposed Pretrial Order (*see* Doc. 79 at 12). However, Plaintiff has now indicated that he disputes which state law governs his claim for breach of the implied duty of good faith and fair dealing. (*See* Doc. 105 (Clerk's Minutes for March 1, 2019 Pretrial Conference) at 2.) The Court will rely on the parties' earlier agreement regarding Delaware law in ruling on Defendant's motion for summary judgment. If Plaintiff seeks to have the Court reconsider and apply New Mexico law to this claim going forward, then this issue must be fully briefed.

of good faith and fair dealing inheres in every contract." *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1195 (10th Cir. 2004) (quoting *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999)). "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Id.* (quoting *Chamison*, 735 A.2d at 920). In determining whether a party has violated the implied covenant of good faith and fair dealing, the factfinder must "extrapolate the spirit of the agreement from its express terms and based on that 'spirit,' determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose." *Id.* (quoting *Chamison*, 735 A.2d at 920–21).

Here, Mr. Huntingford alleges that the spirit of the contract required PharMerica to diligently service all the accounts it purchased and that it failed to do so through poor management techniques and intentionally refusing to service accounts, which "made it less likely that Mr. Huntingford could earn his 'benefit of the bargain'" under the APA. (Doc. 91 at 11.) Mr. Huntingford argues that "PharMerica's failure to take corrective action to keep these customers, despite having notice of their problems, constitutes a breach of the implied covenant of good faith and fair dealing." (*Id.* at 12.) PharMerica counters that the terms of the APA itself show that "the parties clearly contemplated that some . . . accounts would transfer their business away from PharMerica once the purchase was complete[,]" as the APA specifically includes a procedure to reduce the Target Gross Threshold if and when clients terminate their accounts. (Doc. 95 at 3.)

Reviewing the evidence in the record in the light most favorable to Mr. Huntingford, there are multiple material facts in dispute that are relevant to determining whether PharMerica used "oppressive or underhanded tactics" to deprive Mr. Huntingford of the opportunity to receive a

deferred payment. For example, PharMerica denies that Tresco experienced service issues (*id.* at 5), while Mr. Huntingford presents sworn testimony from Maureen Gant alleging that Tresco indeed experienced service issues under PharMerica's management and terminated its account as a result (*see* Doc. 91 at 6). PharMerica denies that there were problems with its billing, record keeping, and pricing and delivery of medications (Doc. 95 at 6–7), but Ms. Carabajal's affidavit alleges that she observed such issues and PharMerica chose not to address them (Doc. 91 at 7).

In a sworn deposition Mr. Huntingford alleges that one account, Turquoise Lodge, was transferred to a different side of PharMerica's service so he did not receive credit for its income. (*Id.* at 8.) PharMerica presents testimony that Turquoise Lodge actually "terminated its contract with PharMerica and brought its pharmacy services in house[.]" (Doc. 95 at 9.) Mr. Huntingford alleges that he provided PharMerica with detailed descriptions of the services each account would require prior to entering into APA (Doc. 91 at 8), while PharMerica disagrees and asserts that, instead, it paid Mr. Huntingford $10,000 per month for two years to ensure a smooth transition for the accounts (Doc. 95 at 8). These are just several examples of genuine disputes of fact regarding how PharMerica managed the business and whether it intentionally provided poor service so clients would terminate their accounts. These facts will be critical to determining whether PharMerica used "underhanded tactics" to deprive Mr. Huntingford of an opportunity to earn a deferred payment, potentially breaching an implied covenant of good faith and fair dealing.

**THEREFORE**,

**IT IS ORDERED** that Defendant's Motion to Exclude Expert George Sandoval (Doc. 63) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Testimony of Maureen Gant and Lori Carabajal (Doc. 62) is **DENIED IN PART**, but the Court will exclude specific inadmissible statements from their affidavits;

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Summary Exhibits or, in the Alternative, to Compel Defendant to Provide Documents Supporting Summaries (Doc. 92) is **DENIED**; and

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 39) is **DENIED** as to all remaining counts.

_____

**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**