**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**ROSS HUNTINGFORD,**

       Plaintiff,

v.                                 **No: 1:17-cv-1210-RB-LF**

**PHARMACY CORPORATION OF AMERICA**
**d/b/a PHARMERICA,**

       Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND**
**MEMORANDUM OPINION AND ORDER**

This case requires the Court to determine whether a corporate buyer's management (or mismanagement) of the pharmacy business it purchased from an individual seller amounted to a breach of the parties' contract and implied duty of good faith and fair dealing. Plaintiff Ross Huntingford maintains that he is entitled to a $1,250,000 deferred payment because Defendant PharMerica's various breaches of contract and implied contractual duties deprived him of a fair opportunity to earn that payment. PharMerica maintains there is no evidence of bad faith or breach, and Plaintiff may not rewrite the contract after the fact simply because he is unhappy with the outcome. The Court conducted a bench trial from April 29, 2019, through May 1, 2019. Being fully advised of the record, the parties' arguments at trial, and the relevant law, the Court makes the following findings of fact and conclusions of law and enters judgment in favor of Defendant.

**FINDINGS OF FACT**

The Asset Purchase Agreement

1. On September 30, 2013, Plaintiff Ross Huntingford, his company Integrated Concepts, Inc. d/b/a PharmaCare Health Services (PharmaCare), and Defendant Pharmacy Corporation of

America d/b/a PharMerica (PharMerica) entered into an Asset Purchase Agreement (APA). (Pl.'s Ex. A at 6).[1]

2. Through the APA, Mr. Huntingford agreed to sell PharMerica his pharmacy business, PharmaCare. (*Id.*)

3. PharmaCare provided services to various customer accounts including "nursing homes, assisted living facilities, group homes and other long-term care or institutional care facilities, and to residents of such homes or facilities . . . ." (*Id.*; *see also* Vol. I of Tr. of Bench Trial Proceedings (Tr. I) at 50:12–21.)

4. PharmaCare serviced customer accounts by providing pharmaceutical products and related services and supplies, clinical and consultant pharmacist services, nutritional products, and medical records. (Pl.'s Ex. A at 6.)

5. Long-term care facilities are facilities that have a "custodial drug permit" through the State of New Mexico, meaning the pharmacy fills prescriptions for the facility and the facility subsequently distributes prescriptions to individuals, rather than individuals receiving their medications directly from the pharmacy. (Tr. I at 49:21–23.)

6. PharMerica is a national corporation that provides pharmacy services for skilled nursing facilities, long-term care facilities, assisted living facilities, hospitals, and other institutional care settings. (Vol. II of Tr. of Bench Trial Proceedings (Tr. II) at 167:21–25.)

7. In 2013, Mr. Huntingford began actively seeking potential buyers to whom he could sell his pharmacy business. (Tr. I at 51:10–15.)

---

[1] All exhibits referenced herein are exhibits introduced by the parties at trial. Identical copies of the Asset Purchase Agreement (APA) were introduced as Plaintiff's Exhibit A and Defendant's Exhibit 1. For efficiency, the Court will cite only Plaintiff's Exhibit A when referring to the APA.

8. Mr. Huntingford worked with a professional consulting firm, Harbor Consulting Group, to contact potential buyers. (*Id.* at 51:14–15.)

9. Mr. Huntingford negotiated the sale to PharMerica with PharMerica's then Vice President of Mergers and Acquisitions, Tim Jolly. (*Id.* at 54:6–18; Tr. II at 172:13–19.)

10. Mr. Jolly also conducted PharMerica's due diligence prior to the sale and had access to all PharmaCare's data during this due diligence period. (Tr. I at 55:11–24.)

11. Mr. Huntingford believed that the value of his pharmacy business at the time he began seeking a buyer was $3.1 million. (*Id.* at 52:2–4.)

12. Mr. Huntingford and PharMerica agreed that the purchase price of the pharmacy business would be *up to* $3 million plus an additional payment for inventory. (Pl.'s Ex. A at 7–8.)

13. The $3 million figure consisted of a $1,750,000 Closing Date Payment and a potential Deferred Payment of up to $1,250,000 based on the business's profits following the sale. (*Id.*)

14. The APA's deferred payment clause provided that if the Actual Gross Profit of the business met a certain target amount at the two-year anniversary of the closing date, PharMerica would make an additional payment to Mr. Huntingford. (*Id.* at 8.)

15. The APA defined Actual Gross Profit as the gross profit earned between the one-year and two-year anniversaries of the closing date "from each of the Qualified Customer Accounts that Buyer actively services as of the Two Year Anniversary." (*Id.* at 9.)

16. The Actual Gross Profit calculation would not include profits from any customer accounts terminated before the two-year anniversary by either PharMerica or the customer. (*Id.*)

17. Gross Profit was defined as "the gross revenues of the Pharmacy Business from each Qualified Customer Account *less* the cost of Inventory *less* the aggregate amount of uncollected accounts receivable of any Qualified Customer Accounts." (*Id.* at 43.)

18. The APA also specified that, when calculating the Gross Profit, "no corporate overhead . . . shall be deducted" and "all expenses, including the purchase of pharmaceuticals, shall be at [PharMerica's] actual invoiced cost" and not include any rebates. (*Id.*)

19. The deferred payment was to be calculated as follows:

    a. If, at the two-year anniversary, the Actual Gross Profit was greater than or equal to $2,200,000, PharMerica would pay Mr. Huntingford $1,250,000. (*Id*. at 8.)

    b. If the Actual Gross Profit was less than $1,870,000 (the Target Gross Threshold), Mr. Huntingford would receive no deferred payment. (*Id.*)

    c. If the Actual Gross Profit at the two-year anniversary fell between $2,200,000 and $1,870,000, Mr. Huntingford would receive a lesser deferred payment calculated using a reduction multiplier. (*Id.* at 8–9.)

20. If PharMerica terminated an account prior to the two-year anniversary for any reason (besides being required to do so by law or because the customer account was not complying with the terms of its contract), then the minimum thresholds for the two deferred payment options ($1,870,000 and $2,200,000) would be reduced by the gross profit earned on that account prior to its termination. (*Id.* at 10.)

21. If a customer terminated its account prior to the two-year anniversary, the minimum threshold required to earn a deferred payment would not change.

22. At the two-year anniversary of the closing date, PharMerica was required to "calculate the Actual Gross Profit and deliver to [Mr. Huntingford] a statement (the 'Deferred Payment Statement') setting forth such calculation with reasonable supporting documentation." (*Id.* at 9.)

23. At closing, PharMerica acquired all of the purchased assets listed in the APA, including "all right, title and interest" in the pharmacy business's inventory, personal property, assumed contracts, customer accounts receivable, and all express or implied guarantees, warranties, and similar claims relating to any assumed liabilities or purchased assets. (*Id.* at 6–7.)

24. The parties also entered into an "Assignment and Assumption Agreement," under which PharMerica "assume[d] and agree[d] to perform all of the obligations of Assignor arising or accruing under the Assumed Contracts . . . ." (Pl.'s Ex. A-D at 1.)

25. PharMerica assumed 66 contracts from PharmaCare. (Pl.'s Ex. B; Def.'s Ex. 3 at 2–5.)

26. The APA also listed 13 "Marketed Customer Accounts," which were accounts that Mr. Huntingford had been actively soliciting business from but did not have contracts with PharmaCare at the time of closing. (Def.'s Ex. 3 at 8; Tr. II at 182:19–25.)

27. Together the "Assumed Contracts" and the "Marketed Customer Accounts" made up the "Qualified Customer Accounts"—those accounts whose profits counted toward the Actual Gross Profit calculation if they were still being "actively serviced" by PharMerica at the two-year anniversary of the closing. (Pl.'s Ex. A at 9, 46.)

28. Negotiations over the sale took approximately seven months (Tr. I at 142:20–23), during which Mr. Huntingford was represented by counsel. (*Id.* at 143:3–17.)

29. Mr. Huntingford reviewed eight to ten drafts of the contract with his counsel and his broker, Harbor Consulting Group. (*Id.* at 142:24–144:1.)

30. Mr. Huntingford believes the closing date of the sale was on or about November 4, 2013 (*id.* at 82:1), while PharMerica asserts it was October 31, 2013 (Tr. II at 173:11–14).

31. PharMerica thus considered the relevant earn-out period to be from November 1, 2014, to October 31, 2015. This was based on its understanding that the APA closing date was October 31, 2013. (*Id.* at 183:9–13.)

PharMerica's Management of the Assumed Contracts

32. PharMerica terminated the Vista Care/Gentiva account before the two-year anniversary. (Tr. I at 82:22–83:5.)

33. As a result, Vista Care/Gentiva's prior gross profits of $37,584 were subtracted from the target threshold Mr. Huntingford would have to reach to earn a deferred payment, a number PharMerica calculated using PharmaCare's accounting data. (Tr. I at 176:7–23; Def.'s Ex. 7 at 4.)

34. The new Target Gross Threshold was thus $1,832,416. (Def.'s Ex. 7 at 4.)

35. On February 1, 2014, PharMerica began transferring account data from the PharmaCare system to its own accounting system. (Vol. III of Tr. of Bench Trial Proceedings (Tr. III) at 16:17–19.)

36. PharMerica's Senior Vice President of Corporate Development, Christopher Schaefer, testified that for several months during the transition period—from the closing date until February 1, 2014—PharmaCare continued to run independently before PharMerica "really made any changes at all or moved any business," even though PharMerica had acquired the business. (Tr. II at 214:3–11.)

37. PharMerica reported that 21[2] of the Assumed Contracts terminated their accounts sometime during this transition period—between October 31, 2013 and February 1, 2014. (*See* Def.'s Ex. 7 at 1–2; Tr. III at 16:7–17:19.)

---

[2] Mr. Huntingford appears to argue that there were 22 such accounts, but the Court finds only 21 reflected in the record. (*See* Pl.'s Ex. E; Def.'s Ex. 7.)

38. Mr. Schaefer testified that PharMerica's position that those 21 accounts terminated their contracts soon after the acquisition was based on "an assumption that if it never showed up in our system at all that it left prior to then." (Tr. III at 16:19–21.) In other words, PharMerica assumed these accounts terminated prior to February 1, 2014 because no data associated with them was ever transferred from PharmaCare's system to its own.

39. PharMerica produced no documentation proving the 21 accounts had indeed terminated their contracts between the closing date and February 2014. (*Id.* at 16:7–13.)

40. Mr. Huntingford asserts that PharMerica failed to perform its contractual obligations under these 21 Assumed Contracts, forcing them to terminate because they were not receiving services. (Tr. I at 90:25–91:2.)

41. Lori Carabajal worked as a consultant pharmacist for PharmaCare for 13 years prior to the sale of the business, then worked as a consultant pharmacist for PharMerica for 11 months following the acquisition. (Tr. II at 5:24–6:13.)

42. As a consultant pharmacist, Ms. Carabajal was the interface between the pharmacy and the customer facilities—resolving problems and overseeing processes. (Tr. I at 5:9–16.)

43. Ms. Carabajal testified that she left her position at PharMerica because she believed that she could not "perform [the] full duties that [she] wanted to as a consultant pharmacist." (*Id.* at 6:17–18.) She felt that she "had no ability to resolve issues or help the clients like [she] was able to with PharmaCare." (*Id.* at 6:18–20.)

44. Ms. Carabajal believed that PharMerica "dropped" all accounts it acquired in the transition that provided only consulting services and did not generate revenue from prescriptions. (*Id.* at 47:13–21.) Ms. Carabajal testified that she believes this to be the case because:

a.   Her supervisor during the transition period, a PharMerica employee, told her at some point that "they were trying to figure out what to do with the non-revenue generating places or contracts . . . ." (Tr. II at 45:17–46:1); and

b.   In March 2014 she "had to start [her] own business to service consulting needs because they were dropped in the transition." (*Id.* at 45:21–23.)

45. Mr. Schaefer testified that he was not aware of any decision by PharMerica to not service any contracts other than Vista Care/Gentiva (*id.* at 222:23–223:5), and that he was not aware of PharMerica failing to service any of the consulting-only contracts it acquired through the APA (Tr. III at 11:16–19).

46. Mr. Schaefer did not investigate whether PharMerica had provided any services to the consulting-only accounts it acquired. (*Id.*)

47. Many, but not all, of the 21 accounts that PharMerica reported as terminated prior to February 1, 2014 were such consulting-only contracts. (Tr. I at 90:3–16.)

48. Of those consulting-only contracts that were terminated prior to February 2014, Mr. Huntingford estimates the combined revenue would have been $20,000. (*Id.* at 130:13–17.)

49. PharMerica transferred one of the Assumed Contracts—Turquoise Lodge—from its long-term care division to its hospital division. (*Id.* at 117:19–118:18.)

50. Mr. Huntingford viewed this transfer as PharMerica "not assum[ing] the contract" and instead "decid[ing] to turn it over to a different business entity and have them service the contract." (*Id.* at 117:19–24.)

51. Mr. Schaefer testified that PharMerica's "Hospital Pharmacy Management Division" is still part of PharMerica, and that it decided to have that division take over the Turquoise Lodge

account because that division "was better equipped to fulfill that contract." (Tr. III at 78:17–25, 79:16–17.)

52. The Turquoise Lodge Account was serviced by PharMerica under the Hospital Pharmacy Management Division until Turquoise Lodge terminated its account on September 15, 2015. (Def.'s Ex. 11.)

53. Around the time of the sale, the parties entered into a Consulting Agreement under which PharMerica agreed to pay Mr. Huntingford $10,000 per month for two years to provide transition services as a consultant by maintaining customer relationships, assisting with account retention, and addressing potential issues raised by the customer accounts during the transition period. (Pl.'s Ex. A-E; Tr. I at 65:5–15).

54. As part of his consulting duties, Mr. Huntingford made in-person visits to customer account facilities and communicated with facility staff frequently via phone and email. (Tr. I at 93:9–94:2.)

55. Mr. Huntingford's main point of contact in reporting client issues was PharMerica employee Tracy Atkinson. (*Id.* at 94:3–12.)

56. Through his role as a consultant, Mr. Huntingford became aware of issues that another account, ARCA, was having with the timing of PharMerica's medication deliveries. (*Id.* at 101:8–102:3).

57. Mr. Huntingford was aware that PharMerica employees Tracy Atkinson and Mike Andrews got involved in an attempt to resolve such issues, but "the issues continued." (*Id.* at 102:4–13.)

58. Tresco, Inc. (Tresco) was one of the larger accounts that PharMerica assumed under the APA. (*Id.* at 108:10–11.) Tresco is a community service provider with a large number of developmentally disabled clients. (*Id.*; Tr. II at 84:5–12.)

59. As a community provider, Tresco serves clients who live in their own individual apartments and homes, not group homes or large institutional facilities. (Tr. II at 107:8–20, 132:19–23.)

60. Thus, unlike a centralized institutional facility like a nursing home, Tresco does not actually administer medications to its clients. Instead, it assists clients by ordering their medications for them and making sure they have the correct medications in their homes. (*Id.* at 84:5–85:11.)

61. Maureen Gant was a Program Support Manager at Tresco prior to and following PharMerica's acquisition of the pharmacy business. (*Id.* at 81:9–25.)

62. When PharMerica was managing Tresco's account, Ms. Gant was aware of service problems including issues with late deliveries and deliveries at off hours (e.g., weekends) when Tresco was not open. (*Id.* at 105:20–106:5, 108:7–109:10.)

63. Tresco also struggled to adapt to PharMerica's new computer system. (*Id.* at 111:20–23.)

64. Though Ms. Gant had concerns about PharMerica's quality control processes, she "thought PharMerica tried to work with us and we tried to work with them." (*Id.* at 105:4–7.)

65. In Ms. Gant's opinion, PharMerica made efforts to address these issues, but "resolution never occurred." (*Id.* at 114:11–18.)

66. According to Ms. Gant, Tresco's CEO, Pam Lillibridge, terminated Tresco's account with PharMerica at some point after a meeting with Tresco staff during which Ms. Gant and others expressed their concerns about PharMerica's service. (*Id.* at 116:25–117:5.)

67. Mr. Huntingford believed that another customer account assumed by PharMerica, Coyote Canyon, was having issues receiving necessary medications after the transition from PharmaCare to PharMerica, so he discussed these issues with PharMerica staff. (Tr. I. at 109:25–115:17.)

68. During Ms. Carbajal's tenure as a consulting pharmacist for PharMerica, various customer account concerns regarding billing, delivery, and medical records were brought to her attention. (*Id.* at 15:9–24.)

69. Some of these concerns involved accounts that did not terminate their contracts with PharMerica prior to the anniversary, but whose clients had "freedom of choice" to pick their pharmacy provider and saw a decline in clients choosing to use PharMerica after the transition. (*Id.* at 18:1–13.)

70. When issues were brought to her attention, Ms. Carabajal would set up meetings with PharMerica staff and relay those concerns. (*Id.* at 18:16–25.)

71. The billing, customer service, and delivery issues Ms. Carabajal raised with PharMerica staff were not always resolved. (*Id.* at 19:1–17.)

72. In response to concerns about high prices and billing, PharMerica staff would "attempt to make corrections on the bills[,]" but sometimes couldn't make changes because certain changes could only be made at the corporate level. (*Id.* at 33:22–34:4, 51:8–10.)

73. Ms. Carabajal raised billing and delivery issues pertaining to many of the Assumed Contract accounts with PharMerica staff. (*Id.* at 36:1–45:13, 50:10–23.)

74. Following PharMerica's acquisition of the business and prior to the two-year anniversary of the closing, six of the Assumed Contracts terminated their accounts with PharMerica (in addition to the 21 accounts that apparently terminated prior to February 1, 2014). (Pl.'s Ex. E; Def.'s Ex. 7.)

75. The six accounts that terminated their contracts with PharMerica between February 2014 and October 2015 included: Alma Assisted Living, Coyote Canyon, MATS – County of Bernalillo, Ramah Care, Turquoise Lodge, and Tresco. (Pl.'s Ex. E; Def.'s Ex. 7.)

76. Of the customer accounts whose termination letters are in the record, none listed their reasons for ending their contracts with PharMerica in their termination letters. (Pl.'s Exs. H–K.)

77. Mr. Huntingford believes that these clients terminated their accounts based on service issues they experienced when PharMerica took over, and that PharMerica's failure to adequately service the Tresco, ARCA, and Coyote Canyon accounts were "constructive terminations" of those accounts by PharMerica. (Doc. 138 at 7.)

78. Mr. Huntingford asserts that PharMerica had a duty to perform on the Assumed Contracts, and that its failure to adequately service the accounts and address problems raised by customers was unreasonable. (*Id.* at 10.)

79. Mr. Huntingford believes that PharMerica decided that rather than devoting resources to addressing customer issues, it could refuse to address issues and force the customers themselves to terminate the accounts, in turn reducing or eliminating Mr. Huntingford's deferred payment. (*Id.*)

80. Mr. Huntingford asserts that if he had known that PharMerica would simply not service certain accounts, he would have sought a provision in the APA stating that any Assumed Contracts not serviced would be deducted from the Target Gross Threshold. (Tr. I at 66:2–11.)

Calculation of the Actual Gross Profit

81. PharMerica uses a customized IMB AS400 platform called LTC400 to maintain prescription accounting data and track day-to-day operations data entered by PharMerica employees. (Tr. II at 186:2–191:7.)

82. PharMerica uses the IBM Cognos software to "pull" data from the LTC400 and perform analytics and prepare such data for analysis. (*Id.*)

83. PharMerica uses a "customer relationship management software" called Sales Force to collect and store information about customer accounts. (*Id.* at 207:11–17.)

84. On January 2, 2016, Mr. Schaefer emailed Mr. Huntingford an initial Deferred Payment Statement (the Earn-out Summary). (Def.'s Exs. 4; 5.)

85. The Earn-out Summary stated that the Actual Gross Profit was $1,416,457.90—several hundred thousand dollars short of even the lowest threshold necessary to earn a deferred payment. (Def.'s Ex. 5.)

86. A PharMerica employee, Tyler Oaks, pulled the data used to create the Earn-out Summary using IBM Cognos and then manually input that data into spreadsheets. (Tr. II at 191:15–24.)

87. The Earn-out Summary also included a spreadsheet breaking down data for each individual customer account, including: revenues, average wholesale price of prescription medications, the wholesale acquisition cost of the medications, the total prescription counts, and the costs of goods sold for both generic and brand name medications. (Def.'s Ex. 5; Tr. I at 154:19–156:1; Tr. II at 198:19–201:12.)

88. The Earn-out Summary contained several errors:

    a. It included rebates for prescription medications as part of the profit calculation, even though the APA made clear that rebates should be excluded from the calculation of the Actual Gross Profit. (Tr. II at 209:9–18.) This error increased the Actual Gross Profit calculation, working in Mr. Huntingford's favor. (*Id.* at 209:19–24.)

    b. It did not include profit data for clinical and consulting services. (Tr. III at 9:11–10:13.)

    c. It listed Mr. Huntingford's potential deferred payment amount as $12.5 million. (Def.'s Ex. 5; Tr. II at 194:17–25.)

89. Mr. Schaefer testified that the creation of the Earn-out Summary was "a little bit careless[,]" because "we all assumed when we saw it that we were so far from the threshold of where there would be any contingent payment that perhaps it didn't need the level of scrutiny on the formatting that we probably should have given it." (Tr. II at 196:22–197:2.)

90. In response to these mistakes and omissions and Mr. Huntingford's request for additional information, PharMerica prepared two more versions of the spreadsheet that removed the rebates and added accounting data for consulting services. (Def.'s Exs. 6; 7.)

91. The final version of the spreadsheet (the Earn-out Reconciliation) (Def.'s Ex. 7; Pl.'s Ex. E) includes data that was also pulled from PharMerica's IBM platform using the Cognos software. (Tr. II at 207:2–10.)

92. Mr. Schaefer helped compile the data for the Earn-out Reconciliation and cross-referenced it against PharMerica's database of historical account information in Sales Force to ensure it wasn't missing any necessary accounts or data. (*Id.* at 207:5–208:1.)

93. The Earn-out Reconciliation was over-inclusive:

    a. It included profit data for accounts that Mr. Huntingford requested to be included on the earn-out statement, but which weren't listed as Assumed Contracts or Marketed Accounts in the APA (*id.* at 209:1–210:15);

    b. It also included two accounts that Mr. Schaefer traced to PharmaCare through Sales Force but were not listed in the APA or requested to be included by Mr. Huntingford. (*See* Tr. II at 211:18–20; Def.'s Ex. 7 at 4.)

94. The Earn-out Reconciliation shows that the minimum gross profit threshold necessary for Mr. Huntingford to receive any deferred payment was $1,832,416, and during the earn-out period

the business earned \$1,260,111, even including the profits from accounts not required per the APA. (Def.'s Ex. 7 at 4.)

95. The profits fell \$572,305 short of the Target Gross Threshold. (*Id.*)

96. Mr. Huntingford believes these calculations should be adjusted in various ways based on PharMerica's failure to adequately service the accounts. (*See* Doc. 138 at 13–14.) For example:

    a. He believes the Target Gross Threshold should be reduced based on various estimations of the profit that some accounts *would* have earned if they had not terminated their contracts (*see id.*);

    b. He believes he should be credited the full revenue generated from consulting services without any deduction of consulting costs (*see id.*);

    c. He extrapolates what he believes PharMerica *should* have earned in prescription revenue based on PharmaCare's revenue in the year prior to the sale and argues that amount should be added to his gross profit calculation (*see id.*).

Based on his estimations and new calculations, Mr. Huntingford believes that he is entitled to the full \$1,250,000 Deferred Payment. (*Id.* at 14–15.)

## LEGAL STANDARD

The APA dictates that Delaware law shall apply to any contractual disputes, and the parties have stipulated to the application of Delaware law to Mr. Huntingford's implied duty of good faith and fair dealing claim. (*See* Pl.'s Ex. A at 38; Doc. 121.)

## I. Legal Standard for Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the

plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citing *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *7 (Del. Ch. 1995)).

## II.     Legal Standard for Breach of the Implied Duty of Good Faith and Fair Dealing

Delaware law also recognizes an implied duty of good faith and fair dealing that "inheres in every contract." *Chamison v. HealthTrust Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd sub nom Healthtrust-Hosp. Co. v. Chamison*, 748 A.2d 407 (Del. 2000). Invocation of this implied covenant is, however, an "occasional necessity" that "should be [a] rare and fact-intensive exercise, governed solely by issues of compelling fairness." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quotation marks and citations omitted); *see also Nemec v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010).

The party asserting a breach of the implied duty of good faith and fair dealing must prove: (1) a contractual gap; and (2) "arbitrary or unreasonable conduct" that "prevent[s] the other party to the contract from receiving the fruits of the bargain." *Dunlap*, 878 A.2d at 441 (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985), construing Restatement § 205) (quotation marks omitted). "[P]arties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms. *Id.* (quoting *Breakaway Sols., Inc. v. Morgan Stanley & Co.*, No. Civ. A 19522, 2004 WL 1949300, at *12 (Dec. Ch. Aug. 27, 2004)). However, the existing terms of the contract control "such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document." *Id.* at 441–42 (internal quotation marks and citations omitted). "Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec*, 991 A.2d at 1126.

### A. The Contractual Gap Requirement

The Delaware Supreme Court has interpreted the "gap-filling" requirement quite narrowly, holding that the "implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (citing *Nemec*, 991 A.2d at 1128). "Rather, the covenant is a limited and extraordinary legal remedy. As such, the implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent' concerning the matter at hand." *Id.* (quotation marks and citations omitted). Even where the contract is silent, "[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" *Id.* (quoting *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015)).

### B. The Arbitrary and Unreasonable Conduct Requirement

The second requirement—that the party asserting a breach of the implied duty of good faith and fair dealing must prove "arbitrary or unreasonable conduct" that prevents him "from receiving the fruits of the bargain"—is less clearly defined. *See Dunlap*, 878 A.2d at 441 (quotation omitted). This prong implicates the element of "bad faith," and there is some disagreement in Delaware law over what conduct may be termed bad faith. As the Delaware Supreme Court explained in *Dunlap*, "the term 'good faith' has no set meaning, serving only to exclude a wide range of heterogeneous forms of bad faith." *Id.* (internal quotation marks and citations omitted).

In *Merrill v. Crothall-Am., Inc.*, the Delaware Supreme Court held that, in the context of a contract for at-will employment, "to constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute an aspect of fraud, deceit or misrepresentation." 606 A.2d 96, 101 (Del. 1992) (internal quotation marks and citation omitted). Subsequent lower court decisions have used this language to assert that "to prove bad faith a plaintiff must demonstrate that the defendant's conduct was motivated by a culpable mental state." *Se. Chester Cty. Refuse Auth. v. BFI Waste Servs. of Pa., LLC*, No. CV K14C-06-016 JJC, 2015 WL 3528260, at *6 (Del. Super. Ct. June 1, 2015) (relying on *Merrill* and its progeny to support that proposition); *see also TekTree, L.L.C. v. Borla Performance Indus., Inc.*, No. CIV.A. CPU4-12-00291, 2015 WL 759213, at *7 (Del. Com. Pl. Feb. 24, 2015) ("The Delaware Supreme Court has explicitly held that a claimant must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation in order to prove a breach of the implied covenant."); *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1234 (Del. Ch. 2000) (same) (internal citations omitted).

The Tenth Circuit, however, has rejected the argument that the Delaware Supreme Court would apply its narrow holding involving employment contracts in *Merrill* to require a showing of fraud, deceit, or misrepresentation to prove a violation of the implied duty of good faith and fair dealing in all contexts. *See O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1195 (10th Cir. 2004) (applying Delaware law). In *O'Tool,* the Tenth Circuit conducted a survey of Delaware law and concluded that the Delaware high court would likely "instead adopt and apply a broader definition of 'bad faith'" more in line with the Restatement (Second) of Contracts, which states that it is impossible to catalogue all types of bad faith, but bad faith "may include 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse

of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'" *Id.* at 1202 (citing Restatement (Second) of Contracts § 205 cmt. d).

### III. Relevant Caselaw

In *Oxbow Carbon*, one of the Delaware Supreme Court's most recent decisions on the implied duty of good faith and fair dealing, the court found no contractual gap (and thus no need to invoke the implied duty of good faith and fair dealing to fill any gap) regarding certain shareholder and investor rights. 202 A.3d 482 at 507. There, "the parties' sloppiness and failure to consider the implications of [allowing certain investors to become LLC members] did not equate to a contractual gap." *Id.* at 505. The court reasoned that although the manner in which the LLC issued the investments was "hardly a model of good corporate governance, the [plaintiffs] were highly sophisticated entities with three Board members who were capable of reading the LLC Agreement and bargaining for the rights they now seek through litigation." *Id.* The court went on to hold that mistakes about the *implications* of certain bargained-for provisions did not equate to a contractual gap. "[E]ven if the record lacked an explanation for the parties' failure to focus on this issue, the [lower court's] use of that failure to generate a gap would still be incorrect[;] . . . whatever mistake the parties subjectively made about the implications of [agreed upon contractual provisions] does not operate to create a contractual gap." *Id.* at 506.

The Tenth Circuit in *O'Tool*, on the other hand, found contractual gaps in a case similar to Mr. Huntingford's that involved a business sale and disputed earn-out provision. 387 F.3d at 1195. In that case, plaintiffs sold their small boat manufacturing company to defendant Genmar, "the world's largest recreational boat manufacturer[,]" which took on plaintiffs' company as a new subsidiary. *Id.* at 1191. The sales contract included a closing payment and an opportunity to earn a future deferred payment if boats manufactured by plaintiffs' subsidiary company earned a certain

profit within the first five years following the sale. *Id.* Genmar retained the plaintiffs as employees of the subsidiary. *Id.* However, after the sale, Genmar immediately made numerous corporate changes that left plaintiffs' subsidiary struggling to turn a profit. *Id.* at 1192.

The Tenth Circuit explained that "the overarching theme of the breach of implied covenant theory asserted by [plaintiffs] is that [Genmar's] entire course of conduct frustrated and impaired [their] realization of the Earn–Out provided in the parties' agreement." *Id.* at 1195 (internal quotation marks and citations omitted). The evidence plaintiffs offered to back up this claim included various business decisions by Genmar that impacted the subsidiary's profits, including changing the brand name of plaintiffs' boats, shifting production priorities to Genmar's own boat models immediately after the sale, discontinuing production of some of plaintiffs' products, and shutting down one of the facilities it purchased from plaintiffs. *See id.* at 1195–96. Genmar argued that each of those decisions was expressly provided for under the contract, and thus there were no gaps to fill using the implied covenant of good faith and fair dealing. *See id.* at 1195. The Tenth Circuit took up each of the disputed business decisions in turn, and found that each one was *not* expressly provided for in the contract, and that "[t]he obvious spirit of [the earn-out payment provision] was that plaintiff, as president of [the subsidiary], would be given a fair opportunity to operate the company in such a fashion as to maximize the earn-out consideration available under the agreement." *Id.* at 1197.

Having determined that there were indeed contractual gaps to be filled, the Tenth Circuit next addressed the bad faith requirement, as Genmar had moved for judgment as a matter of law on the ground that there was not enough evidence that Genmar actually intended to harm plaintiffs. *Id.* The Court held that "ample evidence was presented that defendants had ulterior motives for acquiring [the company], including the desire to remove a potentially significant competitor from

the market and the desire to obtain a facility in the 'southern' market dedicated primarily to the production of [its own] boats." *Id.* at 1194–95. The Tenth Circuit agreed with the trial court's finding that:

> [C]opious evidence was presented at trial demonstrating that defendants acted with . . . "dishonest purpose" or "furtive design." . . . [T]he evidence was sufficient to support the conclusion that defendants believed (but were ultimately incorrect) that they could still turn a profit through the production of Ranger and Crestliner boats at Genmar Kansas while simultaneously preventing [plaintiff] from realizing any earn-out by stifling the production of Horizon boats and reimbursing Genmar Kansas only at standard cost for the production of other boats.

*Id.* at 1197 (citations omitted). "After carefully reviewing the trial transcript," the Tenth Circuit concluded that "the district court's summary of the evidence [was] accurate and sufficient to rebut [Genmar's] assertion that there was no evidence [it] intended to harm plaintiffs." *Id.*

## CONCLUSIONS OF LAW

I. **Mr. Huntingford has failed to prove that PharMerica breached express terms of the APA.**

1. The Asset Purchase Agreement is a valid and enforceable contract.

2. PharMerica "assume[d] and agree[d] to perform all of the obligations of Assignor arising or accruing under the Assumed Contracts . . . ." (*See* Pl.'s Ex. A-D at 1.)

3. Mr. Huntingford argues that PharMerica "breached this contractual obligation by failing to provide any service whatsoever" to the 21 accounts listed as terminated prior to February 1, 2014. (Doc. 138 at 15.)

4. The Court accepts that the language of the APA describes an obligation that PharMerica assumed to provide services to all the accounts listed as Assumed Contracts in the APA.

5. However, Mr. Huntingford has not presented a preponderance of evidence to prove the remaining two elements necessary for a successful breach of contract claim: (1) that

PharMerica actually failed to provide any service to those 21 accounts; and (2) that Mr. Huntingford was harmed by the alleged breach.

6.  Ms. Carabajal's testimony that she believed PharMerica "dropped" consulting-only accounts and failed to service them after assuming the contracts is based only on a vague statement she attributes to a PharMerica employee and her own assertion that she started a business to provide consulting services in March 2014, an assertion that is not corroborated by any other evidence nor tied to any specific accounts listed in the APA.

7.  Further, Ms. Carabajal's testimony does not fully support the claim that PharMerica breached its obligations to service all 21 accounts listed as terminated prior to February 1, 2014, because not all of those 21 accounts were consulting-only contracts.

8.  The extent of Mr. Huntingford's evidence to support his claim that PharMerica "dropped" all 21 accounts is his own speculation and Ms. Carabajal's speculation that PharMerica stopped servicing consulting-only accounts.

9.  PharMerica's recordkeeping regarding these 21 accounts was sloppy, and PharMerica did not produce any evidence beyond Mr. Schaefer's testimony to rebut Mr. Huntingford's claim and show that those accounts terminated their contracts for some reason other than PharMerica's refusal to provide service. But Mr. Huntingford bears the burden of producing evidence to prove PharMerica's actions were a breach of contract, and he has not met that burden.

10. In addition to not presenting sufficient evidence to prove that PharMerica actually breached the APA by not performing its obligations under some of the Assumed Contracts, Mr. Huntingford has presented no evidence to show that he was damaged by such a breach if it occurred at all.

11. Mr. Huntingford argues only that, due to PharMerica's breach, he is entitled to damages in the form of the full $1,250,000 deferred payment because he had a reasonable expectation of earning that payment when he entered into the contract. (*See id.* at 15–16.)

12. Mr. Huntingford has not argued that the amount of revenue generated by the 21 "dropped" accounts would have brought the Actual Gross Profit up to the Target Gross Threshold, or that reducing the Target Gross Threshold by the average profits of those 21 accounts would have resulted in Mr. Huntingford earning a deferred payment. Nor does any evidence in the record indicate that this is so.

13. To the contrary, the Earn-out Reconciliation shows Mr. Huntingford fell $572,305 short of earning any deferred payment, and Mr. Huntingford testified that the annual profits of the consulting-only contracts that were terminated prior to February 2014 only totaled approximately $20,000.

14. Thus, Mr. Huntingford has not brought forward a preponderance of the evidence to show that PharMerica actually breached any assumed obligations under the APA or that he was damaged by any such breach.

15. The Court rejects Mr. Huntingford's breach of contract claim and finds in favor of PharMerica on this issue.

## II. Mr. Huntingford has failed to prove that PharMerica breached its implied duty of good faith and fair dealing.

As described in the following conclusions of law, the Court is not entirely convinced that there is a contractual gap in the APA that justifies invoking the duty of good faith and fair dealing at all. But, even assuming that a contractual gap exists, Mr. Huntingford has failed to carry his burden of proof to show that PharMerica's conduct amounted to bad faith that deprived him of the benefits of his bargain:

16. Under Delaware Law, the covenant of good faith and fair dealing should be invoked to imply a contractual term only "when the contract is truly silent concerning the matter at hand." *Oxbow Carbon*, 202 A.3d at 507 (citations and quotation marks omitted).

17. Even where the contract is silent, "[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties," *see id.*, and the Court should be very cautious about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.

18. The APA explicitly contemplates that some customers might terminate their accounts, providing that a termination by the *customer* would remove that account's profit from the overall profit calculation while the Target Gross Threshold for a deferred payment would remain the same.

19. The APA also explicitly contemplates that PharMerica might terminate some accounts, providing that termination by *PharMerica* would remove that account's profit from the overall profit calculation *and* reduce the Target Gross Threshold for a deferred payment.

20. The APA is silent, however, as to the quality or level of service PharMerica would be required to provide the accounts it assumed and did not terminate.

21. The APA also does not contemplate whether PharMerica's purposeful mismanagement of accounts leading to their termination or PharMerica's decision to stop servicing accounts would amount to a constructive termination and thus reduce the Target Gross Threshold.

22. Mr. Huntingford agreed to the Deferred Payment Clause on the reasonable assumption that PharMerica was equipped to service all the accounts it chose to assume, and that it would either adequately service those accounts or terminate them.

23. Still, the Court finds it likely that the Deferred Payment Clause could have been drafted to address concerns regarding the level of service PharMerica would provide.

24. Mr. Huntingford's situation is arguably similar to *Oxbow Carbon*, in which sophisticated parties, represented by counsel, bargained for a contractual provision and the plaintiffs were simply mistaken about the implications of that provision, which they later sought to change through litigation. *See* 202 A.3d at 507.

25. At the same time, Mr. Huntingford was not necessarily mistaken about the *implications* of the APA provision dictating that customer-initiated terminations would not reduce the Target Gross Threshold. Rather, he was mistaken about how much revenue the Assumed Contracts would earn following the sale and what level of service PharMerica would provide to those accounts.

26. As the contract in *O'Tool* was silent regarding certain business decisions that negatively impacted the plaintiffs' ability to earn a deferred payment, the APA was arguably silent regarding PharMerica's alleged business decision to not service certain accounts or service certain accounts poorly rather than affirmatively terminating those accounts and reducing the Target Gross Threshold. *See* 387 F.3d at 1197.

27. Thus, though the existence of a contractual gap in this case is far from obvious, the Court will assume for purposes of argument that a contractual gap exists and that the obvious spirit of the bargain was that PharMerica would make reasonable efforts to service the Assumed Contracts and Mr. Huntingford would have a fair opportunity to earn a deferred payment.

28. Even if a contractual gap exists, however, a party may be liable for breaching its implied duty of good faith and fair dealing only if it engages in "arbitrary or unreasonable conduct" that

"prevents the other party to the contract from receiving the fruits of the bargain." *Dunlap*, 878 A.2d at 441.

29. Such conduct equates to "bad faith," which may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *O'Tool*, 387 F.3d at 1195 (citing Restatement (Second) of Contracts § 205 cmt. d).

30. Mr. Huntingford was represented by counsel and his broker during the APA drafting process and reviewed up to ten drafts of the contract, and there is no evidence that PharMerica abused its power to set unfair terms in the Deferred Payment Clause.

31. Evidence of the various issues that Tresco, ARCA, and Coyote Canyon experienced with PharMerica's service does not prove that PharMerica acted in bad faith, because the evidence also shows that PharMerica *attempted* to resolve most issues brought to its attention by Mr. Huntingford, Ms. Carabajal, and Ms. Gant.

32. The evidence does not show that PharMerica's response to customer complaints and issues, though it was often slow and unsuccessful, was a "willful rendering of imperfect performance" or otherwise lacked reasonable diligence. *See id.*

33. Mr. Huntingford has not presented evidence beyond his own and Ms. Carabajal's speculations to prove that PharMerica refused to service the 21 accounts that are listed as terminating before February 1, 2014. (*See* Conclusions of Law 5–8, *supra*.)

34. And, even if PharMerica *had* acted in bad faith and "dropped" those accounts, Mr. Huntingford has not shown that he would have earned a deferred payment even if PharMerica had acted in good faith to affirmatively terminate all 21 accounts and subtract their revenues from the Target Gross Threshold. (*See* Conclusions of Law 12–13, *supra*.)

35. The evidence presented simply does not justify using this "limited and extraordinary legal remedy" to recalculate the Actual Gross Profit based on what Mr. Huntingford believed and hoped it would be. *See Oxbow*, 202 A.3d at 507.

36. Though the Court is sympathetic to Mr. Huntingford's frustration at the issues with PharMerica's service and its careless attitude in preparing the Deferred Payment Statement, the Court finds that PharMerica's service and accounting issues, as laid out at trial, do not rise to the level of arbitrary or unreasonable conduct.

37. Thus, Mr. Huntingford has not met his burden to show, by a preponderance of the evidence, that PharMerica acted in bad faith to deprive him of the opportunity to earn a deferred payment.

      **THEREFORE**,

      **IT IS ORDERED** that the Clerk of Court shall enter judgment in favor of Defendant and against Plaintiff's claims for relief based on breach of contract and the implied duty of good faith and fair dealing.

_____

**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**